UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION
CASE NO. 22-cv-81576-CANNON

VPR BRANDS, LP,

                Plaintiff,                    FORT PIERCE, FLORIDA
        vs.
                                              DECEMBER 8, 2022
SHENZHEN WEIBOLI TECHNOLOGY CO.,
LTD. (ELF BAR), YLSN DISTRIBUTION             PAGES 1 - 209
LLC, ECTO WORLD LLC, SAFA GOODS LLC
D&A DISTRIBUTION LLC, UNISHOW
(U.S.A.), INC., SV3 LLC, AND
KINGDOM VAPOR, INC.,

                Defendants.
_____/

          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
           BEFORE THE HONORABLE AILEEN M. CANNON
                UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFFS:        JOEL B. ROTHMAN, ESQ.
                           LAYLA NGUYEN, ESQ.
                           MARION QUINTERO, ESQ.
                           SRIPLAW, P.A.
                           21301 Powerline Road, St. 100
                           Boca Raton, Florida  33433


FOR THE DEFENDANTS:        ERIC HEYER, ESQ.
                           KRUPA PATEL, ESQ.
                           MICHELLE LI, ESQ.
                           CARRIE SHUFFLEBARGER, ESQ.
                           ANNA STRESSENGER, ESQ.
                           Thompson Hine
                           1919 M Street NW, Suite 700
                           Washington, D.C.  20036
                           TUCKER CROWLEY MOTTA, ESQ.
                           McDowell Hetherington, LLP
                           2385 NW Executive Center Dr., Suite 400
                           Boca Raton, Florida  33433

```
REPORTED BY:          DIANE M. MILLER, RMR, CRR, CRC
                      Official Court Reporter
                      United States District Court
                      101 South U.S. Highway 1
                      Fort Pierce, FL  34950
                      (772)467-2337
                      diane_miller@flsd.uscourts.gov
```

**I-N-D-E-X**

**WITNESS:**                                              **PAGE**

**BRYAN HAYNES**

    Direct Examination by Mr. Heyer              13

    Cross-Examination by Mr. Rothman             42

    Redirect Examination                         52

**HAITHAM SHRITEH**

    Direct Examination by Mr. Heyer              54

    Cross-Examination by Mr. Rothman             73

**JON GLAUSER**

    Direct Examination by Mr. Heyer              85

    Cross-Examination by Mr. Rothman            104

    Redirect Examination by Mr. Heyer           122

**KEVIN FRIJA**

    Examination by The Court                    125

    Direct Examination by Mr. Rothman           127

    Cross-examination by Mr. Heyer              129

Thursday, December 1st, 2022

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Good morning, please call the case, and

3   you may be seated.

4          Deputy.

5          THE CLERK:  Court case number 22-cv-81576-Cannon, VPR

6   Brands LP versus Shenzhen Weiboli Technology Company, Ltd.,

7   et al.

8          Counsel, please state your appearances, starting with

9   the Plaintiff.

10          MR. ROTHMAN:  Joel Rothman of SRIPLAW, along with my

11   associates Layla Nguyen and Marion Quintero [phonetic] for the

12   Plaintiff, VPR Brands Limited Partnership, and the CEO of VPR

13   Brands, Kevin Frija, is also here in the courtroom.

14          Good morning, Your Honor.

15          THE COURT:  Good morning, nice to see you in person.

16          MR. ROTHMAN:  Thank you.

17          MR. HEYER:  Good morning, Your Honor.  Eric Heyer

18   from Thompson Hine on behalf of all of the Defendants.  With me

19   is Carrie Shufflebarger, Anna Stressenger, Michelle Li and

20   local counsel, Tucker Motta, from McDowell Hetherington.

21          THE COURT:  Excellent, good morning.

22          All right.  We are here, of course, as a continuation

23   of the hearing we began on the 18th of November.  This is

24   Plaintiff's motion for a preliminary injunction, we heard the

25   testimony of one witness called by Plaintiff, during that

1    hearing, but it became evident that we needed to take

2    additional evidence and that more time was required, so I

3    appreciate everybody's appearance today and quick preparation

4    for today's hearing.

5            I have looked at the hearing plan that was submitted.

6    I believe we have one witness testifying by Zoom, if necessary.

7    I would like to start off this morning with any preliminary

8    procedural matters either side wishes to raise.

9            Let me turn first to Mr. Rothman.

10           MR. ROTHMAN:  Thank you, Your Honor.  We have a few

11   stipulations, I think, that we have worked out and some

12   suggestions on how to address some of the Defendants' concerns

13   about confidentiality in a way that doesn't restrict Your

14   Honor's ability to maintain the courtroom as open.

15           So I would prefer it if Counsel for the Defendants --

16   we have been discussing this and if they can raise these issues

17   and if I need to make a comment, I'll do so.

18           THE COURT:  All right.  Other than the

19   confidentiality piece, any other procedural matters on any

20   other motions?

21           MR. ROTHMAN:  There is -- when we left the hearing

22   last time, Your Honor, the issue of judicial notice as to a

23   trademark search was still open, that's one of the stipulations

24   that we have agreed to that we wanted to put on the record.  We

25   didn't have time to reduce it to writing, so we thought we

1     could just simply stipulate to it in open court, so it's really

2     those two issues.

3              As far as the Plaintiff is concerned in terms of

4     moving forward with the case, we put some time on for the

5     hearing plan, but it's really more earmarked to rebuttal.

6              I do have some additional exhibits, but they are

7     exhibits that I anticipate I can probably put in through the

8     witnesses that the Defendant is going to call or if Your Honor

9     would permit me, during a short rebuttal with Counsel being

10    allowed to cross-examine, I'll put my client on at the end.

11             THE COURT:  Thank you, I figured that was the case.

12             Let me hear from Defense Counsel on these two

13    matters.

14             MS. SHUFFLEBARGER:  Yes, Your Honor.  First I'll

15    start on the second request for judicial notice that we had

16    submitted at docket 33, and you indicated you would give us

17    another opportunity to elicit some foundation on that.

18             I submitted something earlier this week with

19    Mr. Ebling testifying by Zoom for the limited purpose of

20    authenticating that.  Yesterday Mr. Rothman advised us that he

21    would stipulate to that being entered for the sole purpose that

22    we indicated we wanted to use it, specifically in response to

23    their statements on the intent factor, so if Your Honor is okay

24    with that stipulation, I don't believe that Mr. Ebling will

25    need to testify by Zoom, if that's acceptable.

```
 1          THE COURT:  Yes, it is, I think, tentatively.  I just
 2   want a more precise articulation of this intent related purpose
 3   you just mentioned, so what exactly is the purpose that you are
 4   agreeing to Mr. Rothman?
 5          MR. ROTHMAN:  As I understand it, the trademark
 6   search is being offered to rebut statements that my client made
 7   in his declaration relating to the Defendants' intent to cause
 8   confusion, and for that limited purpose, we don't object to
 9   Your Honor's consideration of the trademark search that they
10   are offering, and I think that's it really.
11          THE COURT:  Okay, thank you.
12          Anything to add?
13          MS. SHUFFLEBARGER:  No, Your Honor, Mr. Rothman
14   captured it well.  We are offering it solely for the purpose of
15   showing that our client did not adopt this particular brand
16   actually with any knowledge or intent to trade up on the
17   goodwill of their mark here in the United States, because our
18   client has a broad portfolio worldwide and that was the only
19   purpose for which we were offering it.
20          THE COURT:  All right.  In light of that stipulation
21   and the parties' agreement on the purpose for which the content
22   will be used, I'll grant Defendants' second motion for judicial
23   notice, which is docket entry 33.
24          MS. SHUFFLEBARGER:  That's also Defendants'
25   Exhibit 7, Your Honor.
```

```
1              THE COURT:  Okay, all right.  So now let's turn to
2    the confidentiality issues.
3              MR. HEYER:  Yes, Your Honor.  The way we intend to
4    proceed here, I have provided to Mr. Rothman, consistent with
5    Your Honor's order, under an agreement that he would treat it
6    as attorney's eyes only here, two exhibits and I marked them
7    temporarily as D21 and D22, which are financial information
8    from the two Defendants that are going to have corporate
9    representatives testifying here today about their sales of the
10   accused ELF products and their profit margins and their
11   profits.
12             What I would intend to do -- well, Mr. Rothman
13   doesn't have any objection, to my understanding, to those
14   exhibits being filed under seal, and so what I would intend to
15   do, assuming Your Honor would require this, is lay a foundation
16   through the questioning of those two fact witnesses as to why
17   they would effectively consider this to be trade secret and
18   highly confidential and propriety information that would be
19   competitively harmful to them if publicly disclosed and ask
20   them about the exhibits without actually stating any numbers on
21   the record, but moving in the exhibits and requesting that they
22   be sealed and then the numbers are there, they are in the
23   record, Your Honor has them, opposing Counsel has them, but
24   there is not any public transcript.  We don't have to seal the
25   courtroom about any specific testimony about the numbers, but
```

```
 1    they are in the record in a way that preserves the confidential
 2    information and the trade secret nature of the information that
 3    they are concerned about, so that's kind of it and I think
 4    Mr. Rothman agrees that's where we are at.
 5              MR. ROTHMAN:  Your Honor, I'm very, very conscious
 6    and concerned as always about coming into court and asking the
 7    Court to issue an order that would create a prior restraint on
 8    speech.  I think we have a situation here though and unlike our
 9    Zoom hearing last -- two weeks ago, there is no members of the
10    public here, right?
11              My client does agree to keep this information
12    confidential, we actually will stipulate, without the need for
13    testimony, that the information in these two exhibits is
14    entitled to be sealed, and I think that as long as the
15    Defendants are comfortable that there is no one here who is
16    going to go out and report it in the press, I think it would be
17    helpful that we be able to discuss the numbers in the courtroom
18    because there may be, at some point in the hearing, discussions
19    about, you know, how much bond should be set and why, and I
20    think that these numbers in these two exhibits, as I understand
21    it, go to that issue.
22              THE COURT:  Is that the only issue that they are
23    relevant to, the bond amount if one is entered?
24              MR. ROTHMAN:  I think Counsel should speak to that.
25              THE COURT:  Okay.
```

1          MR. HEYER:  They are, Your Honor.  They show -- they

2     also show the time period during which our client sold these

3     products, but we are going to elicit that orally, so the

4     exhibits aren't necessary to show the time period of when they

5     started selling the products.  It is implicitly part of the

6     exhibit, but it is not -- we don't need the exhibit for that

7     purpose, if that makes sense.

8          THE COURT:  Okay, all right.  Well, I don't typically

9     seal information described as sales, profits or profit margins,

10    I consider that information to be obviously business

11    information.  I can understand why your client doesn't want it

12    to be public, but I don't believe it rises to the level of

13    material that warrants sealing to overcome the strong

14    presumption in favor of public openness, so I'm really not

15    inclined to seal that information.

16         I also am unclear as to how it could rise to the

17    level of trade secret.  I know you have made that sort of

18    characterization, so for now, I'll table the issue.

19         If you want to elicit the testimony through your

20    witness to establish that it is, in fact, a trade secret within

21    the sort of fairly limited nature of that definition, then I

22    will entertain it, but I do want to inform both parties that as

23    a general matter, information in those categories would not

24    warrant sealing in this Court's estimation, so we will leave it

25    at that.

1          At this point, the hearing is public, I have not

2     sealed anything.  This matter, as it progresses, will

3     invariably touch upon information that is commercial in nature

4     and we are not going to run this proceeding with sealing

5     requests peppered throughout the case.  So anyway, that is the

6     ruling, at this point, but Mr. Heyer, if you wish to call your

7     witness to establish your view about the particular contents of

8     that information, you are welcome to do so.

9          MR. HEYER:  Yeah, we will attempt, Your Honor.  Just

10    if I can draw Your Honor's attention, we do have a couple of

11    district court citations that I believe have sealed such

12    exhibits in this sort of context.  One is -- and I'll just give

13    them to Your Honor -- *Teledyne Instruments, Inc. versus Cairns*,

14    C-A-I-R-N-S, 2013 U.S. District Lexis 1508477, it is a Middle

15    District of Florida case from 2013.

16         And I believe there is also one from the Northern

17    District of Georgia, it's *Chemence*, C-H-E-M-E-N-C-E -- it is

18    MRD, I'm not sure what it stands for -- *MRD Products versus*

19    *Medline Industries*, 2015 U.S. District Lexis 2958, Northern

20    District of Georgia from 2015 as well.

21         Thank you, Your Honor.

22         THE COURT:  I'll take a look at those cases.

23         Like I said, general commercial information that you

24    do not wish to be public, including categories such as sales,

25    profits and profit margins, really typically are not sealed in

```
 1   my civil docket.

 2           Things that are much more sensitive, such as personal

 3   identifying information of private clients unrelated to the

 4   case or other things that would generate a particularized

 5   safety concern or other concerning issue, I would be more open

 6   to, but this, as you have described it so far, I don't believe

 7   warrants overcoming that strong presumption, as I said earlier,

 8   so with that, let's get started.

 9           Mr. Rothman, so you are not going to start the day

10   off with Mr. Frija, is that correct?

11           MR. ROTHMAN:  No.  With Your Honor's permission, I

12   think we can move to the Defendants.  Like I said, the only

13   other submissions we have are items that I think we can get in

14   through either the Defendants' witnesses, so for expediency, we

15   can just move ahead.  If I need to call Mr. Frija for rebuttal,

16   and Your Honor permits it, then we will do that.

17           THE COURT:  Okay, great.

18           Then Mr. Heyer, please call your first witness.

19           MR. HEYER:  Your Honor, one other preliminary matter.

20   As Your Honor will recall, I was trying to show on the video

21   camera Mr. Frija an actual physical exhibit.  We brought that

22   with us and marked it with an exhibit sticker on the bottom as

23   D19 and I believe that's stipulated that it can be entered into

24   evidence.

25           MR. ROTHMAN:  We have no objection.
```

```
 1              MR. HEYER:  If I can approach, Your Honor, the court
 2    security officer.
 3              THE COURT:  You may.  Defense 19 is admitted without
 4    objection.
 5         (Evidence admitted as Defense Exhibit No. D19.)
 6              THE COURT:  Just one small housekeeping matter,
 7    please remember that our court reporter is working hard to take
 8    down every word we all say, so let's be mindful of that and
 9    speak as slowly and clearly as we can.
10              All right, Mr. Heyer, please call your first witness.
11              MR. HEYER:  Your Honor, Defendants call Mr. Bryan
12    Haynes.
13              Your Honor, if I could approach with exhibit binders
14    for Your Honor and the witness.
15              THE COURT:  Yes.
16              MR. HEYER:  Thank you.
17              THE COURT:  All right.  If you could stand up one
18    more time before you are seated to be sworn in.
19              THE COURTROOM DEPUTY:  Please raise your right hand.
20                BRYAN HAYNES, DEFENSE WITNESS, SWORN
21              THE COURTROOM DEPUTY:  Please have a seat and state
22    your first and last name for the record.
23              THE WITNESS:  My name is Bryan Haynes.
24              MR. HEYER:  Does Your Honor have a preference if I do
25    this from the podium or from the table?
```

```
 1              THE COURT:  You can pick whatever suits you best.
 2              MR. HEYER:  Okay.  I'll try the podium and I'll try
 3    to speak slowly.
 4                         DIRECT EXAMINATION
 5    BY MR. HEYER:
 6    Q   Mr. Haynes, please introduce yourself to the Court.
 7    A   My name is Bryan Haynes, I'm an attorney.
 8    Q   Where do you work, Mr. Haynes?
 9    A   I'm a partner at Troutman Pepper Hamilton & Sanders, LLP.
10    Q   Okay.  How long have you been a partner there?
11    A   I became a partner January 1st, 2007.
12    Q   Could you explain your educational background and the
13    degrees that you have received, if any.
14    A   I can.  I received a bachelor of arts degree in 1993 from
15    Virginia Tech, I received my law degree in 1998 from George
16    Mason University School of Law.
17    Q   In what jurisdictions, if any, are you admitted to practice
18    law?
19    A   I'm admitted to practice in Virginia and the District of
20    Colombia.
21    Q   And for how long have you been practicing law?
22    A   I was admitted to the bar in 1998, that was during my
23    clerkship, and I started in private practice in 1999.
24    Q   Did there come a time when you started performing legal
25    work for clients in the tobacco and/or nicotine industries?
```

```
 1   A    There did.  That was in 2003, when I joined -- very shortly
 2   after I joined what is my current law firm.
 3   Q    And without getting into the specifics that could be
 4   covered by attorney-client privilege of any particular matter,
 5   could you give the Court a general description of the types of
 6   matters you have handled for clients in that industry.
 7   A    It really covers the full range of regulatory issues as
 8   they pertain to tobacco and nicotine companies.
 9        The principal focus is Food and Drug Administration
10   requirements, but also tobacco tax and licensing requirements,
11   and then the various other marketing restrictions and the like
12   that apply to tobacco companies.
13   Q    To drill down a little bit now, do you have any experience
14   representing clients in the electronic cigarette industry
15   specifically?
16   A    I do.  We first started representing clients in the
17   electronic cigarette industry in roughly the 2009 timeframe,
18   when they started to gain popularity.  At that time, FDA did
19   not have formal jurisdiction over these companies.
20        At some point, it became clear FDA was going to
21   acquire jurisdiction over e-cigarette companies and we were
22   involved at the time in explaining to our clients what these
23   regulations would look like, the advocacy around the proposed
24   regulations and then once the regulations were issued, helping
25   companies comply.
```

```
 1    Q    Could you turn, in the exhibit binder in front of you, sir,
 2    to Defendants' Exhibit 11 and let me know when you have gotten
 3    there.
 4    A    I have it.
 5    Q    Could you identify what is found in Defendants' Exhibit 11?
 6    A    I can.  Exhibit 11 is my law firm biography.
 7         (Evidence identified as Defense Exhibit No. 11.)
 8    BY MR. HEYER:
 9    Q    And behind that, is there a list of your sample recent
10    speaking engagements and publications?
11    A    Yes, Exhibit 11 contains a list -- a sample list of
12    speaking engagements and publications.
13    Q    Have you ever --
14              MR. HEYER:  Your Honor, I move the admission of
15    Defendants' Exhibit 11.
16              THE COURT:  Any objection?
17              MR. ROTHMAN:  No objection.
18              THE COURT:  Defense 11 is admitted without objection.
19         (Evidence admitted as Defense Exhibit No. 11.)
20    BY MR. HEYER:
21    Q    Mr. Haynes, have you ever written on the topic of
22    regulation of electronic cigarettes by FDA?
23    A    I have.
24    Q    Can you give some examples of where your writings have been
25    published.
```

1   A   We maintain a blog, thetobaccologblog.com, that's existed

2   for, I want to say roughly ten years.

3           In addition to our blog, we regularly publish in

4   various other publications, including things like Law360, Vapor

5   Voice, industry magazines, things like that.

6   Q   Okay.  And have you ever spoken or given presentations on

7   the topic of electronic cigarettes by FDA?

8   A   I have many times.

9   Q   Can you give some examples of the forums in which you have

10  given presentations and spoken.

11  A   I can.  So I'm a member of food and drug -- well, my law

12  firm is a member of the Food and Drug Law Institute, which is

13  an association dedicated to FDA regulatory issues.  I

14  frequently speak at Food and Drug Law Institute conferences.

15          We also participate in TMA, which some people

16  understand to refer to Tobacco Merchants Association, I

17  frequently speak at those conferences, and then also various

18  industry trade shows, things like that.

19  Q   And are you a member of any professional associations,

20  boards or advisory committees that deal with the topic of the

21  regulation of electronic cigarettes by FDA?

22  A   I am.  As I mentioned earlier, we are members of the Food

23  and Drug Law Institute, TMA.  With respect to the Food and Drug

24  Law Institute, I served for many years on the tobacco and

25  nicotine -- I think it is called committee, and I currently

1   serve on the enforcement conference committee.

2   Q    And have you been provided any expert reports in any other

3   litigation matters dealing with regulation of tobacco products

4   by FDA?

5   A    I have twice.

6   Q    Okay.  Has your experience included representing clients in

7   the electronic cigarette industry that are subject or

8   potentially subject to FDA enforcement activity?

9   A    It has.

10  Q    Again, without getting into the specifics that may be

11  covered by privilege, can you give some examples of the types

12  of enforcement activities that, in your experience, you have

13  seen FDA take against companies in this space.

14  A    Sure.  It can range from relatively mundane things like

15  establishment inspections, I consider that to be an enforcement

16  activity; two, things like warning letters, which are a more

17  common way for FDA to signal that they have an issue with a

18  particular company's conduct; and then I have seen more

19  aggressive enforcement actions that involve the Department of

20  Justice.

21  Q    Are you familiar with the requirement for premarket

22  authorization under section 910 of the Food, Drug and Cosmetic

23  Act?

24  A    I am.

25  Q    Could you briefly explain what that is to the Court.

```
 1   A    Sure.  So the food, drug and -- in 2009, the Food, Drug and
 2   Cosmetic Act was amended to give FDA regulatory authority over
 3   tobacco products.  FDA has those requirements -- there are a
 4   number of requirements on tobacco companies.  One of those
 5   requirements is the need to obtain FDA authorization for any
 6   so-called new tobacco product that will be sold in the United
 7   States.
 8   Q    Based on your experience, what is a new tobacco product?
 9   A    A new tobacco product is actually defined under the law, so
10   there is a definition of a tobacco product and then a new
11   tobacco product is any product that was not sold in the United
12   States as of February 15th, 2007 or that's been changed in any
13   way since then.
14   Q    Is there terminology that FDA has used for products that
15   were commercially marketed in the United States prior to
16   February 15th, 2007?
17   A    They are called -- they were called, until very recently,
18   grandfathered products.  FDA has recently changed the term to
19   preexisting tobacco products.
20   Q    Based on your experience, what parameters does FDA use to
21   determine what is a tobacco product itself?
22   A    There is a definition of a tobacco product in what I'll, in
23   my shorthand, refer to as the Tobacco Control Act, those
24   amendments I mentioned earlier.
25            The definition of a tobacco product, and I'm
```

1   paraphrasing here, is any product that's made or derived from

2   tobacco, including nicotine from any source, and intended for

3   human consumption, including components and parts of those

4   products.

5   Q   So focus on that last part that you just said, would a

6   vaporizer that does not contain nicotine or any other

7   substance, would that be a component?

8   A   Potentially.  In the regulations, FDA has defined what

9   components or parts are.  A product is the, quote, unquote,

10  tobacco product component.  It doesn't need to contain tobacco

11  or tobacco derivatives, but so long as it is intended or

12  reasonably expected to be used with the consumption of a

13  tobacco product, it is considered a tobacco product component

14  or part; and therefore, a tobacco product itself.

15  Q   That reasonably expected to be used language that you just

16  used, can you explain that a little bit more.

17  A   I can.  In the regulations -- and you will hear more about

18  this.  In the deeming regulations, FDA sought to specifically

19  define components and parts and they indicated in the

20  commentary around those regulations that they chose the

21  language they used, intended or reasonably expected,

22  effectively to insure that companies that marketed products

23  that did not contain tobacco, but were, in fact, used to

24  consume tobacco could not avoid regulation.

25  Q   You referenced the deeming rule, could you explain exactly

1   what that is.

2   A    I can.  So as I mentioned, in 2009, FDA was given authority

3   over tobacco products, but the initial authority that Congress

4   gave it was only over a defined category of products,

5   cigarettes, smokeless tobacco, and roll your own, but Congress

6   also gave FDA authority to deem all other tobacco products as

7   defined by the law as subject to its jurisdiction.  FDA did so

8   in 2016.

9           THE COURT:  Has the FDA, in an enforcement action

10  thus far, actually concluded that a vaporizer that does not

11  itself contain any nicotine could qualify as a new product or

12  the term you used earlier?

13          THE WITNESS:  It has.  It has sent a number of

14  warning letters to companies that market vaporizers that do not

15  contain any nicotine at all.

16          THE COURT:  And other than -- I understand the

17  warning letter, but has there been sort of an ultimate

18  disposition in an enforcement proceeding where it has been sort

19  of determined by the FDA enforcement arm that, in fact,

20  qualifies under the regulatory definition?

21          THE WITNESS:  I'll respond in two ways, Your Honor.

22  I regard a warning letter as a determination by FDA's

23  enforcement arm that this is a regulated tobacco product.

24          I will also mention to you that this issue was

25  addressed in prior litigation involving challenges to the

```
 1   deeming regulations, it is called the Nicopure case out the

 2   D.C. District Court, and in that case, the Plaintiff, Nicopure,

 3   asserted that FDA could not assert jurisdiction over these

 4   products that don't have nicotine at all.  And I'm paraphrasing

 5   here, but the district court basically found that FDA's

 6   regulation on this point, the one that I mentioned earlier

 7   about intended or reasonably expected, was a permissible

 8   construction of the statute; and therefore, FDA had authority

 9   over these products even if they don't have nicotine so long as

10   their intended or expected use is with nicotine.

11           THE COURT:  And so that case you were just talking

12   about, that's an enforcement proceeding that resulted in a

13   federal court action to review the FDA's determination

14   vis-a-vis that particular target, is that correct?

15           THE WITNESS:  Nicopure, Your Honor, was not an

16   enforcement proceeding, it was a challenge to the regulations

17   themselves.

18           THE COURT:  So if another company in the marketplace

19   thinks that one of its competitors, you know, didn't comply

20   with this premarket authorization requirement, can they go and

21   just file a private lawsuit in federal court somewhere?

22           THE WITNESS:  I don't believe so, Your Honor.  I

23   believe that there is case law to the effect that there is not

24   a private right of action to enforce the Food, Drug and

25   Cosmetic Act.
```

```
 1              THE COURT:  All right.  Please continue.
 2   BY MR. HEYER:
 3   Q   Are you familiar with the concept of deferred enforcement
 4   when it comes to FDA regulation of electronic cigarettes?
 5   A   I am.  In a variety of contexts, FDA has made
 6   pronouncements through guidance that it will not enforce
 7   aspects of the law as written as it pertains to certain
 8   requirements or categories of products.
 9   Q   Okay.  And with respect to the premarket authorization
10   requirement, what, if anything, will FDA extend as far as
11   enforcement discretion?
12   A   So when the deeming regulations became effective in August
13   of 2016, there is a whole slew of products that were suddenly
14   subject to regulation.
15              We talked earlier about this premarket authorization
16   requirement and a very large number of products, if you
17   interpreted that requirement literally, would be immediately
18   unlawful.  So what FDA decided to do was to, when the deeming
19   regulations were promulgated, adopt a deferred enforcement
20   policy for e-cigarettes and other products such that -- should
21   I elaborate on what the policy was?
22   Q   That would be my next question, so go ahead.
23   A   Such that if a product was on the U.S. market by the
24   effective date of the deeming regulations, August 8, 2016, the
25   product could stay on the market so long as the supplier sought
```

Thursday, December 1st, 2022

1    marketing authorization from FDA by a specified date.

2              At the time, that was -- I think it was August of

3    2018.  The product could stay on the market so long as the

4    supplier filed and then it could stay on the market during some

5    period of time while FDA considered the application.

6    Q   Did that date of 2018, was that ultimately moved to a later

7    date?

8    A   It was.  It moved different times, which made life

9    interesting as a regulatory lawyer, but in 2017, the FDA

10   commissioner extended the deadline, at least for electronic

11   cigarette products, to 2022.

12   Q   Okay.  And was it ultimately later advanced because of

13   litigation around the deadline?

14   A   It was.  A number of organizations challenged Commissioner

15   Gottlieb's decision in federal court, and a federal judge

16   issued an order that moved up the deadline to what at the time

17   was May of 2020; that was ultimately extended to September 9,

18   2020 due to the pandemic.

19   Q   And I want to ask you about a couple of pathways to get

20   marketing authorization.  Could you explain what a premarket

21   tobacco application or PMTA is and what a substantial

22   equivalence application is?

23   A   Sure.  There are effectively three pathways for tobacco

24   products to obtain FDA marketing authorization.  The PMTA,

25   premarket tobacco application, is the presumptive pathway;

1    however, suppliers have a couple of options to seek

2    authorization through other pathways, either substantial

3    equivalence or exemption from substantial equivalence.

4            The latter two effectively require a comparison

5    between your new product and one of these grandfathered

6    products that I have described earlier, and proving to the

7    agency that whatever differences there are between those

8    products, they do not, quote, unquote, raise different

9    questions of public health.

10   Q   Based on your extensive knowledge and experience with the

11   industry, for electronic cigarettes particularly, was the

12   substantial equivalence or substantial equivalence exception

13   pathway possible for most electronic cigarette products?

14   A   Generally not.  Certainly none have been authorized through

15   those pathways, I am not aware of anybody that has even filed

16   through those pathways.

17           And the issue, as I mentioned earlier, is you have

18   got to compare your product to one of these so-called

19   grandfathered products as it existed back in 2007.  To the

20   extent these e-cigarettes were on the market in 2007, those

21   products are very different from the products that exist today;

22   relatively simple, low nicotine delivery, not a wide selection

23   of flavors.  I'm not even sure that open systems, for example,

24   existed back then, so I guess I would be highly skeptical that

25   somebody could get one of these products through, for example,

1   the substantial equivalence pathway.

2   Q    All right.  If one wanted to file a substantial equivalence

3   application or report for an electronic cigarette product in

4   order to keep their product on the market under deferred

5   enforcement discretion, to be entitled to that, would that

6   product have had to be on the market prior to August 8, 2016?

7   A    Yes.  As I mentioned earlier, this whole deferred

8   enforcement policy was dependent on you having your product in

9   the market by August 8, 2016, and if you were to file a request

10   for marketing authorization under whatever pathway, including

11   substantial equivalence, that request would have had to have

12   been filed by September 9th, 2020.

13   Q    Is that the same answer for a PMTA, that in order to be

14   entitled to deferred enforcement discretion, the product had to

15   be -- the electronic cigarette product had to be commercially

16   marketed before August 8, 2016 and the PMTA submitted by

17   September 9th, 2020?

18   A    That's correct.  The enforcement policy is independent of

19   whatever pathway the supplier chose.

20   Q    Now, you referenced a minute ago an open system electronic

21   cigarette.  Could you explain the difference between an open

22   system electronic cigarette and a closed system cigarette

23   electronic cigarette?

24   A    I can.  A closed system contains this consumable, like the

25   nicotine liquid, either that or it's designed for use with

```
 1   cartridges containing the consumable that's sold by the
 2   supplier.
 3          An open system would not contain any nicotine or
 4   liquid at all and allows the consumer to choose what they want
 5   to put in it.
 6   Q   And you referenced a cartridge, is there a difference
 7   between a cartridge based electronic cigarette, based on what
 8   FDA has historically done, and a disposable electronic
 9   cigarette?
10   A   There is.  I kind of liken it to a razor blade, just like
11   you have disposable razors, as well as razors that are designed
12   to be used, you know, with replaceable cartridges, it is
13   basically the same concept with a disposable e-cigarette.
14          Once the consumable that is in there is depleted, the
15   consumer disposes of it.  The cartridge based ones, the
16   consumer, once the cartridge is depleted, they would replace it
17   with a new cartridge, periodically charging the battery along
18   the way.
19   Q   Mr. Haynes, could you turn to Exhibit D2 in the binder.
20   This is already in evidence by stipulation, and I'll ask you if
21   you could explain generally the significance of this FDA
22   guidance for industry.
23   A   I have Exhibit 2 and I'm familiar with it.
24          As I mentioned earlier, FDA had an enforcement policy
25   around premarket authorization requirements when the deeming
```

```
 1   regulations were promulgated.  At some point, late 2019 to
 2   early 2020, FDA decided that that should change.
 3           What FDA decided to do was to subject a defined
 4   category of electronic cigarettes to immediate enforcement
 5   action if they did not have marketing authorization, which none
 6   of them did at the time.
 7           And so if you had a cartridge based -- cartridge or
 8   pod based electronic cigarette that offered flavors in anything
 9   other than tobacco or menthol, those products were subject to
10   immediate enforcement action unless and until FDA issued
11   marketing authorization.
12           The end result was this defined category of cartridge
13   based products in flavors, other than tobacco and menthol, that
14   had to come off the market immediately.
15   Q   Were there any exceptions to that change for disposable
16   electronic cigarettes that would be flavored?
17   A   There were.  In a footnote, FDA specifically said that
18   disposable products were not subject to this modified
19   enforcement policy, so they remained subject to the default
20   rules, the default enforcement policy that I mentioned earlier.
21   Q   Circling back to the topic of a PMTA, a premarket tobacco
22   application, just to give the Court an idea, can you give a
23   general estimate or sense, based on your experience, of the
24   cost of preparing a robust PMTA for an electronic cigarette.
25   A   In my experience, to prepare a robust PMTA, one that
```

1   adheres to FDA guidance regulations in the Tobacco Control Act,

2   performing all the studies that FDA seems to want, somewhere

3   between five and up to 10 million dollars per product.

4           THE COURT:  So if you were not commercially marketing

5   your product as of that date of August 2016, and it is an open

6   system that doesn't itself contain nicotine, what do you do if

7   you want to sell it in the United States?

8           THE WITNESS:  If that open system is a, quote,

9   unquote, tobacco product as I talked about earlier, you need to

10  first seek and obtain FDA authorization, as I mentioned, likely

11  through the PMTA pathway.

12          THE COURT:  All right.  Please continue.

13  BY MR. HEYER:

14  Q   In your experience, does FDA require premarket

15  authorization for electronic cigarette components even if they

16  are sold alone without any e-liquid or other nicotine

17  containing substance?

18  A   Absolutely.  If this is a component as mentioned in your

19  question, then it is by definition considered a tobacco product

20  that is subject to FDA authority.

21  Q   Would that be the case for batteries for electronic

22  cigarettes sold alone?

23  A   That is correct.  The deeming regulation specifically

24  mentions a battery as being a, quote, unquote, component.

25  Q   How, in your experience, does FDA determine whether a

1    vaporizer is considered to be a tobacco product or not?

2    A    I'm going to assume, for purposes of this question, that

3    the vaporizer does not actually have tobacco or nicotine in it,

4    so then that goes to the question of whether the vaporizer is

5    considered a component or part.

6              As I mentioned before, the definition of a tobacco

7    product includes components or parts.  When FDA issued the

8    deeming regulations, it defined components or parts, and the

9    definition -- I'm paraphrasing here -- is any software or

10   assembly of materials, basically anything that is either

11   intended or reasonably expected to be used with the consumption

12   of a tobacco product or that can affect a tobacco product's

13   performance or characteristics.

14   Q    I apologize if this is repetitive of the Court's question,

15   but in your experience, has FDA taken enforcement action

16   against open system cigarettes in the past?

17   A    It has.

18   Q    If you can turn, please, sir, to Defendant's Exhibit 5 in

19   the binder in front of you, and I'll ask you if you recognize

20   that document.

21   A    I do recognize Exhibit 5.  It is a warning letter that FDA

22   issued in April of 2020 to a company named E-Cig, LLC.

23   Q    And this is already in evidence.  Based on your -- let me

24   ask you this:  Based on the contents of this warning letter,

25   have you reached any conclusions as to whether FDA itself had

 1   concluded that the product at issue was a tobacco product?

 2   A    The FDA concluded that the subject products, both of which

 3   are open systems, are FDA regulated tobacco products.

 4   Q    And typically in a warning letter that the FDA issues, what

 5   is FDA looking for the recipient of the warning letter to do in

 6   your experience?

 7   A    FDA is telling the recipient that we believe we regulate

 8   you and we believe you are not in compliance, please tell us

 9   why you think you are in compliance or implement corrective

10   action.

11   Q    All right.  And turning to Defendants' Exhibit 6, do you

12   recognize --

13            THE COURT:  Before you proceed, so when you refer to

14   corrective action in the case of a company like this E-Cig,

15   what does that mean at the end of the day; stop selling?

16            THE WITNESS:  In this particular context, the only

17   corrective action that would be in compliance with the law

18   would be to stop selling, yes, Your Honor.

19            THE COURT:  And that's because you would have to go

20   through that lengthy and expensive process to obtain the

21   authorization, which you probably won't get, is that your view?

22            THE WITNESS:  I agree that they would first have to

23   go through the process; I agree that it is lengthy and

24   expensive.  It is possible, as evidenced by the fact that FDA

25   has issued marketing orders, but it is difficult.

1          THE COURT:  But there have been authorizations

2     granted to vaporizers, let's say, open system vaporizers that

3     don't itself contain nicotine.

4          THE WITNESS:  Not really.  I know a number of those

5     applications are pending.

6          I say not really because FDA has given authorizations

7     to cartridge based systems.  Part of those authorizations

8     included the actual device that's designed to be used with the

9     cartridge, the device itself does not contain nicotine.  So

10    literally, the FDA has given authorization to devices, but

11    those devices were specifically designed for use with

12    cartridges.

13    BY MR. HEYER:

14    Q   Mr. Haynes, if you look at Defendants' D1, this is, again,

15    already in evidence, but I'll ask if you recognize this as a

16    list of products, electronic cigarette products, for which FDA

17    has already given marketing authorization?

18    A   I see D1 and that appears to be a current list of products

19    that FDA has authorized under the PMTA pathway.

20    Q   And to your knowledge, if you have such knowledge, and if

21    you don't maybe a reasonable expectation, are there

22    applications for open system devices, electronic cigarettes,

23    pending still before FDA, PMTAs pending before FDA that have

24    not received a decision one way or the other?

25    A   I am aware of that, and yes, there are PMTAs that were

```
1    submitted by the September 9, 2020 deadline that have not

2    received final action from FDA.

3    Q   Okay.  Sir, if you look to Defendants' D6 in your binder,

4    I'll ask if you can -- again, this is already in evidence, I'll

5    ask if you are familiar with this warning letter.

6    A   I am.  This is a warning letter that was issued by FDA in

7    April of 2020 to Shenzhen Uwell Technology.

8              THE COURT:  I'm sorry, to go back for a minute,

9    Defendants' Exhibit 1, was that previously admitted?

10             MR. HEYER:  I think all of these were subject to

11   stipulation, if I'm correct.

12             MS. SHUFFLEBARGER:  Judicial notice.

13             MR. HEYER:  Judicial notice, I'm sorry.

14             THE COURT:  Defense 1, okay.

15             MR. HEYER:  This was the first request for judicial

16   notice, Your Honor.

17             THE COURT:  All right.  I think you were going back

18   to another exhibit.

19   BY MR. HEYER:

20   Q   D6, I think we are on.  In looking at the second page of

21   this warning letter to this company called Shenzhen Uwell

22   Technology dated April 27, 2020, I'm going to direct your

23   attention, Mr. Haynes, to the second page about halfway down.

24   Do you see the four bullet points there that are listing four

25   different products?
```

1    A    I do.

2    Q    I'm going to ask you about the latter three products.  Have

3    you had an opportunity to look into the design of the Uwell

4    Caliburn and pod kit, the Uwell Caliburn and Koko, K-O-K-O,

5    kit, and the Uwell Yearn, Y-E-A-R-N, pod system?

6    A    I have, I have looked at all three of those products

7    depicted on Uwell's website.

8    Q    And we will look at those websites in a second, but in

9    summary, are those open system electronic cigarettes to your

10   understanding?

11   A    They are.  They all offer the consumer the ability to

12   effectively take their own consumable and put it in the device.

13   Q    If I could have you turn to Defendants' Exhibit 16, sir,

14   and this is not in evidence yet, so I'll ask if you can

15   identify this.

16   A    Exhibit 16 is a printout from Uwell's website that I

17   mentioned I looked at earlier.

18        (Evidence identified as Defense Exhibit No. 16.)

19   BY MR. HEYER:

20   Q    And is this a fair and accurate printout of what you saw on

21   the website?

22   A    I believe it is.

23   Q    Okay.

24        MR. HEYER:  Your Honor, I move the admission of

25   Defendants' Exhibit 16.

```
 1                THE COURT:  Any objection?

 2                MR. ROTHMAN:  I don't have objection to authenticity.

 3     I don't think it is relevant, but I don't object to it based on

 4     authenticity.

 5                THE COURT:  And so your relevance objection is?

 6                MR. ROTHMAN:  This exhibit doesn't have anything to

 7     do with my client's product, nor did his testimony about the

 8     last two exhibits.  So I don't understand the relevance of it,

 9     but I'm trying to give opposing Counsel leeway to make his

10     record.

11                THE COURT:  Right.  So it's relevant, according to

12     Defendant, to establish its unlawful use defense, then it

13     arguably has some relevance.

14                MR. ROTHMAN:  I understand the unlawful use defense

15     as it relates to a different product --

16                THE COURT:  Right.

17                MR. ROTHMAN:  -- depicted in this exhibit.

18                THE COURT:  All right.  I understand that it is a bit

19     attenuated, but I think under the circumstances and the Court's

20     decision to permit Defendant to make a record on this legal

21     issue, I'll allow Exhibit D16 to be admitted over Plaintiff's

22     partial objection.

23         (Evidence admitted as Defense Exhibit No. 16.)

24     BY MR. HEYER:

25     Q   Mr. Haynes, do you understand Exhibit D16 to establish and
```

1    demonstrate the Uwell Caliburn product that was listed in

2    Exhibit D6, the warning letter?

3    A    I do.

4    Q    And does that show -- does Exhibit D16 show it is an open

5    system on the fourth page of that exhibit?

6    A    It does.  There are different pages that depict an empty

7    pod that is designed for the consumer to fill with their own

8    e-liquid.

9    Q    On the second page, does it indicate it's a refillable pod?

10   A    That's what I was specifically thinking of, the reference

11   to a refillable pod effectively, by definition, makes it an

12   open system.

13   Q    I'll have you look at Exhibit D17, and again, is this a

14   website that you visited?

15   A    It is.  It looks like this is another printout from the

16   Uwell website.

17        (Evidence identified as Defense Exhibit No. 17.)

18   BY MR. HEYER:

19   Q    Okay.  And is this a fair and accurate printout of what you

20   saw on the Uwell website for the Uwell Yearn electronic

21   cigarette product?

22   A    I believe it is.

23        MR. HEYER:  Your Honor, I move the admission of

24   Defendants' Exhibit 17.

25        MR. ROTHMAN:  No objection.

```
 1              THE COURT:  All right.  Defense 17 is admitted

 2   without objection.

 3         (Evidence admitted as Defense Exhibit No. 17.)

 4   BY MR. HEYER:

 5   Q   Mr. Haynes, do you have an understanding as to whether at

 6   least one of the versions of the Uwell Yearn is an open system

 7   version as opposed to a prefilled cartridge version?

 8   A   I do understand and from looking at the website, it looks

 9   like at least one of the versions that are depicted there is an

10   open system.  They offer two options for the consumer with that

11   product; one is a pod that consumers can evidently buy

12   prefilled, another is a pod that consumers can buy empty that's

13   designed to be refilled or filled -- I'm sorry, filled

14   initially by the consumer with a consumable liquid of their

15   choice.

16   Q   I'll have you turn to Defendants' Exhibit 18.

17              MR. HEYER:  Did I move in Exhibit 17?  I'm sorry, if

18   I haven't, I'll move --

19              THE COURT:  You did.

20              MR. HEYER:  I'm sorry.

21   BY MR. HEYER:

22   Q   Can I have you turn then to Defendants' Exhibit 18, and can

23   you describe what is Defendants' Exhibit 18?

24   A   Exhibit 18 looks like another printout from the Uwell

25   website depicting a different product.
```

1          (Evidence identified as Defense Exhibit No. 18.)

2     BY MR. HEYER:

3     Q    Is the product depicted the Caliburn and Koko product that

4     was described in Exhibit D6?

5     A    I believe it is.

6     Q    Okay.  Is this a fair and accurate printout of what you

7     found on the Uwell website about this product?

8     A    I believe it is.

9              MR. HEYER:  Your Honor, I move the admission of

10    Exhibit 18.

11             THE COURT:  Any objection?

12             MR. ROTHMAN:  No objection.

13             THE COURT:  Defense 18 is admitted without objection.

14         (Evidence admitted as Defense Exhibit No. 18.)

15    BY MR. HEYER:

16    Q    And does this website, and particularly on the second,

17    third and fourth pages, indicate whether this is an open system

18    electronic cigarette?

19    A    It does, and it indicates that it's an open system by

20    virtue of the reference on the third page, and I'm noting

21    specifically the words refillable pods.  That, by definition,

22    is an open system.

23    Q    And again, going back to Exhibit D6, the warning letter on

24    these products, was FDA taking enforcement action in your

25    estimation against these products because they lacked marketing

```
1    authorization under the Food, Drug and Cosmetic Act?

2    A    In my opinion, this was an enforcement action.  A warning

3    letter is, by definition, an enforcement action, and what FDA

4    says in the letter is that they are taking this action because

5    these products appear to be unauthorized new tobacco products.

6    Q    Are you familiar with the Plaintiff, VPR's, products that

7    are marketed under the term ELF?

8    A    I am, I'm aware of two of them.

9    Q    Can you describe the two products that you are aware of.

10   A    Both of the products are vaporizers that are designed for

11   use by consumers, evidently to include nicotine.

12   Q    And have you had an opportunity to form any opinions

13   regarding whether VPR's products marketed under the term ELF

14   are tobacco products?

15   A    I have.  Although the products do not themselves contain

16   ingredients that are made or derived from tobacco or nicotine,

17   it is my opinion that these products would be classified as

18   tobacco product components; and therefore, tobacco products

19   themselves because they are either -- they are both intended or

20   reasonably expected to be used with the consumption of a

21   tobacco product.

22   Q    Why do you say that they are intended or reasonably

23   expected, in your estimation, to be used with consumption of a

24   tobacco product?

25   A    I have two reasons for that.  One, VPR refers to these
```

1    products as e-cigarettes or electronic cigarettes.  In my

2    experience in the industry, you would not refer to a product as

3    an electronic cigarette if its intended use was not -- or at

4    least one of the intended uses was not with tobacco or

5    nicotine, I have just never heard that term used to refer to a

6    product that has a different intended use.

7            Second, I'm aware that VPR's principal has indicated

8    an expectation on behalf of VPR that these products will, in

9    fact, be used to consume nicotine, and that seems that directly

10   tracks the definition that I mentioned earlier that FDA put

11   into the deeming regulations.

12   Q   Have you formed any opinion as to whether VPR's products

13   marketed under the term ELF are compliant with FDA regulations

14   and enforcement policies?

15   A   I do have an opinion on that subject.  Assuming they are

16   tobacco products, as I believe they are, they would not be in

17   compliance with the requirements of the Tobacco Control Act,

18   most notably the premarket authorization requirement.

19           As I mentioned earlier, in order to avail yourself of

20   this compliance policy, a product had to be on the market by

21   August 8, 2016.  I understand these products were not sold in

22   the U.S. until 2017; therefore, they would have had to first

23   obtain authorization before selling these products.

24           I also understand that they have neither sought nor

25   obtained marketing authorization for these products from the

```
1    FDA.
2              THE COURT:  Let me ask you a few questions.  You
3    formulated your opinion, I take it by perhaps extrapolating how
4    the FDA has interacted via warning letters with other
5    companies?
6              THE WITNESS:  I think that's fair to say.  I cannot
7    tell you that I've seen a specific example just like this.
8              For example, I'm not aware of a circumstance where
9    somebody had testified and said, I expect that my consumers
10   will use this with tobacco or with nicotine, rather, inferring
11   that that is something that FDA, based on the definition, would
12   consider a tobacco product, but I have seen the question of
13   intended or reasonable use could depend on different factors.
14             THE COURT:  And that's, I think, inherently fact
15   specific, correct?
16             THE WITNESS:  It is, it is.  It's fact specific and
17   could depend on a variety of things, yes.
18             THE COURT:  All right.  You may continue.
19             MR. HEYER:  Okay.
20   BY MR. HEYER:
21   Q   Have you formed an opinion, Mr. Haynes, as to whether VPR
22   is marketing its ELF branded products in violation of the Food,
23   Drug and Cosmetic Act?
24   A   I have, and I believe these the two products we are talking
25   about are not lawfully marketed under the Tobacco Control Act,
```

1    again, because they were not introduced by August -- well,

2    first of all, they are new tobacco products because they were

3    not introduced as of February 15th, 2007; they did not

4    successfully avail themselves to the compliance policy because

5    the products were not introduced until 2017; and they have not

6    obtained marketing authorization as evidenced by FDA's public

7    list of products that have received marketing authorization.

8            MR. HEYER:  Thank you, Your Honor.

9            THE COURT:  All right, thank you.

10           Any cross-examination?

11           MR. ROTHMAN:  Yes, Your Honor, and I may need the

12   computer connection.

13           THE COURT:  All right.

14           MR. ROTHMAN:  Just to show the witness exhibits, if

15   that's okay.

16           THE COURT:  Yeah, that's fine.  It's 10:17, it may be

17   a good time to take a 15 minute break, so we will recess until

18   approximately 10:30.

19       (Recess was had at 10:17 a.m.; and the proceedings

20        resumed at 10:31 a.m.)

21           THE COURT:  You may be seated.

22           MR. ROTHMAN:  Your Honor, may I?

23           THE COURT:  Please proceed.

24           MR. ROTHMAN:  Thank you, Your Honor.

25

<u>CROSS-EXAMINATION</u>

BY MR. ROTHMAN:

Q   Mr. Haynes, good to see you again.  Remember, I took your deposition a couple of days ago?

A   I do.

Q   All right.  You used a term during your deposition and I asked you to define it, the term was ENDS, E-N-D-S, do you remember that?

A   I do.

        MR. ROTHMAN:  I'm not sure who that is, I hope it is not me.

        THE COURT:  I don't know why that's happening.

BY MR. ROTHMAN:

Q   ENDS, that was the term you used.  What does that stand for?

A   ENDS is an acronym that FDA and others use, and it stands for electronic nicotine delivery systems.

Q   Okay.  Do you remember I asked you questions about ENDS products, and you gave me answers about ENDS products during the deposition, do you remember having that back and forth with me?

A   I do recall that, sir.

Q   Okay.

        MR. ROTHMAN:  Your Honor, may I ask you please to show the witness Defendants' Exhibit, 19, I believe it was

1  handed up, it is the ELF product.

2  BY MR. ROTHMAN:

3  Q   Is that product, Defendants' Exhibit 19, is that an ENDS

4  product?

5  A   It appears to be.  I will tell you I am not terribly

6  familiar with this particular product, but I see that it has

7  the mandatory nicotine -- FDA nicotine warning on it, which

8  leads me to believe that it actually has nicotine and this

9  looks like a typical or one of a typical ENDS product.

10 Q   Okay.

11         THE COURT:  And ENDS, again, is electronic nicotine

12 delivery system?

13         THE WITNESS:  Yes, Your Honor.

14 BY MR. ROTHMAN:

15 Q   No electronic nicotine delivery system product has received

16 marketing authorization besides tobacco variance, isn't that

17 true?

18 A   Mostly.  As I mentioned in my testimony earlier, no

19 flavors, other than tobacco variants, have received

20 authorization.  Technically devices have that don't have any

21 consumable at all, so it would be a tobacco variant plus the

22 devices that they can be used with.

23 Q   And that ENDS product that you are holding there,

24 Defendants' 19, is a flavored product, right?

25 A   I cannot tell from looking at this what flavor this is.

```
 1   Q   Isn't that -- I'm sorry, doesn't that say cigar flavor?
 2   A   It says Cuba cigar.
 3   Q   Cuba cigar.
 4   A   And candidly, I don't know if FDA would consider this to be
 5   a tobacco variant or not.  A cigar is made of tobacco, so I
 6   don't know what FDA would consider this.
 7           I guess I typically would consider a cigar to be a
 8   tobacco variant, but I haven't tried this product, I haven't
 9   seen it before today.
10           MR. ROTHMAN:  I show the witness Plaintiff's Exhibit
11   22 for identification, please.
12           THE COURT:  Have you shown that to Mr. Heyer?
13           MR. ROTHMAN:  Yes.
14           THE COURT:  Okay, you may.
15   BY MR. ROTHMAN:
16   Q   Take a look at Plaintiff's Exhibit 22 for identification.
17   Is that the same ELFBAR brand product as Defendants'
18   Exhibit 19?
19   A   Yes, it appears to be the same, other than the flavor
20   variant.
21   Q   Okay.  What is the flavor variant there?
22   A   The flavor listed on this one is strawberry ice, which is
23   not a tobacco flavor.
24       (Evidence identified as Plaintiff's Exhibit No. 22.)
25
```

```
 1    BY MR. ROTHMAN:

 2    Q   Okay.  So since no flavored, including strawberry flavored

 3    products, have received authorization, the product that you are

 4    holding as Plaintiff's Exhibit 22 would be an unauthorized

 5    product.

 6            MR. HEYER:  Objection, Your Honor, relevance and

 7    beyond the scope.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  I don't believe that this product

10    that's depicted on Exhibit 22 has received FDA authorization

11    both because it does not appear on FDA's list of authorized

12    products and because FDA has not authorized any nontobacco

13    variants.

14    BY MR. ROTHMAN:

15    Q   Okay.  You testified earlier about enforcement action.  Her

16    Honor was asking you about enforcement action, and you

17    testified that you viewed warning letters, such as what's been

18    marked as D5 -- can you see it on the monitor?

19    A   I can.

20    Q   That you viewed warning letters to be a type of FDA

21    enforcement action, is that right?

22    A   That is correct.

23    Q   Okay.  What other types of FDA enforcement actions, beyond

24    warning letters, are there?  For example, could the FDA go into

25    court and seek an injunction?
```

```
1   A    Yes.   There are a variety of enforcement measures available

2   to the FDA under the Food, Drug and Cosmetic Act.   In my

3   experience, at least with tobacco products, warning letters are

4   by far the most common, but yes, they can go into court, the

5   FDA can go into court and seek an injunction, they can seek

6   fines, it can block the importation of products, it has an

7   array of remedies.

8            THE COURT:   Just to be clear, all of those things are

9   things the FDA would do?

10           THE WITNESS:   Those are all things FDA can do.

11           THE COURT:   Not a court in a private suit, for

12   example.

13           THE WITNESS:   Correct.   As I mentioned earlier, Your

14   Honor, I do not believe that there is a private right of action

15   to enforce the Food, Drug and Cosmetic Act.   That is, as I

16   understand it, the sole province of FDA.

17   BY MR. ROTHMAN:

18   Q   And FDA could also, and has in certain situations,

19   especially in situations that pose dangers to health and

20   safety, gone to the Department of Justice and sought Department

21   of Justice assistance in prosecuting violators of the Food,

22   Drug and Cosmetic Act, isn't that true?

23   A    Yes.   I have heard of FDA working with the Department of

24   Justice to pursue more aggressive enforcement actions beyond

25   warning letters.
```

```
 1              As I understand it, the Department of Justice

 2    approached the companies at issue and sought a consent decree,

 3    otherwise the Department of Justice indicated that it would

 4    pursue the matter in court.

 5    Q   But sitting here today, with respect to either my client's

 6    product or the Defendants' product that you have there in

 7    Exhibit 22, there has been no such FDA enforcement action.

 8    A   All I can say is that I have not seen FDA enforcement

 9    actions.  I believe I checked -- warning letters are available

10    in a database on FDA's website.  I do not believe the VPR

11    products appear in the database of FDA warning letters.  I

12    cannot say for sure about FDA -- other FDA enforcement actions

13    against either company's products because those actions are not

14    typically made public.

15              The example I mentioned earlier of DOJ involvement,

16    if I recall correctly, was something that was shared with the

17    press and I learned about it that way, but the only thing that

18    is typically made public is a warning letter as is depicted on

19    Exhibit 5.

20    Q   Okay.  We looked at Exhibit 5, this is a warning letter

21    dated April 27th, 2020, correct?

22    A   That is correct.

23    Q   Now, the product that we saw the exhibit for that

24    corresponds to 25, is that this product in Defendants' Exhibit

25    16?  It's on the screen if you want to glance at it.
```

```
 1    A    I was just going back to look at Exhibit 6 to verify.

 2              Yes, that product depicted on Exhibit 16 is the same

 3    one that's depicted on Exhibit 6.

 4    Q    I'm sorry, Exhibit 6 or Exhibit 5, I want to make sure we

 5    match them up correctly?

 6    A    I believe it is 6 and 16.

 7    Q    Okay.  So let's go back and look at 6.

 8              Here is Exhibit 6, the Shenzhen Uwell Technology

 9    Company warning letter, and that's also April 27, 2020, right?

10    A    That is correct.

11    Q    That one matches to Defendants' 16, which is here, right?

12    A    That is correct.

13    Q    The date of this printout on the upper left-hand corner --

14    it's small, can you see it -- doesn't that say November 18,

15    2022?

16    A    It does.

17    Q    So this product that got an FDA warning letter two years

18    ago was still on the website in 2022 advertising it for sale,

19    correct?

20    A    It is definitely listed on -- it is depicted on the

21    website.  What I don't know one way or the other is whether

22    this product is actually sold in the U.S., I'm not saying it is

23    or isn't, I just don't know.

24    Q    Well, according to the lower left, it's at the URL

25    myuwell.com.  That's not a Chinese domain name or anything.
```

```
 1   A    That appears to be the case, yes.
 2   Q    And this Uwell product is actually advertised for use with,
 3   as we see on page two, e-juice, right?
 4   A    I see those words on that web page, yes.
 5   Q    And e-juice is commonly used as a term to refer to
 6   e-liquid, which is also a term that refers to liquid nicotine
 7   that is vaped in products like this.
 8   A    That would be my understanding.  If somebody uses the term
 9   e-juice or e-liquid, I would typically think that that product
10   contains nicotine.  I know other people refer to it more
11   generically.  What the intent was here, I do not know.
12   Q    And then going back to Exhibit 5, this warning letter from
13   April 27, 2020, that one corresponds to the products shown in
14   Exhibits 17 and 18, is that right?
15   A    I actually think that Exhibit 6 correlates to Exhibits 16,
16   17 and 18.
17   Q    All right.  Just as we saw before, these printouts were all
18   from -- I don't know -- the last two weeks indicating that
19   these products may, indeed, continue to be for sale, despite
20   having received warning letters two years ago, isn't that
21   correct?
22             MR. HEYER:  Objection, calls for speculation.
23             THE COURT:  I'll sustain as worded.  You can reframe
24   it.
25
```

```
 1   BY MR. ROTHMAN:

 2   Q   Doesn't this appear to indicate the products are still for

 3   sale in the United States, despite the fact that warning

 4   letters were sent concerning them two years ago?

 5   A   Again, I cannot tell for sure based on the simple fact that

 6   there is a website that is in English and available to people

 7   in the U.S. that these products are for sale in the U.S.  I'm

 8   not disputing that, I just do not know.  It is -- I guess you

 9   could say it is possible.

10   Q   Okay.  So it's possible that they received FDA warning

11   letters advising them to stop marketing the products in the

12   U.S., because FDA's jurisdiction is only the United States,

13   correct?

14   A   That is correct.

15   Q   But they left the websites up even though they are not

16   marketing and selling them in the U.S.?

17   A   That is possible.

18   Q   Possible, okay.  But you don't know one way or the other.

19   A   I do not.

20   Q   Okay, okay.  So now how many -- do you know how many

21   employees there are at FDA approximately today total?

22   A   I have no clue about the number of employees at FDA.  We

23   most directly engage with the FDA Center for Tobacco Products,

24   they have different centers that are responsible for different

25   products.
```

1              At the Center for Tobacco Products, I'm thinking it

2    is in the thousands.  I know I have heard that number, those

3    employees have a variety of responsibilities.

4    Q   That's fairly consistent with what I have heard, too, that

5    there are about 18,000 to 20,000 employees at FDA generally and

6    of that, there are about a thousand, maybe a few more than

7    that, at the Tobacco Center.

8    A   I believe it is significantly more than a thousand --

9    Q   Okay.

10   A   -- at the Tobacco Center, but I could be wrong.

11   Q   Do you have any idea how many products there are like the

12   ones we see in these exhibits for sale, marketed and

13   distributed in the U.S.?

14   A   I do not, but I believe it is a very large number.

15   Q   So FDA's authority is exclusive, too, isn't it in this

16   area?

17             As opposed to sharing it with state regulatory

18   authorities, isn't FDA preemption fairly extensive in this

19   area?

20   A   You sort of asked two different questions.  I mean, I

21   consider preemption a separate principle from coextensive

22   enforcement authority.

23             I mean, I will say this:  As I mentioned earlier, I

24   don't believe there is a private right of action to enforce the

25   FDA.  From time to time, you will see states and localities

```
 1    taking enforcement action vis-a-vis FDA requirements, I can
 2    think of discrete examples of that.
 3            I would not say that's the norm and so to answer your
 4    question, generally speaking, FDA is expected to enforce the
 5    laws it's been tasked with enforcing.
 6    Q   I just want to make sure so we have it, the deeming
 7    regulations that you referred to earlier, those are at
 8    21CFR1143.1, correct?
 9    A   I am not great on memorizing citations, but I do not
10    dispute that.
11    Q   Okay.  I'll just put it up on the screen, just so we are
12    clear, should the Court need to refer to it.  It's this
13    regulation that talks about here, Component or part means any
14    software, et cetera, that was one of the issues and there are
15    some other definitions in here that may be relevant.
16    A   Yes, that is the definition that I mentioned earlier.
17    Q   Okay.
18            MR. ROTHMAN:  No further questions.
19            THE COURT:  Any redirect?
20            MR. HEYER:  Just briefly, Your Honor.
21                          REDIRECT EXAMINATION
22    BY MR. HEYER:
23    Q   Mr. Haynes, in your experience, have you ever seen websites
24    in the English language advertising electronic cigarettes or
25    tobacco products that to your knowledge were not necessarily
```

1   marketed or sold in the United States?

2   A    I have.

3   Q    Okay.  And are you aware of whether electronic cigarettes

4   are marketed and sold in other English speaking countries, such

5   as United Kingdom, Australia and Canada?

6   A    I am aware that electronic cigarettes are marketed in

7   numerous English speaking countries.

8   Q    Are you -- have you ever attended or are you aware of any

9   presentations or explanations publically by FDA about the

10  different increasing enforcement steps that they typically take

11  in the case of noncompliance?

12  A    I have heard that -- from FDA on that.  As I mentioned

13  earlier, I attend the Food and Drug Law Institute conferences

14  and both the center director, who is in charge of the tobacco

15  at FDA, speaks at these things, as well as the head of the

16  office of compliance and enforcement and both of those people

17  routinely speak to those issues.

18  Q    In your experience, has FDA repeatedly described warning

19  letters as one step in the exculpatory enforcement actions that

20  they may take against noncompliant products?

21  A    That's exactly right.  That's typically the first step that

22  the target sees, is a warning letter and other steps follow

23  potentially.

24       MR. HEYER:  Thank you, Mr. Haynes.  No further

25  questions.

```
 1              THE COURT:  All right.  Thank you.

 2              Thank you very much, Mr. Haynes.  I found your

 3   testimony very helpful and clear, so thank you.

 4       (Witness excused)

 5              THE COURT:  All right.  Defense, please call your

 6   next witness.

 7              MR. HEYER:  Your Honor, Defense calls Haitham

 8   Shriteh.

 9              THE COURT:  Good morning, sir.

10              THE WITNESS:  Good morning, Your Honor.

11               HAITHAM SHRITEH , DEFENSE WITNESS, SWORN

12              THE COURTROOM DEPUTY:  Please have a seat and then

13   state and spell your first and last name for the record.

14              THE WITNESS:  My name is Haitham Shriteh,

15   H-A-I-T-H-A-M; last name, S-H-R-I-T-E-H.

16              MR. HEYER:  May I proceed, Your Honor?

17              THE COURT:  You may.

18                          DIRECT EXAMINATION

19   BY MR. HEYER:

20   Q    Mr. Shriteh, which Defendant are you affiliated with?

21   A    Safa Goods, S-A-F-A, Goods, G-O-O-D-S, LLC.

22   Q    And what is your title with Safa Goods?

23   A    Operations manager.

24   Q    Are you one of the owners of Safa Goods?

25   A    I am.
```

1    Q    Where is Safa Goods located?

2    A    Port Charlotte; Port Charlotte, Florida.

3    Q    And could you describe generally the nature of Safa Goods'

4    business.

5    A    Yes, we are a vapor and smoke shop distributor.

6    Q    Approximately how many employees does Safa Goods currently

7    have?

8    A    Over 40.

9    Q    And when was Safa Goods founded?

10   A    2018.

11   Q    Did you have any experience in the electronic cigarette

12   industry prior to founding Safa Goods in 2018?

13   A    Yes, through retail shops.

14   Q    And could you explain, for the Court's benefit, when you

15   first got involved at all in the electronic cigarette industry.

16   A    Sorry, one more time.

17   Q    Could you explain when you personally first got involved in

18   the electronic cigarette industry.

19   A    Yes.  So I started in about 2016, working for a different

20   company wholesale, operating multiple retail shops, and

21   following that, we entered distribution in 2018 through Safa

22   Goods, which I currently own.

23   Q    Okay.  So would it be fair to say that at this point, you

24   have over six years of experience in the electronic cigarette

25   industry?

```
 1    A    Yes, I do.

 2    Q    Okay.  Approximately how many different electronic

 3    cigarette products does Safa Goods sell?

 4    A    Over 1,000.

 5    Q    And can you explain to the Court here, to Her Honor,

 6    generally how the channels of distribution work for electronic

 7    cigarette products in your experience in the industry.

 8    A    So you generally have the manufacturer or the brand selling

 9    to master distributors, who sell to distributors, who then

10    would sell to stores.  Sometimes the master distributor

11    themself have some stores they sell to direct as well.

12    Q    And Mr. Shriteh, if you can go slowly for the court

13    reporter.

14    A    Sorry.

15    Q    I try, I have to catch myself, too.

16         And where does Safa Goods fit into that chain of

17    distribution?

18    A    It depends on the brand.  So some brands, we are the master

19    distributor; some brands, we are the distributor.  It depends

20    on negotiation with the brand and how we can operate.

21    Q    All right.  And not e-liquids sold in a bottle, but

22    electronic cigarette devices, let's say, where are most of

23    those manufactured in your experience?

24    A    In China.

25    Q    Okay.  Now, before you became aware of this lawsuit filed
```

1    by VPR, had you ever heard of any electronic cigarettes branded

2    as ELF?

3    A    No, I have not.

4    Q    Before this lawsuit was filed, had you ever heard of the

5    Plaintiff, VPR Brands?

6    A    No, I have not.

7    Q    Okay.  So even though you are based here in Florida and VPR

8    is based in Florida, you had never heard of them before, is

9    that right?

10   A    I have not heard of them before, no.

11   Q    Okay.  Did there come a time when Safa Goods started

12   distributing ELFBAR branded electronic cigarettes?

13   A    Yes.

14   Q    Okay.  When did that start?

15   A    December, we sampled it or tried it, but January is when we

16   actually started to sell the product.

17   Q    Of 2022, is that right?

18   A    January 2022.

19   Q    Okay.  And did there come a time, in your observation, when

20   ELFBAR branded electronic cigarettes started to become popular

21   with consumers?

22   A    Toward the spring of 2022.

23   Q    So the spring of this year?

24   A    Yes.

25   Q    And if you can, how would you rank the popularity of the

1    ELFBAR brand of electronic cigarettes, say in the State of

2    Florida today?

3    A    As far as I know, it is the number one product in the

4    market in Florida.

5    Q    So even though you sell, you said, over 1,000 products, the

6    ELFBAR brand is the post popular product in your estimation?

7    A    Yes.

8              THE COURT:  In what category?

9              THE WITNESS:  Disposable e-cigarette category.

10   BY MR. HEYER:

11   Q    Go ahead.

12   A    In the closed system category, if that's what you meant.

13   Q    Are there any other electronic cigarette products, apart

14   from the closed system or disposable categories, that you

15   estimate are more popular in the State of Florida today than

16   ELFBAR brand?

17   A    Can you repeat the question, sir.

18   Q    Apart from the disposable category or the closed system

19   category, is there any other brand of electronic cigarettes

20   that in your estimation is more popular that ELFBAR in the

21   State of Florida today?

22   A    More popular, no, I do not think so.

23   Q    Approximately how much of Safa Goods' overall sales do the

24   ELFBAR branded electronic cigarettes represent?

25             THE COURT:  I don't understand the question, apart

```
 1    from the disposable category or the closed system category, so

 2    what -- can you say that more directly so I can understand.

 3              MR. HEYER:  Yeah.

 4    BY MR. HEYER:

 5    Q   Taking all electronic cigarettes as a whole, Mr. Shriteh,

 6    is there any, in your estimation, any other brand of electronic

 7    cigarette in the State of Florida today more popular than the

 8    ELFBAR brand?

 9    A   As far as we know at Safa Goods, ELFBAR is number one

10    product in the market.

11              THE COURT:  All right.

12    BY MR. HEYER:

13    Q   Can you estimate, of Safa Goods' overall sales, how much of

14    those sales are represented by the ELFBAR brand of electronic

15    cigarettes?

16    A   Over 50 percent of our sales.

17    Q   Okay.  Have you had to hire any additional employees this

18    year to handle the demand for the ELFBAR brand of electronic

19    cigarettes?

20    A   Yes, about doubled.

21    Q   Okay.  Approximately how many employees have you had to

22    take on?

23    A   About you could say -- if I have to put a number, 19.

24    Q   Okay.

25              THE COURT:  Nineteen extra employees?
```

```
 1              THE WITNESS:  Yes, ma'am.
 2   BY MR. HEYER:
 3   Q   Now, as a result of being named as a -- Safa Goods being
 4   named as a Defendant in this lawsuit, are you familiar with VPR
 5   Brands' auto concealer ELF electronic cigarette?
 6   A   No.
 7   Q   Okay.
 8   A   If I could add to the previous question about the
 9   employees, and we are hiring more to keep up with ELFBAR.
10   Q   Okay.  So I think your testimony was you really started
11   selling the ELFBAR at any significant volume in January of this
12   year.
13   A   Yes.
14   Q   How would you describe the trajectory of sales, as it were,
15   of ELFBAR over the course of the year?
16   A   Rapidly growing.
17   Q   Right up to the present, is that the case?
18   A   Yes.
19   Q   In your position with Safa Goods, do you frequently attend
20   electronic cigarette industry trade shows?
21   A   Yes.
22   Q   Around the country?
23   A   Yes.
24   Q   Do you frequently visit vape shops and smoke shops?
25   A   I often do.
```

1   Q   Could you explain what a vape and smoke shop are.

2   A   A vape shop would be -- would sell different e-cigarette

3   products; you have the e-liquids, the hardware, the

4   electronics, disposables.

5           Smoke shops would be selling alternative vaporizers,

6   water pipes and so on, and you also have a mix of some stores

7   that do both vape shops and smoke shops.

8   Q   And do you --

9           THE COURT:  How many total brands do you distribute?

10          THE WITNESS:  A number off top of my head is hard, at

11  least 50 brands.

12  BY MR. HEYER:

13  Q   And in the course of your job responsibilities, do you

14  frequently visit convenience stores to see what electronic

15  cigarette products are being sold?

16  A   Yes.

17  Q   Okay.  How often do you visit the different retail outlets

18  that sell electronic cigarette products?

19  A   If I have to put a number, this year, I've visited 25 at

20  least.

21  Q   Okay.  And do you monitor online what other distributors

22  that are competitors of yours are selling in terms of

23  electronic cigarette products?

24  A   Yes, I do, on a weekly basis, actually; this is how we can

25  see how the market is going.

```
 1   Q   If you can estimate, how many of your competitor
 2   distributors' websites would you say you look at on a weekly
 3   basis?
 4   A   About ten.
 5   Q   Okay.  In all of the years you have been doing these
 6   activities, whether it's trade shows, physical retail outlets
 7   or online, have you ever seen an ELF branded product from VPR
 8   in any of those outlets as it were?
 9   A   No.
10   Q   Have any of your customers ever inquired about selling
11   VPR's ELF branded electronic cigarettes?
12   A   No.
13          THE COURT:  When did your sort of consumer research
14   really ramp up for this knowledge that you've acquired going to
15   these various locations?
16          THE WITNESS:  Can you repeat that question?
17          THE COURT:  Sure.  What I'm trying to understand,
18   what is the timeline for your general understanding of what is
19   being sold in these locations?  Is it something you have been
20   doing routinely over the last six years on a consistent basis
21   or --
22          THE WITNESS:  I understand.  So I came from retail
23   shops, that's how I got into the business, so I generally -- to
24   help Safa grow, I generally try to understand the market, so I
25   generally try my best to visit, as much as I can, vape shops in
```

```
 1  the area, wherever I go, California, Florida, any other

 2  different cities to understand the market better to be able to

 3  bring better products to the distribution chain.

 4          THE COURT:  And when would you have started that kind

 5  of on-the-ground research in a rigorous way?

 6          THE WITNESS:  Before I even entered the vape

 7  industry, ma'am.

 8          THE COURT:  Which would have been when?

 9          THE WITNESS:  2015.

10          THE COURT:  All right, thank you.

11  BY MR. HEYER:

12  Q   To your knowledge, has anyone in the electronic cigarette

13  industry, whether they are your customer or not, ever indicated

14  any confusion between the ELFBAR products like you sell and

15  VPR's ELF branded products?

16  A   I never had a customer even mention ELF as a brand besides

17  ELFBAR.

18  Q   Okay.  And speaking specifically about ELFBAR as a brand --

19  A   Yes.

20  Q   -- can you just explain if there is, to your -- your

21  understanding, a difference between disposable electronic

22  cigarettes and open system electronic cigarettes?

23  A   Yes.  You have the older system, the open system, which

24  included more parts, more maintenance, a little more technical

25  for the end user, and we have atomizers to refill the tank,
```

```
 1   e-liquids, sometimes batteries, different components to deal
 2   with, whereas the closed system is a more easy on-the-go
 3   product; less maintenance, very convenient for the end user,
 4   easy as opening the wrap and beginning to use.  Sometimes it is
 5   a prefilled pod, where you just have to add the pod to the
 6   hardware and that is it.
 7   Q   In taking open systems like you just described versus --
 8   and again, not specific to ELFBAR, but disposable electronic
 9   cigarettes more generally, which type would you say or
10   subcategory, as it were, is more popular with consumers right
11   now?
12   A   Disposable, the disposable category.
13   Q   For how long, if you could estimate, has that been the case
14   in your experience?
15   A   It began in 2018 --
16   Q   Okay.
17   A   -- from my experience.
18   Q   And historically, has Safa Goods almost always sold more
19   disposables than more open system electronic cigarettes?
20   A   Yes, it increased in the past two years, yes.
21   Q   What increased, if you can be specific?
22   A   The disposable category has become more popular in the past
23   two years.
24         THE COURT:  What does it means to be disposable; you
25   use it one time and then you throw it in the trash or what?
```

1    I'm not sure I understand what you mean exactly by disposable.

2            THE WITNESS:  So the word -- it's like the example

3    that was used earlier with the razor, it is a one time use

4    until it is done.  A disposable can be rechargeable or

5    nonrechargeable, based on its style, but you use it and throw

6    it away when it's done.

7            THE COURT:  So if you want to smoke one e-cigarette,

8    you buy one disposable?

9            THE WITNESS:  Yes.  At the end of the day, it is

10   about convenience.  So with the disposable, you use it until it

11   is -- until the e-liquid is out, and then you dispose of the

12   disposable afterward.

13           MR. HEYER:  Maybe I can clarify with a question.

14   BY MR. HEYER:

15   Q   Mr. Shriteh, is it fair to say that a disposable is never

16   refilled or refillable by the consumer versus an open system

17   being filled and refillable by the consumer with new and

18   different e-liquid?

19   A   Yes, it is a one time use.

20           THE COURT:  How many, I guess, uses of the disposable

21   cigarette are possible, is it something that lasts for a month

22   or so, depending on daily usage?  I'm just trying to understand

23   compared to a traditional cigarette in the old days how it

24   compares.

25           THE WITNESS:  So it all depends.  There is a set

```
1    amount of e-liquid inside the disposable and the battery

2    capacity, if you look at it like a cigarette, right, you have

3    20 cigarettes in a pack, you have somebody who can smoke all 20

4    in one day, you can have somebody who can smoke all the

5    milliliters in one day as well.  It depends on the end user and

6    it depends on the capacity of the liquid inside and the

7    battery.

8              THE COURT:  Okay, thank you.

9              THE WITNESS:  No problem.

10   BY MR. HEYER:

11   Q    Okay, Mr. Shriteh, I'm going to give you some questions

12   about some financial information for your company, and I'm

13   going to ask a few foundational questions first.

14             Do you have concerns about publishing to the general

15   public information on your profit margins on the sales of your

16   products?

17   A    Can you repeat that question.

18   Q    Do you have concerns about the public being aware, through

19   your testimony or through evidence in this case, the profit

20   margins from your sales of electronic cigarettes?

21   A    By our nature, we are in a competitive market.  If we have

22   competitors that are able to see our data, that could create

23   some extra problem for us in the future with competitors.

24   Q    Okay.  Do you keep your revenue and profit margin

25   information confidential within the company, on a need-to-know
```

1    basis for company employees?

2    A    Yes.

3    Q    Okay.  Is it fair to say you don't do any external

4    publishing of your revenues or your profits or profit margin

5    information?

6    A    Yes.

7    Q    Okay.  Would you consider these types of information to be

8    a trade secret of your company?

9    A    Yes.

10   Q    Okay.  Do you believe it would be harmful to your company's

11   competitive standing in the industry to have profits and profit

12   margin and revenue information publicly disclosed?

13   A    Yes.

14   Q    Okay.  I'm going to hand you what's been marked as

15   Defendants' Exhibit 21.

16          MR. HEYER:  If I can approach, Your Honor.  Let me

17   get Your Honor a copy.

18          THE COURT:  Does the witness have one, also?

19          THE WITNESS:  Yes.

20   BY MR. HEYER:    --

21   Q    Without referencing the specific numbers, can you explain

22   generally what Exhibit D21 is, Mr. Shriteh.

23   A    It is my revenue for ELFBAR sales and my gross profit.

24          (Evidence identified as Defense Exhibit No. 21.)

25

```
 1   BY MR. HEYER:
 2   Q   Was Exhibit 21 prepared by you based on your company's
 3   financial records that are created and maintained in the normal
 4   course of Safa Goods' practice?
 5   A   Yes.
 6   Q   Is it fair to say this is a compilation or summary of what
 7   those financial records show?
 8   A   Yes.
 9   Q   Okay.
10           MR. HEYER:  Your Honor, I would move the admission of
11   D21 and also move, for the reasons we stated previously, to
12   seal it, and I know what Your Honor said about that.
13           THE COURT:  Do I understand this is a document
14   limited to your ELFBAR sales?
15           THE WITNESS:  This is based on revenue of ELFBAR
16   sales, yes, ma'am.
17           THE COURT:  ELFBAR sales only, no other brand?
18           THE WITNESS:  ELFBAR, yes.
19           THE COURT:  During the period of 2022?
20           THE WITNESS:  During the period of 2022 for the
21   revenue, yes.
22           MR. ROTHMAN:  Aren't we looking at D21, I'm sorry?
23           MR. HEYER:  Yes.
24           MR. ROTHMAN:  Because I see October '21 through
25   October '22, I just wanted want to make sure, because there was
```

```
 1    another exhibit that didn't have '21 on it, and he just said

 2    '22.

 3              MR. HEYER:  I don't think it references '21.

 4              MR. ROTHMAN:  Oh, I have -- wait, which one is it?

 5              THE COURT:  Off the record and confer with each other

 6    on whatever it is you are showing.

 7         (Discussion off the record.)

 8              MR. HEYER:  We gave Mr. Rothman -- we switched the

 9    number on two exhibits.

10              THE COURT:  I have D21 that references 2022 sales, is

11    that what we are on?

12              MR. ROTHMAN:  We fixed it.

13              THE COURT:  Okay.  All right.  Any objection to

14    admission of Defendants' Exhibit 21, setting aside the sealing

15    issue, Mr. Rothman?

16              MR. ROTHMAN:  No, Your Honor.

17              THE COURT:  All right.  I'll admit D21, but it will

18    not be done in a sealed way.  Merely labeling something trade

19    secret information or generally being concerned about

20    circulation of profit margins, revenues or profits is not

21    sufficient to warrant sealing for the reasons already stated,

22    nor is the fact that the company doesn't voluntarily share this

23    information in the ordinary course, so that's the Court's

24    ruling on the sealing request, but the information is admitted

25    as Defendants' Exhibit 21.
```

```
 1              MR. HEYER:  Okay.  Thank you, Your Honor.
 2         (Evidence admitted as Defense Exhibit No. 21.)
 3    BY MR. HEYER:
 4    Q    And Mr. Shriteh, does Defendants' Exhibit 21 accurately
 5    reflect Safa Goods' revenues and sales of ELFBAR products from
 6    January 12th, 2022 to October 31, 2022?
 7    A    Yes.
 8    Q    Okay.  And does Exhibit 21 accurately reflect your
 9    company's gross profit margin that it applies to the sales of
10    products during that time period?
11    A    Yes.
12    Q    Okay.  And does Exhibit 21 show accurately your total gross
13    profits from the sale of the ELFBAR electronic cigarettes
14    during that period?
15    A    Based on the gross margin of Safa Goods, yes.
16    Q    Okay.  Now, looking at -- again, without stating specific
17    numbers, but looking at the sum of pieces sold column in the
18    sum of amount column, was there a time earlier this year when
19    you had any issues obtaining sufficient ELFBAR products from
20    the supplier?
21    A    Yes.
22    Q    Okay.  And when was that time period?
23    A    In July 2022.
24    Q    Okay.  And in that time period in the summer, did you
25    notice any other products enter the marketplace for the first
```

```
 1   time that you believe entered due to decreased supply of ELFBAR
 2   branded products?
 3   A    Yes.  We saw an increase in counterfeits and knockoff
 4   products.
 5   Q    And when you say counterfeits and knockoff products, can
 6   you explain what you mean and -- well, can you explain what you
 7   mean?
 8   A    Well, there was a deficiency or lack of product in the
 9   market and copy paste, counterfeit devices were introduced into
10   the market heavily.
11   Q    When you say copy paste, can you explain what you mean?
12   A    Copy paste of the device, the packaging, everything like
13   this product right here.  And in addition, we had knockoffs
14   such as ELF Box, ELF Unlimited became a new product in the
15   market.
16   Q    So am I understanding correctly there were other products
17   that were introduced that had the word ELF in the name as well?
18   A    Yes.
19   Q    Were you aware of any other products that used the term ELF
20   as their name or part of their name in the U.S. market before
21   2022?
22   A    No.
23   Q    If the Court were to enjoin Safa Goods from further sales
24   of ELFBAR products while this case remains pending, what would
25   the impact be on your business and your employees?
```

Thursday, December 1st, 2022

```
 1   A    It would affect more than 50 percent of my revenue, which
 2   would affect a number of employees as well.
 3   Q    What do you mean it would affect the number of employees?
 4   A    The business will not be able to operate with the number of
 5   employees we currently have.
 6   Q    So would you have to layoff some employees?
 7   A    I would have to layoff, yes, sadly, yes.
 8   Q    Okay.  And based on your experience to date, do you have
 9   any expectation, if that were to happen, as to what may occur
10   to satisfy consumer demand that you currently see for the
11   ELFBAR disposable electronic cigarette products?
12   A    As it happened in July, we would see the void filled with
13   counterfeits.
14   Q    Okay.  And do you have any -- apart from the fact that you
15   are not selling them, do you ever any other concerns about
16   these counterfeit products?
17   A    With the counterfeits, you can't trust the quality where it
18   can increase health and safety hazards.  You don't know what
19   the other parties, the counterfeits, are doing to the material,
20   they could be using cheaper material, which could be harmful.
21            MR. HEYER:  No further questions at this time, Your
22   Honor.
23            THE COURT:  Thank you.
24            Any cross-examination?
25            MR. ROTHMAN:  Yes, Your Honor.
```

Thursday, December 1st, 2022

1                        CROSS-EXAMINATION

2    BY MR. ROTHMAN:

3    Q    Help me with your last name, sir.  Is it Mr. Shriteh?

4    A    Shriteh.

5    Q    Please forgive me in advance if I mispronounce it, I'm

6    going to do my best.  Thank you for your time today, sir.  I

7    want to ask you a few questions.

8              You just testified that there have been

9    counterfeiting issues where products with the ELFBAR name have

10   come on to the market that are not authentic ELFBAR products,

11   did I understand your testimony correctly?

12   A    Yes.

13   Q    And the concern you raised was about the quality of those

14   products, did I understand that correctly?

15   A    Yes.

16   Q    And potential threat to health and safety?

17   A    Yes.

18   Q    You don't do any of your own testing of those products,

19   correct?

20   A    Can you elaborate what you mean.

21   Q    In other words, generally in the industry, a distributor in

22   your position would rely on the source of the products to

23   provide the certificate of authenticity or some sort of

24   certificate to indicate that the product was not adulterated or

25   misbranded.  You rely on that information, you don't do your

Thursday, December 1st, 2022

```
 1  own testing of the products, right?

 2  A   Yes, but we only work with reputable companies.

 3  Q   Okay.  So are you -- where do you fit in the chain of

 4  distribution?  I heard you describe the distribution as being

 5  several different distributors, a master distributor, and then

 6  distributors below the master distributor, where does your

 7  company fall?

 8  A   It depends on the brand.

 9  Q   Let's talk about ELFBAR, where does it fall?

10  A   Master distributor.

11  Q   Okay.  So how many master distributors are there of ELFBAR?

12  A   Master distributors of ELFBAR?

13  Q   Right.

14  A   Same as in the lawsuit, six plus one.

15  Q   Okay, so seven in the United States?

16  A   Yes.

17  Q   Okay.  And then as a master distributor, you are receiving

18  the importation from Shenzhen Weiboli and your other six -- the

19  other six master distributors the same, coming directly from

20  the manufacturer, right?

21  A   Yes.

22  Q   Okay.  So you are relying upon Shenzhen Weiboli to provide

23  you with product that is authentic, not adulterated and not

24  misbranded, correct?

25  A   Yes.
```

```
 1   Q   You know who you are buying from, you are buying from
 2   Shenzhen Weiboli, correct?
 3   A   Yes.
 4   Q   Okay.  So you wouldn't purchase ELFBAR product that was
 5   counterfeit from Shenzhen Weiboli, right?
 6   A   I don't understand your question.
 7   Q   Okay.  I'm just trying to understand your concern about
 8   counterfeit products coming into the market.  You are saying
 9   that it's not you who is going to experience having counterfeit
10   products being sold to you because you know who you are buying
11   them from, right?
12   A   Yes.
13   Q   Okay.  You are saying that others -- there may be other
14   distributors out there who are not master distributors, who
15   have no relationship with Shenzhen Weiboli, they may be fooled
16   somehow.
17   A   Yes.
18   Q   Okay.  I just wanted to make sure of that.
19           THE COURT:  I also had a question.
20           You mentioned earlier that you only work with
21   reputable companies, can you explain to me how you go about
22   determining who is reputable?
23           THE WITNESS:  Basically, we look into the size of the
24   company, the brands they sell.  We are a newer distribution
25   into the market, so there are brands that existed before us
```

```
 1    that have a good streamline of products and good customer

 2    service to their end users, and that's what we go with, ma'am.

 3              THE COURT:  All right.  Thank you.

 4              MR. ROTHMAN:  Okay.

 5    BY MR. ROTHMAN:

 6    Q   Is another way you determine the nature of the supplier to

 7    make sure they are reputable by, for example, researching them

 8    in trade publications?

 9    A   No.

10    Q   No, okay.  What about going to trade shows?

11    A   We do.

12              MR. ROTHMAN:  If I can have the witness look at

13    Plaintiff's Exhibits 23, 24, and 25 for identification.

14              Thank you very much.

15    BY MR. HEYER:

16    Q   Mr. Shriteh, before the hearing today, I handed exhibits

17    23, 24, and 25 to Counsel, and he handed them back and I saw

18    you reviewing them, do you recognize what these exhibits are?

19    A   They appear to be basically magazines to advertise smoke

20    shop and vape shop products.

21       (Evidence identified as Plaintiff's Exhibits 23, 24 and

22         25.)

23    BY MR. ROTHMAN:

24    Q   Okay.  They are trade magazines, you have seen magazines

25    like these before, right?
```

```
 1   A    Yes.

 2   Q    And --

 3   A    Sorry.  They are mailed to us, but that does not mean I go

 4   through them.

 5   Q    No, I understand that, but you have seen these sorts of

 6   periodicals in your experience in the past.

 7   A    Yes.

 8              MR. ROTHMAN:  Your Honor, we move these three

 9   exhibits into evidence.  Pursuant to Rule 902.6, they are

10   periodicals and self-authenticating.

11              THE COURT:  All right.  And the numbers are?

12              MR. ROTHMAN:  23, 24, and 25.

13              THE COURT:  Any objection?

14              MR. HEYER:  I think lack of foundation and relevance,

15   Your Honor.  I mean, the witness just said -- I think he has

16   testified he doesn't typically review these sorts of things,

17   there has been no relevancy grounds laid, so I'm not --

18              THE COURT:  All right.  I'll overrule the objection.

19   The exhibits are admitted, Plaintiff's 23, 24 and 25.

20      (Evidence admitted as Plaintiff's Exhibits 23, 24 and

21        25.)

22              MR. ROTHMAN:  Thank you very much.

23              I apologize, I should have asked you not to step down

24   again.  Now I have to ask your clerk to get up, because I'll

25   show him a few things on the Elmo.
```

```
 1              Thank you.
 2   BY MR. ROTHMAN:
 3   Q   So you understand -- you are familiar with trademarks,
 4   right?  You know what a trademark is, correct?
 5   A   I believe so.
 6   Q   Okay.  And you understand that trademarks are used to
 7   identify goods and help the consumer identify the source of
 8   those goods, right?
 9   A   Uh-huh.
10   Q   Yes?
11   A   Yes.
12   Q   Great.  In fact, your company has applied for a number of
13   trademarks, right?
14   A   Yes.
15   Q   Including trademarks for exactly the same type of
16   e-cigarette and similar e-cigarette devices like both my client
17   and ELFBAR makes and sells, right?
18              MR. HEYER:  Objection, compound.
19              THE COURT:  One moment.
20              MR. ROTHMAN:  Sure.
21              THE COURT:  I'll sustain the objection.
22   BY MR. ROTHMAN:
23   Q   Your company has applied for trademarks for e-cigarette
24   products, not unlike ELFBAR, correct?
25   A   My company applied for a trademark for multiple names, yes.
```

1   Q    Okay.  And you indicated earlier that if the ELFBAR were to

2   be removed from the market, that you would be forced to layoff

3   a large number of employees because one of the reasons was you

4   would have no more ELFBARs to sell, did I understand that

5   correctly?

6   A    It would affect my revenue heavily, so I would have to

7   layoff a lot of employees, yes.

8   Q    Okay.  Well, isn't the market that we are talking about for

9   vaping devices, isn't it a market that has many alternative

10  products that are not called ELF?

11  A    There are many products in the market, yes.

12  Q    Okay.  And among those many products are products that have

13  names that don't include the name ELF in them, right?

14  A    Yes.

15          MR. ROTHMAN:  Can I have the Elmo, please?

16          It's on, great.

17          THE COURT:  One moment, I need to be able to activate

18  the Court's screen.  Warren, can you help me with that.

19          Do we still need the Zoom link to be up and

20  activated?  I don't think so, correct?

21          MS. SHUFFLEBARGER:  No.

22          MR. ROTHMAN:  I don't think so.

23          THE COURT:  Okay.  All right, let's continue.

24          MR. ROTHMAN:  Okay.

25          THE COURT:  I will look from here.

```
 1              MR. ROTHMAN:  Oh, look, it is up there, I didn't see
 2    it.
 3    BY MR. ROTHMAN:
 4    Q   We are looking at a page for a company, it says on the
 5    upper left-hand side, called AK Wholesale, do you see that?
 6    A   Yes.
 7    Q   Are they a distributor?
 8    A   Yes.
 9    Q   Okay.  And the page shows the ELFBAR right in the center,
10    right?
11    A   Yes.
12    Q   But it also shows a variety of other disposable electronic
13    nicotine delivery system products, like ELFBAR, being sold
14    under different names, right?
15    A   Yes.
16    Q   So if ELFBAR were taken off the market, you could sell some
17    of these products, right?
18    A   Not because you go make a new brand tomorrow, it's going to
19    sell.
20    Q   Okay.  But if consumers don't have access to the ELFBAR,
21    are you saying that they are going to completely give up
22    purchasing disposable nicotine delivery system products like
23    the ELFBAR, or won't they just change to another brand?
24    A   They will be confused with the counterfeits for as long as
25    possible until something comes along.
```

```
 1   Q    My understanding is that ELFBAR, the company Shenzhen
 2   Weiboli has been doing a lot of work to get rid of the
 3   counterfeits, isn't that your understanding, too?
 4   A    Could you repeat the question?
 5   Q    Haven't they been trying to get rid of counterfeits?
 6            MR. HEYER:  Objection, lack of foundation.
 7   BY MR. ROTHMAN:
 8   Q   Do you know?
 9            THE COURT:  Well, hold on, let me rule.
10            I'll sustain the objection, rephrase the question
11   given the objection.
12   BY MR. ROTHMAN:
13   Q   Do you know if the manufacturer who you import from has
14   been taking action to stop the counterfeiting problem?
15   A    Yes.
16   Q    Okay.  Has that had some effect?
17   A    Yes.
18   Q    Have they indicated to you that they are going to stop
19   doing that?
20   A    Who are they?
21   Q    Shenzhen Weiboli.
22   A    To stop advertising the counter --
23   Q    No.  Have they indicated to you that they are just going to
24   stop and let the counterfeits flood the market?
25   A    No.
```

```
 1   Q    Let me show you another page, this is from Exhibit 25.  Are
 2   you familiar with the Puff brand?
 3              THE COURT:  What page of Defense -- I'm sorry,
 4   Plaintiff's 25?
 5              MR. ROTHMAN:  Unfortunately, they are not numbered.
 6              THE COURT:  All right, then just use some kind of
 7   descriptor.
 8              MR. ROTHMAN:  Sure.
 9   BY MR. ROTHMAN:
10   Q    They are for a company called omnidistro.com, do you see
11   that?
12   A    I see the page.
13   Q    Okay.  You are familiar with the Puff brand, right?
14   A    Yes.
15   Q    The Puff product has two variants and one of them is called
16   bar, right, we can see it right here?
17   A    I see Puff Bar on there, yes.
18   Q    You have seen other disposable vape products that use the
19   word bar in their name, like ELFBAR, correct?
20   A    Yes.
21   Q    Okay.  So Puff Bar -- isn't Puff Bar a potential substitute
22   for a consumer looking for an ELFBAR, but they can't find one,
23   isn't it possible -- isn't it realistic to expect that they
24   would buy a Puff Bar?
25   A    I don't understand the question.
```

```
 1   Q   Isn't it realistic to expect that a consumer who purchases

 2   a product that you have distributed, who normally buys ELFBAR,

 3   would instead purchase a substitute like Puff Bar?

 4   A   I don't know.

 5   Q   You don't know, okay.  Thank you.

 6              MR. ROTHMAN:  Thank you, Your Honor, no further

 7   questions.

 8              THE COURT:  All right.  Any redirect?

 9              MR. HEYER:  May I have one moment, Your Honor.

10              No redirect, thank you, Your Honor.

11              THE COURT:  Thank you very much, Mr. Shriteh.  You

12   may return.

13       (Witness excused)

14              THE COURT:  All right.  I just want to get a sense of

15   where we are and what is left to do today.  I see Jon Glauser

16   would be your final witness, sir.

17              MR. HEYER:  Yes, that's correct.

18              THE COURT:  That's estimated as maybe a total of an

19   hour-and-a-half or so.

20              MR. HEYER:  And I think it will probably end up being

21   far shorter than that, if Mr. Shriteh's testimony is any

22   indication.

23              THE COURT:  All right.  We are going to then just do

24   the lunch break now.  Do the parties prefer an hour and 15

25   minutes or an hour?  I just don't know if you have travel plans
```

```
 1   returning home or whatever else you have going on.

 2            MR. HEYER:  An hour and 15 would be fine, given our

 3   travel plans.

 4            MR. ROTHMAN:  That's fine, Your Honor.

 5            THE COURT:  We will be in recess until ten til 2:00,

 6   so 1:50 -- no?  All right, I'm not good at math.

 7              Okay, there we go, see you all after lunch.

 8   Anything further before we break?

 9            MR. ROTHMAN:  Just if we can get access to the

10   attorneys's conference rooms, please.

11            THE COURT:  Certainly, we will make that available to

12   you.

13            MR. ROTHMAN:  Thank you.

14       (A lunch recess was had at 11:39 a.m.; proceedings

15        resumed at 12:55 p.m.)

16            THE COURT:  Nice to see you again, you may be seated.

17            I hope you had a nice lunch.  Let's resume,

18   Mr. Heyer, please call your next witness.

19            MR. HEYER:  The Defense calls Jon Glauser, Your

20   Honor.

21            THE COURT:  Please remain standing to be sworn, sir.

22              JON GLAUSER, DEFENSE WITNESS, SWORN

23            THE COURTROOM DEPUTY:  Please have a seat and then

24   state and spell your first and last name for the record.

25            THE WITNESS:  My name is Matthew Jonathan Glauser,
```

```
 1   G-L-A-U-S-E-R.

 2              MR. HEYER:  May I proceed, Your Honor?

 3              THE COURT:  Yes, please.

 4              MR. HEYER:  Thank you.

 5                       DIRECT EXAMINATION

 6   BY MR. HEYER:

 7   Q   Mr. Glauser, where do you work?

 8   A   I work at Ecto World, LLC, also known as Demand Vape.

 9   Q   And what is your title with -- I'll refer to it as Demand

10   Vape, what is your title with Demand Vape?

11   A   I am the chief strategy officer and cofounder.

12   Q   And are you one of the owners of Demand Vape?

13   A   I am.

14   Q   Okay.  Where is Demand Vape located?

15   A   In Buffalo, New York.

16   Q   What is the nature of Demand Vape's business?

17   A   We distribute vape products throughout the entire country

18   and some internationally.

19   Q   And when you say vape products, do you mean electronic

20   cigarettes?

21   A   I do.

22   Q   Approximately how many employees does Demand Vape have?

23   A   We have approximately 283, I believe, total.

24   Q   Can you explain the history a little bit of when and how

25   Demand Vape was founded.
```

1    A    Yes.  Back in 2009, I quit smoking using a vaporizer, so I

2    took a trip to China one way, I stayed there for about six

3    months, met all of the manufactures, did some marketing

4    research, came back and started the business with my two

5    partners and got into distribution of open systems and some

6    single lights that were around back then and went from there,

7    and officially opened in 2011.

8    Q    So is it fair to say at this point that you have

9    approximately 13 years of experience with the electronic

10   cigarette industry?

11   A    Professional experience, yes; personal, even longer.

12   Q    Okay.  Based on your knowledge and experience, how old is

13   the electronic cigarette industry, at least in the United

14   States?

15   A    It started in approximately 2007 in China, and it came to

16   the United States shortly thereafter, so almost 15 years old.

17   Q    Okay.  Would it be fair to say you got in almost on the

18   ground floor of the industry in the United States?

19   A    In the United States, absolutely, yes.

20   Q    If you have an idea, how many different electronic

21   cigarette products does Demand Vape sell?

22   A    We sell about 30,000 skews.

23   Q    Can you explain what a skew is, just for the record?

24   A    A skew is -- it could be it's an individual product, but

25   there could be a product category and each product under that

```
 1  category is an individual skew.
 2  Q   Okay.  And in how many states does Demand Vape sell its
 3  products?
 4  A   Forty-nine states.
 5  Q   Do you have an estimation as to how many retailers or
 6  retail customers nationwide Demand Vape sells to?
 7  A   On average, about 5,000.
 8  Q   Okay.  Would it be fair to say Demand Vape is one the
 9  largest distributers of electronic cigarettes in the United
10  States?
11  A   To my knowledge, yes.  There is no concrete metric to say
12  that, but to my knowledge, yes.
13  Q   And based on your experience in the industry, could you
14  explain how the channels of distribution for electronic
15  cigarettes work.
16  A   Yeah, I'm just going to mirror what the prior witness said,
17  you know.  There's suppliers in Shenzhen, China, that's where
18  99 percent of e-cigarettes are made.  We form a relationship
19  with them, buy it from them either as a master distributor or
20  distributor.
21       In my case, we primely sell directly to the vape
22  shops, smoke shops and convenience stores, but we do master
23  distribute a lot of products as well.
24  Q   Did there come a time over this last summer where you
25  became aware of a cease and desist letter that was sent by
```

```
 1   VPR's counsel relating to ELFBAR products?

 2   A   Yes.

 3   Q   Prior to that time, had you ever heard of any electronic

 4   cigarettes branded as ELF?

 5   A   I have not, no.

 6   Q   Before this lawsuit was filed, had you ever heard of the

 7   Plaintiff, VPR Brands?

 8   A   I have, only to the extent that they have been involved in

 9   a lot of litigation regarding patent issues.

10   Q   Did there come a time when Demand Vape started distributing

11   ELFBAR brand electronic cigarettes?

12   A   Yes, that time would be about October 2021.

13   Q   Okay.  And did there come a time when, in your observation,

14   the ELFBAR electronic cigarettes became more popular?

15   A   Yes.  So I would say the spring of 2022 is when they really

16   peaked in their popularity, and it has only been growing ever

17   since.

18   Q   How would you rank the popularity of the ELFBAR brand of

19   electronic cigarettes nationwide in the United States today?

20   A   I would unequivocally say across all categories, end

21   products, they are number one in the United States.

22   Q   Do you believe more of those are sold even than RJ

23   Reynolds' Vuse products found in many convenience stores?

24   A   Yes, I do believe that, in fact, to be the case.

25   Q   And do you believe that they are -- more of them are likely
```

```
 1   sold than Juul electronic cigarettes that are sold in

 2   convenience stores?

 3   A   I could definitively tell you that they are, yes.

 4   Q   How much, maybe on a percentage basis, of Demand Vape's

 5   overall revenues do the ELFBAR electronic cigarettes represent?

 6   A   Because we have such a vast business, it's like it changes

 7   from time to time.  So it could be anywhere from about

 8   25 percent to 35 percent of our overall revenue.

 9   Q   Just go slowly, Mr. Glauser, for the court reporter.

10   A   I apologize.

11           I'm sorry, Your Honor.

12   BY MR. HEYER:

13   Q   As a result of this lawsuit, are you familiar with VPR

14   Brands' auto concealer ELF electronic cigarette?

15   A   I am.

16   Q   Okay.  Now, there has been -- you were present for the

17   testimony on the previous day of the hearing via Zoom, were you

18   not?

19   A   That is correct.

20   Q   Okay.  And do you recall that there was a point made by VPR

21   about the size and the shape of the ELFBAR electronic

22   cigarettes being similar to those of their auto concealer

23   product, do you recall that?

24   A   I do you recall that, yes.

25   Q   In your experience, are there any other electronic
```

1   cigarettes available in the marketplace that are also of a

2   similar size and shape?

3   A   Due to the nature of how this industry has evolved over the

4   years, I would say that is probably the most common size and

5   shape that's available and the most popular size and shape

6   available in the industry today.

7   Q   Have you ever heard, in your experience, the ELFBAR brand

8   electronic cigarettes ever referred to by anyone in the

9   industry as ELF?

10  A   I have not, no.

11  Q   Okay.  And in your position over the years, do you

12  frequently attend trade shows for the electronic cigarette

13  industry?

14  A   Yes.  I -- probably on average, over the last six to seven

15  years, about 50 trade shows a year, I would say.

16  Q   Okay.  Do you regularly visit vape shops?

17  A   Yes, very regularly.

18  Q   Okay.  How about convenience stores that handle or that

19  sell electron cigarette products?

20  A   Yes, I also visit convenience stores.

21  Q   Do you have an estimate as to how many brick and mortar

22  retail outlets you would visit that sell electronic cigarette

23  products in a given year?

24  A   This is an estimate, it being -- maybe approaching a

25  thousand.

```
1   Q    Okay.  And have you ever seen, in your experience, any of
2   VPR's ELF branded products advertised or offered for sell in
3   any of these outlets?
4   A    I have not, no.
5   Q    Do you visit the websites of other distributors in your
6   position?
7   A    From time to time, yes.
8   Q    Okay.  Have you ever seen any of VPR's ELF branded
9   electronic cigarettes advertised or offered for sale on any
10  other distributors' websites?
11  A    I have not, no.
12  Q    To your knowledge, have any of your customers ever inquired
13  about selling VPR's ELF branded electronic cigarettes?
14  A    They have not, and in my position, I have 32 sales people
15  who are constantly requesting products based on demand, and not
16  a single one of them has ever requested that product.
17  Q    Okay.  Have you ever seen VPR's ELF branded products
18  advertised online?
19  A    I have not, no.
20  Q    Has anyone, in your experience in the industry, whether
21  they are your customer or your sales rep or anyone else, ever
22  indicated any confusion between VPR's ELF branded electronic
23  cigarettes and ELFBAR products?
24  A    No, I have not.
25  Q    Are you aware of any confusion among consumers between
```

1   ELFBAR and VPR's ELF branded electronic cigarettes?

2   A   I'm not aware.  We routinely do surveys with consumers to

3   get their perception, and it has never come up.

4   Q   Okay.  Do you think it is likely that such confusion would

5   exist amongst consumers based on your experience?

6   A   In my experience, I would say it is highly unlikely there

7   is any confusion between the two.

8   Q   Why not?

9   A   Because the VPR branded ELF is just not known about in any

10  big enough fashion to cause any confusion, where ELFBAR is by

11  far the number one selling one in the country.

12  Q   How would you describe the target consumer for electronic

13  cigarettes?

14  A   So the target consumer for electronic cigarettes are

15  generally nicotine addicted adults who want to transition to a

16  safer alternative to traditional combustible cigarettes.

17  Q   Okay.  And for vaporizers that use substances other than

18  nicotine, who would you describe as the target consumers for

19  those?

20  A   I would describe those people mainly recreational,

21  non-addicted users of alternative products, such as THC, Delta

22  8, CBD and the like.

23  Q   Can you explain what THC, Delta 8 and CBD are.

24  A   Yeah.  So all of those substances are derived from the

25  cannabis plant, different variants that are chemically derived,

1   and they perform different functions for different people

2   depending on how they are consumed.

3   Q    Okay.  Can you speak to the general popularity of

4   disposable electronic cigarettes, not necessarily ELFBAR

5   specifically, but just sort of that subclass?

6   A    Yes.  So over the years, the disposable category has very

7   much become like the mainstream staple category of this entire

8   industry.

9   Q    Was that always the case historically?

10  A    Absolutely not, no.

11  Q    Okay.  Can you explain a little bit about the evolution of

12  what was popular and less popular.

13  A    Yeah.  So I have the benefit of getting in kind of very

14  earlier in this industry, and it was actually a very

15  interesting evolution.  It started off with devices that looked

16  just like a cigarette, held like a cigarette, weighed like a

17  cigarette.

18          As things progressed, it went to your open type

19  system, where you refill your own liquids, e-liquids that would

20  come on to the market and they were very primitive.  And as

21  more time went on, those types of systems, they became, you

22  know, better electronics, wider range of power, bigger tanks,

23  and then we kind of transitioned to like the smaller more

24  streamlined style, but with a more technologically efficient

25  way of using them, and that brings us back to the disposable

1    type e-cigarette.

2    Q    Could you explain, from an ease of use perspective, how

3    disposables compare to open system products for your typical

4    consumer of electronic cigarettes.

5    A    So in my opinion, I think it's night and day.  When you

6    have an adult cigarette smoker, it is very easy to smoke a

7    cigarette.  You pull a cigarette out of a pack, you put it in

8    your mouth, light it, you smoke it until it is finished, and

9    disposables offer that same kind of convenience for those adult

10   smokers who want to transition, but in a much safer, proven

11   way, and I think that's why they have gravitated back towards

12   that type of e-cigarette type device.

13   Q    And you're referring to these products as safer.  Can you

14   explain, is there any testing that your company does on the

15   products that you import and sell from a safety perspective?

16   A    Absolutely.  So we take safety very seriously, we do

17   in-house testing through a third party lab on, you know,

18   specific products, we do random products all the time.  We

19   actually do testing on counterfeits as well.

20          I filed two premarket tobacco applications and --

21          THE COURT REPORTER:  Pre what, I'm sorry?

22          THE WITNESS:  Premarket tobacco applications, PMTA,

23   would be the abbreviation, which, you know, that took quite a

24   bit of time and money.  It's a lot of studies to be done, it

25   gives you very good insight into how these products work and

1   what is involved in them, the chemistry of what they do to the

2   human body, et cetera.

3   BY MR. HEYER:

4   Q   Thank you.  And to what would you attribute the increased

5   popularity of disposables over time?

6   A   I think it's honestly a matter of convenience for the

7   consumer because the easier you make something, especially when

8   you are transitioning from something that someone is addicted

9   to, the more likely they are to be able to make that

10  transition, so I think disposables really help bridge that gap

11  for your everyday smoker in the convenience factor and it's

12  much more accessible to the masses.

13          MR. HEYER:  Court's indulgence, may I approach to

14  show the witness Exhibit 22?

15          THE COURT:  You may.

16          MR. ROTHMAN:  This is 22?

17          MR. HEYER:  Yeah.

18          THE COURT:  I just have a quick question, before we

19  get to the financials, on the disposable issue.

20          The actual boxes that we had, I think Defense 19

21  perhaps, and maybe Plaintiff's -- I can't recall the number for

22  the Plaintiff's exhibit, but I would like the witness to answer

23  whether those are disposable.

24          THE WITNESS:  Of course, Your Honor.

25          Yes, these are both disposable type e-cigarettes.

```
 1                THE COURT:  Okay.  You can keep them.
 2                THE WITNESS:  Thank you.
 3     BY MR. HEYER:
 4     Q   Mr. Glauser, if you could look at Defendants' Exhibit 22,
 5     can you explain to the Court what this is.
 6     A   This is -- I had my employee pull a report to show our
 7     gross profit and margin on the sales from October '21 to
 8     October '22 on ELFBAR products.
 9         (Evidence identified as Defense Exhibit No. 22.)
10     BY MR. HEYER:
11     Q   October 2021 until October 2022, is that correct?
12     A   That is correct.
13     Q   And I see that -- it looks like one of the grand totals did
14     not show up.  Is that the grand total revenue from sales of
15     ELFBAR products that has the pound signs there?
16     A   Yes, that's correct.
17     Q   And that number could be derived by adding up all of the
18     numbers?
19     A   Yes.
20     Q   And is Exhibit D22 basically a compilation of data prepared
21     from the company's financial records that are created and
22     maintained in the normal course of Demand Vape's business?
23     A   They are, yes.
24                MR. HEYER:  Your Honor, I move the admission of
25     Defendants' Exhibit 22.
```

```
 1              THE COURT:  Any objection from Plaintiff to

 2   Defendants' 22?

 3              MR. ROTHMAN:  No, Your Honor.

 4              THE COURT:  All right.  Defendants' 22 will be

 5   admitted without objection.

 6        (Evidence admitted as Defense Exhibit No. 22.)

 7   BY MR. HEYER:

 8   Q   In the lower table, as it were, in Defendants' Exhibit 22,

 9   Mr. Glauser, can you explain what that represents there?

10   A   So that is our gross profit margin.  That does not include

11   any overhead or any other expenses, that's just the gross

12   profit after the sales of the product before any other expenses

13   are involved.

14   Q   Okay.  And is that calculated into your company's ERP

15   system?

16   A   Yes, that is correct.

17   Q   All right.  And the numbers over to the right, those are

18   monthly totals of gross profit for each of the months from

19   October 2021 to October 2022, is that correct?

20   A   Correct.

21   Q   How would you characterize if there has been a trajectory

22   in the sales of ELFBAR products that Demand Vape has sold over

23   time?

24   A   Sure.  So it has steadily been going up.  The demand is

25   actually been so high that if you look at this chart, it is a
```

1    little bit misleading because the numbers reflect the sales,

2    but if we would have had enough product, those numbers would

3    actually be much higher, so we were selling it faster than we

4    could get it in.

5    Q    What time period specifically did you have issues with

6    getting sufficient supply to meet sufficient demand for the

7    ELFBAR products?

8    A    So I would say right after June is when it really became

9    problematic to get the supply to meet the demand.

10   Q    Okay.  June of this year?

11   A    Of 2022.

12   Q    Okay.  Have you -- let me ask you this:  Do you know

13   whether ELFBAR has filed any PMTAs for any of its products?

14   A    Yes, they have.  I always do my due diligence with our

15   suppliers, not only in the testing of the products

16   independently, but also in terms of what they have done in

17   terms of regulatory stuff and they have done a PMTA.

18   Q    During the last year or so, have you noticed any other

19   products enter the marketplace that have ELF as part of their

20   name, besides ELFBAR?

21   A    I have, and most of those -- actually all of those products

22   come from very unreputable Chinese manufacturers.  I would call

23   them counterfeit products, and they are made at a very low

24   quality.

25   Q    Okay.  And when you say that they are counterfeit or low

1    quality, could you explain how you determine that or why you

2    classify it that way.

3    A    Yes, absolutely.  I have spent quite a bit of time in

4    Shenzhen, China over the years.  I basically know and have a

5    good relationship with every manufacturer over there, I mean

6    legitimate manufacturer.  I have been to all of their

7    facilities, I see how they manufacture everything, and the

8    people that are sending the counterfeits are your fly-by-night

9    pop-ups.  Places open, start manufacturing, and then move to

10   another location to evade the Government.

11          I have actually even done testing on some of these

12   products and the toxic level of metals, for example, would be

13   off the charts.  The harmful -- potentially harmful

14   constituents of the e-liquid are much, much higher than the

15   ELFBAR products that are on the market.

16   Q    The legitimate ELFBAR products?

17   A    Yes, the legitimate ELFBAR products.

18   Q    All right.  Did you notice whether more of those

19   counterfeit-type products were being imported into the U.S. and

20   offered for sale when the supply to be able to supply the

21   ELFBAR products was not sufficient to meet demand in the summer

22   of this year?

23   A    Yes, absolutely, that is the case.  Anytime a demand is not

24   met, someone fills that demand and the Chinese business model,

25   the way it is run, is very good at adapting to fill that

1    demand, so it is almost immediate that you see that happen.

2    Q    Have you seen that in your experience with other brands,

3    other than ELFBAR, where there were similar issues of knockoffs

4    or counterfeits coming out?

5    A    Yes, over the years, many, many times.  It happened with

6    Juul, it happened with Hyde, it has happened with almost every

7    mainstream product that has, you know, gained a big market

8    share of this industry.

9    Q    Are you -- since this litigation has been filed, have you

10   become familiar with VPR's auto concealer ELF branded product?

11   A    Yes.

12   Q    Okay.  Do you have any firsthand experience in interacting

13   with FDA with respect to similar products, and what I mean by

14   similar products are open system vaporizers that are not

15   explicitly marketed for use with nicotine, in your experience?

16   A    I do, yes.

17   Q    Could you explain what that experience has been.

18   A    So since we import so many products and we distribute so

19   many products, I deal with FDA on a fairly regular basis.  Just

20   a couple weeks ago, they came and did an inspection on what I

21   would classify as an almost identical product type in function

22   and form.  They classified it as a tobacco product and I'm

23   still waiting the determination of the release of that product

24   from customs.

25   Q    So FDA has not released that particular product from

```
 1   customs, is that right?
 2   A    That is correct, and that means they have regulatory
 3   authority over that product.
 4   Q    Okay.  If the Court were to preliminarily enjoin Demand
 5   Vape from further sales of ELFBAR products, what, if any, would
 6   be the impact on your business?
 7   A    I would classify it as detrimental given we have so many
 8   employees, and if it makes up, at times, about a third of our
 9   overall profit, you know, that's -- you are approaching 100
10   employees that I would have to potentially layoff, and a lot of
11   our employees are actually refugees that are here legally from
12   Burma.
13   Q    In terms of your relationship with customers that buy
14   ELFBAR products, what would you anticipate would happen if
15   Demand Vape is enjoined from continuing to sell ELFBAR
16   products?
17   A    It would put a huge strain on some of those customer
18   relationships that we put a lot of time and energy into over
19   the years to maintain.  One of the best assets of our company
20   are those customer relationships, it is really what we depend
21   on to keep our market share.
22   Q    Okay.  I think there was perhaps a suggestion by VPR's
23   Counsel that couldn't a distributor like Demand Vape use other
24   branded products to fill the void if ELFBAR products are not
25   able to be sold due to an injunction, what would you say to
```

```
1    that?
2    A    I would say that I can definitively, without a doubt, based
3    on history and my own experience, say that's equivocally
4    untrue.
5            When there is a demand for a product and the consumer
6    is very familiar with that product, they are going to continue
7    to want to get that product, in some cases even knowing they
8    are counterfeit products.  It is like anything else, they get
9    tied to the brand, so you can't just switch one product for
10   another and push a product.  There is a supply and demand issue
11   there that we have no control over.
12   Q    Do you remember him showing Mr. Shriteh, I think it was
13   Plaintiff's Exhibit 25 that had the Puff Bar products --
14   A    Yes.
15   Q    -- just a little while ago?
16           What can you say with respect to Puff Bar products
17   and counterfeits, if anything?
18   A    So Puff Bar was actually pulled from the market because of
19   FDA action.  They were -- I would classify them as, you know,
20   in the same category of ELFBAR at one point.  About a year and
21   a half ago in terms of potential sales, they were definitely
22   number one in the marketplace and they also had a huge
23   counterfeit problem and no one was able to stop it and the
24   demand was still there.
25   Q    If, in fact, other products from less reputable
```

1   manufacturers did sort of fill the void, as you have explained

2   it, would you have any concerns from a public health or safety

3   point of view related to that?

4   A    Absolutely.  Just based on my own in-house testing of some

5   of these products, it would be detrimental to public health,

6   especially at the numbers we are talking about here entering

7   the marketplace.

8   Q    Okay.

9   A    You are talking about a situation where people don't know

10  what they are getting and what they are inhaling into their

11  lungs.

12  Q    I know you mentioned like heavy metals potentially being

13  something that would be inhaled, is that right?

14  A    That's correct.

15  Q    What else have you found from testing some of these

16  counterfeit products?

17  A    So in the statutory requirements of a premarket tobacco

18  application, you test for harmful and potentially harmful

19  constituents, which there is an exhaustive list of constituents

20  that you may find in e-liquid that would qualify as potentially

21  harmful.  We've found levels of nitrosamines, all kinds of

22  stuff to be quite honest, all across-the-board.  Almost

23  everything that I have seen, FDA doesn't want to see in that

24  product.

25  Q    You found these things in counterfeit products?

```
 1    A    Yes, absolutely.
 2              MR. HEYER:  I move Defendants' Exhibit 22 into
 3    evidence, and I think I'm done.
 4              THE COURT:  Defense 22 is in evidence.
 5              MR. HEYER:  Thank you.
 6              THE COURT:  All right.  Any cross?
 7              MR. ROTHMAN:  Yes, Your Honor.
 8                       CROSS-EXAMINATION
 9    BY MR. ROTHMAN:
10    Q    Good afternoon, Mr. Glauser.
11    A    Good afternoon.
12    Q    You're obviously very passionate about some of these topics
13    that we have been talking about today.
14    A    Yes, I agree with that.
15    Q    You are a member of the board of the Vape Technology
16    Association.
17    A    That's accurate, yes.
18    Q    And what is the mission of the Vape Technology Association?
19    A    The VTA or the Vape Technology Association is a
20    not-for-profit organization that advocates for what I would
21    call a safer alternative to products for adults to consume
22    nicotine in a safer way.
23    Q    And when you say products for adults to consume nicotine in
24    a safer way, we are talking about products like ELFBAR.
25    A    Yeah, I would classify ELFBAR as one of those products.
```

```
 1   Q   Your company, Demand Vape, what were the total -- what was

 2   the total revenue earned by Demand Vape in the last year that

 3   you have a full year of revenue for?

 4   A   Are you asking for a specific product or across-the-board?

 5   Q   No, I'm asking for overall revenue in dollars and not

 6   profit, total revenue.

 7           MR. HEYER:  Objection, relevance.

 8           THE COURT:  Why do you consider that question to be

 9   irrelevant, if you are trying to persuade the fact finder that

10   a potential injunction would cause irreparable harm?

11           MR. HEYER:  The extent of it is getting beyond the

12   products at issue in this case and given sort of the sensitive

13   nature of the data, I feel like it is irrelevant, Your Honor,

14   to ask such a specific question in such a broad manner.

15           THE COURT:  I'll overrule the objection.  You may

16   proceed.

17           THE WITNESS:  I don't have the numbers in front of

18   me, I can give you an estimate probably; about five to

19   600 million.

20   BY MR. ROTHMAN:

21   Q   Five to 600 million?

22   A   Yes.

23   Q   Do you recall testifying on direct that the ELFBAR product

24   was between 25 to 35 percent of your company's overall revenue?

25   A   I do.
```

Thursday, December 1st, 2022

```
1   Q    Twenty-five to 35 percent of the overall revenue based on

2   an estimate of between 500 and 600 million would be in the

3   nature of several hundred million dollars, right?

4   A    I may have misunderstood the question.

5              So I took the gross profit and given we sell a wide

6   variety of categories, such as hardware open system, where we

7   make a much lower profit on, the revenue wouldn't reflect

8   evenly across-the-board.  Well, the revenue would, but the

9   gross profit would not, if that makes sense.

10  Q    It doesn't.  I'm looking at Exhibit 22 and according to my

11  math -- I can't tell because the grand total is blocked out

12  here, but according to my math, the total sum of the revenue

13  for the ELFBAR product from October '21 to October '22 is on

14  the order of 128 million or so.

15  A    That is correct.

16  Q    Okay.  So that -- that seems like a smaller percentage of

17  overall revenue than 25 to 35 percent.

18  A    Well, 150 million times four would be 600, so what is that,

19  600 million.

20  Q    Okay.  It sounds like, though, we are talking about more in

21  the nature of maybe 15 to 20 percent of the total revenue today

22  based on your sales for 2022, right?

23  A    As I stated, I don't have an exact number for you, so I'm

24  estimating.

25  Q    And according to Exhibit 22, the sales only began to exceed
```

1   the ten million dollar a month amount beginning in April of

2   this year, right?

3   A    Yes, that is correct, as per the chart.

4   Q    Okay.  What was your biggest seller a year ago?

5   A    The Hyde brand of products.

6   Q    What is the Hyde brand of products, is that a disposable

7   vape like the ELFBAR?

8   A    It is very similar, yes.

9   Q    And was it the biggest seller two years ago?

10  A    I don't know the exact timeframe, but yes, there was a

11  point in time where it was the biggest seller.

12  Q    Did it hold on to that top spot for more than a couple

13  years?

14  A    No.

15  Q    No?  I mean, I have been to your website.

16          MR. ROTHMAN:  If I can use the video connection, the

17  HDMI connection.  And we will produce a PDF version of this,

18  Your Honor, to the extent that it would be hard to capture all

19  of the motion in a PDF, but we will do our best and mark it as

20  the next exhibit number.

21  BY MR. ROTHMAN:

22  Q    Looking at the screen, this is Demand Vape's website, your

23  company's website, right?

24  A    That is correct.

25  Q    And we see right front and center there is the ELFBAR

```
 1   product, right?

 2   A    Yes.

 3   Q    Above that is the Hyde product, correct?

 4   A    Correct.

 5   Q    Okay.  To the left of the ELFBAR, what is that product?

 6   A    Flum probably; yes.

 7   Q    That product looks very similar to the ELFBAR product, is

 8   it a similar product, does it fall into the same category?

 9   A    Yes, it is a disposable device.

10   Q    Okay.  Below the Flum product, there is this product that

11   looks very similar to the ELFBAR, I can't tell what that is by

12   bar?

13   A    I'm not sure where you are --

14   Q    On the left-hand side of the screen, do you see the --

15   A    Yep, Biff Bar.

16   Q    And below the ELFBAR is the Luffbar.

17   A    That's correct.

18   Q    To the right of the Luffbar is the Geek Bar.

19   A    Is that a question?

20   Q    That's another product that's similar to the ELFBAR.

21   A    Yes.

22   Q    But I just want to make sure we understand each other, you

23   want this Court to believe that despite the fact that your

24   company distributes the Luffbar, the Biff Bar, the Geek Bar,

25   the Flum Pebble, all of which are similar to the ELFBAR, that
```

```
 1   enjoining the sales of the ELFBAR will lead to a vacuum where
 2   purchasers will end up buying counterfeit ELFBARs that will
 3   harm them, that's your testimony?
 4   A    That is correct, and I think that testimony is backed by
 5   history and a long pedigree in this industry.
 6   Q    And I understand you do have a long pedigree in this
 7   industry and I'm not challenging that, but you talked about
 8   surveys that you have done on e-cigarettes.  Have those surveys
 9   been produced to us in this case?
10            MR. HEYER:  Objection, Your Honor, discovery hasn't
11   started.
12            THE COURT:  All right, sustained.
13            MR. ROTHMAN:  Okay.
14   BY MR. ROTHMAN:
15   Q    I'm not aware of receiving any surveys that the Defendants
16   are relying upon, okay.  So are there any surveys that you
17   intend to rely upon that I'm not aware of because you indicated
18   that that was something that you were basing your testimony on?
19            MR. HEYER:  Objection, Your Honor.  We haven't even
20   filed our answers to the complaint yet, this is an expedited
21   preliminary injunction.
22            THE COURT:  All right.  Why don't -- I'll sustain the
23   objection based on the way the question was presented.
24            But Mr. Rothman, if you want to ask the witness about
25   surveys, you may do so.  He did mention in his direct that his
```

1    company conducts surveys in a general sense, so you can probe

2    that line of inquiry if you wish.

3              MR. ROTHMAN:  Okay.

4    BY MR. ROTHMAN:

5    Q   Is there a specific survey done by a specific survey

6    company on a particular date concerning a particular product

7    that you're relying upon here today?

8    A   No.

9    Q   You also referred to testing.  Is there specific testing

10   done on a specific product that you are relying on here today?

11   A   Can you rephrase the question, because I'm not sure what

12   you mean by relying on.

13   Q   Well, I want to understand the basis for the position you

14   are taking that removing ELFBAR is going to harm people, right,

15   and you said you've done surveys, you have done testing, and

16   you also referred to situations where there was an FDA hold

17   placed on a product, it sounded like it was in customs, on an

18   almost identical product type, and I want to understand what

19   those specifics are if you are, in fact, asking the Court to

20   rely upon them.

21             I'm not questioning your experience, I just want to

22   know, sitting here today, is there something specific that you

23   want the Court to refer to or is this just -- this is just your

24   general experience?

25   A   I appreciate you clarifying and let me clarify.  I wasn't

```
1    relying on those things in a specific sense to prove that
2    ELFBAR would be over -- would not get overtaken by something
3    else.
4            I was relying on those things in a general sense, but
5    my bigger reliance was on the historical data in sales I have
6    on other products that were in a similar situation that is
7    demonstratively proveable.
8    Q   The historical data that you have indicates, and I'm
9    quoting from your testimony on direct, that, quote, "Any time a
10   demand is not met, someone fills that demand."
11   A   That's correct.
12   Q   Okay.  So isn't it the case and perhaps just as likely that
13   if the ELFBAR product is not available for purchase, that the
14   demand for the product will be filled by another product like
15   one of these other bar products we see on your website?
16   A   No, I cannot agree with that statement at all.  I don't
17   think it's just as likely.  I think it's much more likely that
18   it will be filled by counterfeits.
19   Q   Okay.  And your basis for concluding that is what, other
20   than this experience that you have told us about, what else?
21   A   I gave specific examples such as Juul, Hyde, there are a
22   couple other products in the past as well that faced similar
23   situations and in every single one of those situations in the
24   immediate aftermath -- yes, in time, they were replaced by
25   other types of products, just as ELF did in this situation.
```

 1   But for -- you know, I don't know the exact time period, but

 2   it's not a negligible time period, it was fulfilled by

 3   counterfeits every single time, that's what I'm relying on.

 4   Q    How much time are we talking about, because we are looking

 5   at the sales here in Exhibit 22, and I want to understand so

 6   that the Court can make a determination, how much time is it

 7   going to take for the demand for ELFBAR to be filled by other

 8   products and during that time, you say, will be diverted to

 9   counterfeit products; a month, two months, three months, how

10   much time?

11   A    Well, this is speculation on my part, but base based off

12   history and the other products, anywhere from 40 days to 90

13   days.

14   Q    Okay.  So somewhere between 40 to 90 days is when the

15   absence of the ELFBAR product on the market could potentially

16   lead people to be purchasing counterfeit product until it is

17   filled by some other legitimate product seller, for lack of a

18   better term than legitimate.

19   A    That is one possible outcome, yes.

20        THE COURT:  So when you refer to this prospect of

21   purchasing counterfeit, what exactly are you referring to?  So

22   a counterfeit of the ELFBAR would be what exactly in your mind?

23        THE WITNESS:  So Your Honor, a counterfeit, how I

24   define it is something that looks exactly like Exhibit D19

25   here, that has the same packaging, has the same markings, it

```
 1   looks exactly like the product, but is not made by the original

 2   manufacturer, that's what I describe as a counterfeiter, Your

 3   Honor.

 4           THE COURT:  Then I have another question about the

 5   surveys, you mentioned them in your direct in relation to the

 6   potential for consumer confusion.  Are you aware of any studies

 7   conducted by your company that have actually compared the

 8   prospect of confusion between ELFBAR and ELF products?

 9           THE WITNESS:  No, we have not done because as I

10   stated in my previous testimony, I was not aware of the ELF

11   product line until this lawsuit.

12           THE COURT:  Understood, thank you.

13   BY MR. ROTHMAN:

14   Q   Thanks.  Now, you are aware of my client's company, though,

15   right?

16   A   Yes, as I previously stated, just from hearing of

17   litigation in the industry.

18   Q   But you also sell his products on your website, right?

19   A   I'm not -- not that I'm aware of, I don't do the

20   purchasing, so I don't know.

21   Q   Okay.  But my client has a few different -- you know my

22   client has a few different brands it holds trademarks for,

23   products under the name HoneyStick, are you familiar with that?

24   A   No, I did not know your client held the trademark under the

25   trademark HoneyStick until you just told me, so --
```

```
 1    Q    If we go and we look at your website for brands --
 2              MR. ROTHMAN:   Where did we see it?
 3         (Discussion off the record.)
 4    BY MR. ROTHMAN:
 5    Q    So if we look at Demand Vape under alternative, there's two
 6    HoneyStick products there that my client makes.
 7    A    Is that a question?
 8    Q    Well, I'm asking, now that you see that, do you agree that
 9    your company sells products that are made and distributed by
10    VPR?
11    A    To the extent that what you are telling me is accurate,
12    absolutely, yes.
13    Q    There was some testimony about the types of products that
14    my client sells, these kit products, the ELF products.
15              MR. ROTHMAN:   What are we up to?
16              I would like to show the witness what has been marked
17    as Plaintiff's Exhibit 26.
18              Thank you, sir.
19    BY MR. ROTHMAN:
20    Q    You have seen pictures of that product before, maybe you
21    haven't held one previously, but the product that my client
22    sells that is marked Plaintiff's Exhibit 26, does that fall
23    into a category of products that we could find on the Demand
24    Vape website?
25    A    Can you be more specific with the question, what do you
```

1    mean by category?

2    Q   Well, there are many different categories on the Demand

3    Vape website and if we go to devices, there is a device

4    category called kits, and if I click on kits, right, we see

5    devices including -- see this Uwell device that Mr. Hardy (sic)

6    was testifying about earlier today?

7    A   I do.

8    Q   Okay.

9    A   I don't believe that's the same device though.

10   Q   No.  It looks somewhat like what we saw in Defendant's

11   Exhibit 16 or 17 to me, but these products we are looking at

12   under kits, can you describe for me what these -- perhaps how

13   these products are different from the ELFBAR product, what are

14   the attributes of these products?

15   A   Yes.  A kit is anything that when you buy it, such as what

16   you just handed me here --

17   Q   Okay.

18   A   -- across any category, it comes with everything you need

19   to start vaping minus potentially whatever substance you are

20   going to put into it.

21       (Evidence identified as Plaintiff's Exhibit No. 26.)

22   BY MR. ROTHMAN:

23   Q   Okay.  So the product that you are holding there, my

24   client's ELF product that's been marked as Exhibit 26, that

25   product is like the products that are listed on your website

```
 1   under the devices kits subsection, correct?

 2   A   Yes, it's similar, correct.

 3   Q   Okay.  And what about -- well, I'll show you what we will

 4   mark as Plaintiff's Exhibit 27.

 5            MR. ROTHMAN:  You don't have to get up, if you allow

 6   me to approach the witness.

 7            MR. HEYER:  Can we see what that is?

 8            MR. ROTHMAN:  It's the pen battery, it is the

 9   battery.

10            MR. HEYER:  Thank you.

11            THE COURT:  None of these exhibits yet have been

12   admitted, correct, Mr. Rothman?

13            MR. ROTHMAN:  They were shown before.  If necessary,

14   I can put them in through my client, if there is any objection.

15   At this point, I'm just showing them to --

16            THE COURT:  Okay.

17            MR. ROTHMAN:  -- the witness for identification

18   purposes.

19            THE COURT:  Okay.

20            MR. ROTHMAN:  Pictures of them have been admitted as

21   exhibits already, though.

22            THE COURT:  Okay.

23   BY MR. ROTHMAN:

24   Q   What category would that exhibit fall into, that product,

25   the device you are holding?
```

```
 1   A    This is a battery.

 2        (Evidence identified as Plaintiff's Exhibit No. 27.)

 3   BY MR. ROTHMAN:

 4   Q    Okay.  Would you attach something to the battery?

 5   A    You could, yes.

 6   Q    Okay.  And would that something that you attached to the

 7   battery be a vaporizer that you could put liquid into?

 8   A    Potentially, yes.  There is a -- there is what you call a

 9   510 connection to it, which is the industry standard.  So you

10   can connect almost anything you wanted to this battery that has

11   a 510 threaded adapter on it.

12   Q    Okay.  So that 510 threaded adapter could be filled with

13   nicotine e-liquid, and then it would function like any of the

14   devices that we saw on the kits site when they were filled,

15   right?

16   A    It would function in a similar manner, yes, it would become

17   essentially a kit.  But this, in and of itself, wouldn't be

18   considered a kit.

19   Q    That's just the battery part you need to attach the

20   reservoir for the e-liquid to what you refer to as the 510

21   mouthpiece, correct?

22   A    Correct, yes.

23   Q    Do you sell those 510 mouthpieces on Demand Vape?

24   A    Yeah, I'm sure we do.  We sell a ton of different -- you

25   know, across all categories.
```

```
1              MR. ROTHMAN:  Is there any objection to the admission

2       of Exhibits 26 and 27?

3              MR. HEYER:  I mean, if there is a proffer that

4       otherwise the principal of VPR is going to testify, I'll accept

5       the proffer.

6              MR. ROTHMAN:  All right.  So we move those two into

7       evidence, Your Honor.

8              THE COURT:  So 26 and 27, any objection?

9              MR. HEYER:  No objection, Your Honor.

10             THE COURT:  Those exhibits are admitted without

11      objection.

12         (Evidence admitted as Plaintiff's Exhibits 26 and 27)

13      BY MR. ROTHMAN:

14      Q   You are not going to have to layoff employees if ELFBAR

15      comes off the market, are you?

16      A   Can you rephrase that.

17      Q   The prior witness testified that, you know, if ELFBAR were

18      removed from the market, he would have to layoff employees.

19             Would Demand Vape have to layoff employees if ELFBAR

20      was removed from the market for a period of time?

21      A   Potentially, yes.  I mean, ELFBAR is very profitable for

22      us.  That's different than, you know, the total amount of sales

23      that you do, so profit is what you make your money on, right.

24      Q   How much more profitable is ELFBAR than other comparable

25      products like the ones we saw on the first page of your
```

```
1    website?

2    A    Each product varies.

3    Q    Sure.

4    A    Some drastically so.

5    Q    Right.  But how much more profitable is ELFBAR than, say,

6    Flum or Biff Bar or Luffbar or Geek Bar?

7    A    Well, quite a bit, because not only is it in high demand,

8    but there is also a very good profit margin on it, probably the

9    highest profit margin of any of those devices.

10   Q    In your Exhibit 22, you indicated a 29 percent profit

11   margin.  How does that compare to the profit margin on Biff

12   Bar?

13   A    I don't have the exact number, but I think our average

14   profit margin across our devices is around 15 percent.

15   Q    15 percent.  So you are making double the profit on the

16   ELFBAR than you are on these other products?

17   A    Yeah, according to what I just said, that would be

18   accurate, yes.

19   Q    Okay.  Is it really the fact that customers want the ELFBAR

20   that's generating the demand as a result or is it really that

21   the ELFBAR is so much more profitable, that you are selling

22   that instead of alternative products?

23   A    No.  It's the first thing you said, because we make our

24   products as well, and trust me, we would much rather sell those

25   products than anything else, but people demand ELFBAR.
```

Thursday, December 1st, 2022

```
 1   Q    What is so appealing about that product?

 2   A    I wish I knew, I wish I could answer that question.

 3   Q    But you don't you know, though, because weren't you

 4   interviewed by Reuters and asked specifically about what it is

 5   that makes products like ELFBAR so in demand?

 6   A    Yeah, I gave them a very similar answer to what I just gave

 7   you.

 8   Q    Well, my understanding of the answer that you gave was that

 9   those products like ELFBAR that come in fruit and candy flavors

10   are attractive to children, but despite the fact they are

11   attractive to children, adults like them, too.

12            MR. HEYER:  Objection, lack of foundation, hearsay.

13            THE COURT:  All right, I'll sustain the objection.

14   BY MR. ROTHMAN:

15   Q    Well, it's actually your statements, so --

16            THE COURT:  I'm not really sure where this whole

17   thing is going.

18            MR. ROTHMAN:  I'll leave it.  I'll leave it there,

19   Your Honor.  I appreciate that, I think we have probably

20   covered all of the areas.

21   BY MR. ROTHMAN:

22   Q    Weiboli is a Defendant in this case, Shenzhen Weiboli, or

23   Weiboli Shenzhen, right?

24   A    Correct.

25   Q    They are not here, there is no representative of them here
```

Thursday, December 1st, 2022

```
 1   today, right?
 2            MR. HEYER:  Objection, Your Honor, Counsel is here.
 3            MR. ROTHMAN:  Well, no, I'm asking in terms of a
 4   witness or a corporate representative.  Obviously, Counsel is
 5   here, I see you there.
 6            THE COURT:  I think we can all understand that there
 7   is no physical human being here from --
 8   BY MR. ROTHMAN:
 9   Q   Do you know why Shenzhen Weiboli is not here and presenting
10   evidence about its losses?
11   A   I can't --
12            MR. HEYER:  Objection -- I'm sorry.
13            THE WITNESS:  I can't speak for someone else, I have
14   no idea why they aren't here.
15   BY MR. ROTHMAN:
16   Q   Are you aware of other products sold under other brands by
17   that company?
18   A   Not to my knowledge, but in China, the business structures
19   are set up in such a way where there is multiple facets to it,
20   so I can't tell you definitively one way or another, I have no
21   knowledge of that.
22   Q   So the only brand that you are aware of that Shenzhen
23   Weiboli sells and that you import into U.S. is the ELFBAR
24   brand.
25   A   As I sit here today, to my knowledge, yes.
```

```
1   Q    Lost Mary is not the name of another brand that they make

2   that you import?

3   A    I'm not sure that is sold to us by Weiboli, I don't know,

4   that's why I'm -- you know, there's different companies that we

5   buy different things from.

6   Q    Okay.  But I was asking specifically about Shenzhen

7   Weiboli, do you know if you buy the Lost Mary brand of

8   disposable vape product from them?

9   A    I don't know the answer to that question.

10         MR. ROTHMAN:  Okay, thank you.

11         No further questions, Your Honor.

12         THE COURT:  All right, thank you.

13         Any redirect?

14         MR. HEYER:  Very briefly, your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. HEYER:

17  Q    Mr. Glauser, were you present for Mr. Frija's testimony on

18  November 18th during the first day of the preliminary

19  injunction?

20  A    Yes.

21  Q    Do you recall his testimony to the effect -- I won't

22  attempt to repeat his exact words, but to the effect that he

23  attributed a decline in the ELF auto concealer sales in 2020

24  and 2021 to the arrival of the ELFBAR products on the U.S.

25  market?
```

```
1   A    I am, yes.
2   Q    Okay.  And is that possible based on your experience and
3   knowledge about your company's sales of ELFBAR products?
4        MR. ROTHMAN:  Your Honor, objection.  This goes
5   beyond the scope of both direct and cross.
6        THE COURT:  Overruled.
7        THE WITNESS:  No, I don't believe that's possible
8   based on my experience in the industry.  I mean, there was a
9   full two-year period where they could have established their
10  product, that's more than the lifespan of most products that
11  become successful.
12  BY MR. HEYER:
13  Q    Was Demand Vape selling any ELFBAR products in 2020?
14  A    No.
15  Q    And when, looking at Exhibit 22, did Demand Vape start
16  selling in 2021?
17  A    Approximately October 2021.
18        MR. HEYER:  Thank you, Your Honor.  No further
19  questions.
20        THE COURT:  Thank you, Mr. Glauser.
21        THE WITNESS:  Thank you, Your Honor.
22    (Witness excused)
23        THE COURT:  All right, Mr. Heyer, do you have any
24  additional witnesses to present today?
25        MR. HEYER:  We do not, Your Honor.
```

```
 1              THE COURT:  Do you have any additional exhibits to
 2     introduce?
 3              MS. SHUFFLEBARGER:  Your Honor, just for
 4     clarification, we want to note that Defendant's Exhibits 1
 5     through 7 were all admitted by a judicial notice.
 6              THE COURT:  All right.  And I will say this at the
 7     conclusion of this hearing, but within ten days of this
 8     hearing, I would ask both sides to file on CM/ECF the admitted
 9     exhibits with an exhibit list that indicates those numbers with
10     precision.
11              All right.  Mr. Rothman, do you have any additional
12     testimony or exhibits to present?
13              MR. ROTHMAN:  No, Your Honor.
14              THE COURT:  All right.
15              I do have one question for Plaintiff and that
16     concerns a factual question.  I would like a little more
17     information about ELF sales in -- where ELF is being sold in
18     the United States at this time and within the last few years.
19              There was some testimony today that that product is,
20     according to at least some witnesses, not sold in stores, so
21     I'm curious about that issue.
22              Mr. Rothman, anything to add on that point?
23              MR. ROTHMAN:  Why don't we call Mr. Frija back to the
24     stand, and he can certainly answer Your Honor's questions and
25     any follow-up that I have.
```

```
 1              THE COURT:  All right.
 2              MR. FRIJA:  I'm embarrassed, but can I go to the
 3   men's room for a bit?
 4              THE COURT:  Sure.  We will take a ten minute break,
 5   then, for everybody's benefit.
 6       (Recess was had at 1:59 p.m.; and the proceedings
 7       Resumed at 2:11 p.m.)
 8              THE COURT:  Thank you, you may be seated.
 9              Mr. Rothman.
10              MR. ROTHMAN:  Should we call --
11              THE COURT:  Yes.  Mr. Frija, please come to the
12   witness stand and I will have my CRD swear you in again.
13              THE COURTROOM DEPUTY:  Please raise your right hand.
14               KEVIN FRIJA, PLAINTIFF WITNESS, SWORN
15              THE COURTROOM DEPUTY:  Please have a seat and then
16   state and spell your first and last name for the record.
17              THE WITNESS:  Kevin Frija, F-R-I-J-A.
18              THE COURT:  Mr. Rothman.
19              MR. ROTHMAN:  Well, I want to allow Your Honor to ask
20   the questions.  You had some specifics and I think then I can
21   just ask any follow-up.
22              THE COURT:  All right.
23                          EXAMINATION
24   BY THE COURT:
25   Q   At this point, where do you sell your ELF products?
```

1   A    Smoke shops, vape shops, convenience stores and online

2   website resellers.

3   Q    In the United States?

4   A    In the United States and Canada.

5   Q    And I think you may have testified that you also sell

6   online, is that correct?

7   A    Very little, but we do, yes.

8   Q    Obviously, you were here during the testimony of the two

9   corporate representatives of the distributors, both of whom

10  testified they were not aware of your product and have not seen

11  it sold in any physical stores, what is your reaction to that

12  testimony?

13  A    Well, first of all, I believe that we were doing a great

14  job marketing our product, but I'm a little bit humbled and

15  embarrassed to see the paltry sales we have done over the

16  years.

17         So let me just start by saying, I was shocked to see

18  how little we were doing in the big scheme of things, but there

19  are more than 10,000 vape and smoke shops in the country.  I

20  think one of the witnesses testified he went to 25, so it's

21  possible that he didn't see it.

22         Also, there are thousands of products in the stores

23  and it is possible that our product is not the most popular and

24  is probably not displayed in a prominent space, if I could

25  guess.

```
 1              Also, ELFBAR seems to have about six or seven master
 2    distributors, and even one of them may sell to ten or more
 3    distributors, there could be hundreds of distributors in the
 4    country, so we also have four or five master distributors that
 5    we sell product to.  We don't sell to everybody, we can't,
 6    there are competitive reasons and politics involved.  So if you
 7    sell to one store, you can't sell to the neighbor, they get
 8    upset.  Generally, we pick our customers, just like I think
 9    ELFBAR probably picked their distributors and they don't sell
10    to others.  So it is very possible -- there is 100,000 plus
11    convenience stores in the country -- that we just got lost in
12    the shuffle.
13              THE COURT:  All right, thank you.  I don't have any
14    other particular questions.
15              Mr. Rothman, you are welcome to supplement on this
16    topic, or otherwise we can be done, and I'll ask Mr. Heyer if
17    he has any limited cross on this issue.
18              MR. ROTHMAN:  Okay.  I'll just ask the witness some
19    questions, if we could use the -- oh, okay.
20                        DIRECT EXAMINATION
21    BY MR. ROTHMAN:
22    Q   Do you see the exhibit what was filed as 35-10, I believe
23    this is going to be Plaintiff's Exhibit 10 that's already in
24    evidence.
25    A   Yes, I can see it.
```

```
 1   Q    Okay.  So this exhibit is a compilation of sales by items

 2   for a period from January of 2018 through August of 2022,

 3   right?

 4   A    That's correct.

 5   Q    In looking at this exhibit and understanding VPR's

 6   business, are the majority of these sales of ELF products sales

 7   made to retail customers or to wholesale customers and

 8   distributors?

 9   A    Distributors and wholesale customers.

10   Q    Okay.  And do you rely on the wholesale customers and those

11   distributors in order to further distribute and promote your

12   products in the marketplace?

13   A    That is correct.

14   Q    Would you describe the marketplace as a crowded

15   marketplace?

16   A    Very crowded, yes.

17   Q    However, among the distributors that you deal with, do they

18   know and recognize the trademark ELF?

19   A    Of course they do, yes.

20   Q    And who do they associate it with?

21   A    With our company, VPR Brands.

22   Q    What products do they associate it with?

23   A    Vaporizers.

24   Q    In particular, the two products at issue in this case?

25   A    The concealer is more popular, but the battery has been
```

```
 1    making more sales lately.
 2    Q    Okay.  You're familiar with the industry just like the
 3    other witnesses who testified, right?
 4    A    Yes.
 5    Q    Okay.  Are there a very small number of manufacturers or
 6    product marketers in the industry or is it a very largely
 7    crowded industry?
 8    A    Extremely large and extremely crowded.
 9    Q    And do you consider the company to have been successful?
10    A    I did, yes, I have.
11    Q    Do you attribute any of that success to your ability to
12    protect your trademarks?
13    A    It is very important, sure.
14    Q    Okay.
15              MR. ROTHMAN:  I have no further questions.
16              THE COURT:  All right, Mr. Heyer?
17              MR. HEYER:  Just briefly, Your Honor.
18                        CROSS-EXAMINATION
19    BY MR. HEYER:
20    Q    Mr. Frija, we were looking at Plaintiff's Exhibit 10.  You
21    haven't actually provided a month-by-month breakdown of sales
22    of your ELF brand products, have you?
23    A    I don't know if it was entered into evidence, we obviously
24    have that, but I'm not sure.
25    Q    Plaintiff's Exhibit 10 is cumulative for a four and a half
```

1   year period.

2   A    That is right.

3   Q    Okay.  Is ELF auto concealer actually still being

4   manufactured by the original manufacturer that you signed the

5   contract with in China?

6   A    Yes, sir, it is.

7   Q    Are you familiar with the fact that that manufacturer was

8   deregistered with the Chinese corporate authorities a couple of

9   years ago?

10  A    I'm not familiar with that, no.

11  Q    Okay.  And how about the ELF battery, is that still being

12  actively manufactured?

13  A    Yes.

14          MR. HEYER:  Court's indulgence, one second, Your

15  Honor.

16          No further questions, Your Honor.

17          Thank you, Mr. Frija.

18          THE WITNESS:  May I step down?

19          THE COURT:  Yes, you may, thank you.

20     (Witness excused)

21          THE COURT:  All right, Mr. Rothman, I assume no

22  additional evidence to present.

23          MR. ROTHMAN:  That's correct, Your Honor.

24          THE COURT:  All right.  Have both sides have checked

25  their notes and have admitted any exhibits they want

```
 1    introduced, I want to give you both one last opportunity for
 2    that purpose.
 3              Okay, all right.  Well, then, let's hear argument.  I
 4    would like to stay as focused as we can on the particular
 5    standard I'm required to apply in this posture, and of course,
 6    the substantive law that arises under that substantial
 7    likelihood of success analysis.
 8              So with that, Mr. Rothman, since it is your motion,
 9    you will go first.
10              MR. ROTHMAN:  Thank you, Your Honor.  First of all,
11    on behalf of my client and personally, I want to thank Your
12    Honor for the time today.  I understand there are many other
13    matters on Your Honor's schedule and whenever a district court
14    judge allows intellectual property attorneys time to present a
15    case, we really appreciate it and I thank you for that.
16              I'm going to run generally through the factors that
17    Your Honor needs to consider.  They are briefed already, but
18    you have heard testimony and received exhibits, and that's
19    going to provide Your Honor with some additional information to
20    consider.
21              I'm going to get my computer and I'm also going to
22    suggest that -- and this was something I think Counsel for the
23    Defendants had also suggested -- if Your Honor wishes to
24    receive proposed findings of fact and conclusions of law, we
25    have already started on a set of those, so I want to make that
```

```
1    offer again for Your Honor's consideration.

2            So by way of overview, what we have had, Your Honor,

3    is a presentation that has gone through just about all aspects

4    of the case that Your Honor has to consider on the motion for

5    preliminary injunction.

6            Drilling down specifically, the three factors are the

7    priority of the Plaintiff's mark; the Defendants' use of the

8    mark subsequent to Plaintiff's priority; and three are the

9    confusion factors and those are all broken down into

10   subfactors.  And then following those factors, of course, we

11   have the issues of likelihood of success, which is subsumed

12   within public interest and the setting of a bond.

13           On the issue of priority, there is no dispute here.

14   What we have is we have a registered trademark for ELF for the

15   products that are implicated that both the Defendants use,

16   import, sell, distribute and that the Plaintiff does.

17           The registration certificate is in the record, it's

18   the first exhibit.  It indicates that ELF is owned by VPR

19   Brands, registered in class 34 for electronic cigarettes,

20   electronic cigarette lighters, smokeless cigarette vaporizers.

21   First use, 11/21/17; in commerce three days later, 11/24, 2017.

22   It has been extant for almost five years, and there have been

23   no efforts to cancel it.

24           On its face, it is entitled to a presumption of

25   validity, which can be rebutted, but we have seen no testimony
```

1    or evidence sufficient to rebut the validity of this mark,

2    right?

3            The Defendants' use and all of the examples that the

4    Defendants have offered are subsequent.  Our client, the ELF

5    product, came out, was manufactured, made, distributed earlier

6    in time, so when it comes to the issue of who has priority to

7    this mark, it's quite clearly Plaintiff.

8            Factor two, the Defendants' use:  Again, no dispute.

9    The Defendants have used the ELF Mark in connection with a

10   product called ELFBAR, we have seen many examples of similar

11   products to the ELFBAR called something bar, bar something,

12   Geek Bar, this bar, that bar.  Bar describes the shape of the

13   product, like a candy bar, a rectangle of some thickness.  It

14   is commonly used and the Defendants' use of that ELF Mark with

15   bar, the primary portion of the mark is the ELF part, not the

16   bar part because otherwise you would be capitalizing and

17   monopolizing the use of bar, and that can't be the case because

18   it describes a shape or feature of all of these other products.

19   So what we have are priority, Defendants' use, really no

20   dispute at this point.

21            The confusion factor is the third step, and the first

22   step of that is the strength of the mark.  So the strength of a

23   mark is generally on a sliding scale.  The top of the scale are

24   the completely arbitrary marks, things like Xerox, which had no

25   meaning whatsoever before it came out, and though many don't

```
 1   use paper anymore, I certainly understand when somebody says a

 2   Xerox, they mean a copy.

 3          Below that, you have marks that are fanciful, and

 4   below that you have marks that are subject -- excuse me,

 5   suggestive, and then below that, you get into the realm of the

 6   barely protectable and unprotectable, descriptive and generic.

 7          ELF falls somewhere in the fanciful to subjective

 8   category.

 9          THE COURT:  You mean suggestive or subjective?

10          MR. ROTHMAN:  Suggestive, not subjective.  Thank you.

11          It's fanciful because it really has nothing

12   whatsoever to do with the product, it is a real word, so it

13   can't be completely arbitrary, but it really has nothing to do

14   with the product at all except to the extent that one says,

15   Well, an ELF, a popular movie on TV this days is ELF about

16   someone who is not the size of an ELF, but much bigger, ELF

17   connotes something small.  So maybe because it has a compact

18   shape to it, it could be suggestive, but I think it is really

19   more than suggestive, I think it is more in the realm of

20   fanciful.  In either case, this is mark that is strong because

21   both of those categories denote strong marks.

22          The similarity of the marks have already been

23   covered; one is ELF, one is ELFBAR.  My client's registration

24   covers ELF in standard characters, so when you look at the

25   certificate, you are not looking at the registration for a
```

1    particular stylized version like we see in the circle with ELF,

2    but rather the plain characters.  So in one case, it is ELF; in

3    the other case it is ELFBAR, there is really no dispute as to

4    similarity.

5          The similarity of the goods:  Well, there has been

6    some disagreement about that.  What there hasn't been

7    disagreement about is that the goods all fall in basically the

8    same category, they are goods used to vaporize a variety of

9    substances, mostly nicotine containing substances, right?

10   Whether it's the disposable, such as the ELFBAR, or the

11   refillable such as my client's product, they are similar.  They

12   are both sold in variations of the form of the product on

13   websites like Demand Vape's products and others, and they are

14   sold in the same outlets, which actually falls under the next

15   category, which is sales methods, but the goods are effectively

16   the same, the only difference being the ELFBAR product is sold

17   full.

18         Well, sold full gets thrown away versus sold empty

19   and can be filled and reused.  There isn't a whole separate

20   category of shops or convenience stores or websites or

21   distributors for these two types of the same product.  They all

22   fall within the same international class and within the same

23   sales methods, advertising, all of the other things that

24   indicate similarity of goods.

25         The magazines are, I think, very probative of that

```
 1   because it is page after page, one page it's reusable products,
 2   the next page, it's disposable products and it goes back and
 3   forth like that.
 4           Sales methods:  You go to a vape shop, you can buy
 5   the ELFBAR, you can buy our client's product.  We submitted
 6   point of purchase information and exhibits as part of the proof
 7   to Your Honor and you can see that based on the testimony of
 8   Mr. Frija, that people go to these very same places to purchase
 9   these very same things.
10           If you even search for the product, as we saw in
11   Exhibits 13 and 14, on websites that are devoted to the sale of
12   vapes, you will find ELFBAR responds to the same search that my
13   products respond -- my client's products respond to.  The sales
14   methods, really, no dispute.
15           Advertising:  The Defendants, who are all here
16   because they distribute products and they go to trade shows and
17   they get magazines, and they then resell on a wholesale basis,
18   or they sell directly to consumers on a retail basis and they
19   read the same trade publications and they go to the same trade
20   shows and they are all attracting the same interest that
21   advertising attracts.  And we saw submitted on the Zoom session
22   that my client has found ads for ELFBAR in exactly the same
23   publications where we see -- where my client follows the
24   industry and where he testified that he previously has
25   advertised.
```

1        Intent:  The issue of intent here is really a

2   subsidiary issue because you don't need to intend to infringe a

3   trademark, but intent does enhance, and the case law indicates

4   it creates an inference that there was an intent to free ride

5   on the senior user, but it's just an inference.  It is not

6   dispositive and it is not even necessary, but it is an

7   inference.

8        And where intent factors here is really only in the

9   USPTO office action that was issued against the Defendants

10   attempt to register the mark and in response to that attempt,

11   the -- the USPTO trademark examiner indicated that the mark was

12   not registerable by the Defendant because of the existence of

13   my client's senior registration, so that was Exhibit 3, I

14   believe, and what it indicates -- Exhibit 3 indicates that as

15   of July 19th of 2021, the Defendants knew that my client was

16   selling and marketing and had registered a trademark in the

17   U.S. for exactly the same type of products in the same class

18   with the same descriptions.

19        What happens after that?  We saw in Defendants'

20   Exhibit 22, when we look at the sales beginning.  So they get

21   this office action July of 2021, and August, September,

22   October, three months later, Demand Vape sells $86,000 worth of

23   ELFBAR.  So if the estimate is correct that it takes about 90

24   days to flesh out the system and get a new vape in there to

25   replace ELFBAR, during which time you heard testimony there may

```
 1    be counterfeits, they certainly knew and had enough time to
 2    pick a different name because from this exhibit, they are only
 3    starting to market the product and ramping up sales three
 4    months after they were told they can't name the product that,
 5    but they move forward and they keep going and going and going.
 6    And if we look at the sales go up, we see that it's only after
 7    they are notified and we find out.  This is a very reasonable
 8    amount of time, by the way.  We are talking about a year,
 9    during which time my client finds out only about five or six
10    months into sales, of the existence of this product on the
11    market and now the problem that the Defendants have really
12    isn't any of our doing, okay.  We gave them notice, the
13    trademark office gave them notice, but they moved forward.
14            So from the standpoint of intent and its relevance
15    here, it is that inference, that inference that they knew, knew
16    enough and chose to move forward.
17            Actual confusion:  There has been --
18            THE COURT:  Before you proceed to that, so there was,
19    I think, some discussion that maybe the international
20    registrations are relevant to intent.  Can you flesh that out
21    in your view, why you think that is the sensible reading of
22    those registrations or not.
23            MR. ROTHMAN:  Listen, it's -- I don't think that it's
24    a completely irrelevant point and I understand that especially
25    these days, business is international.
```

1          The problem is that trademarks are still national and

2     companies know that because they hire lawyers like

3     Ms. Shufflebarger, who has handled many of the trademarks for

4     the Defendants in this case, and they know that they need to

5     address their trademark portfolio on a country-by-country

6     basis.

7          Interestingly enough, for the first time in a long

8     time, in this coming session of the Supreme Court, they are

9     going to address an issue of extraterritorial application of

10    the Lanham Act, which is the exception.  But the rule is that

11    IP rights apply in the U.S. if they are U.S. rights, and the

12    rule is not that it's sufficient to simply check to see if your

13    IP registration is valid in a few countries; and therefore, you

14    can then market it everywhere.

15         What is the purpose of the trademark search?  The

16    purpose is to indicate what countries are protectable and what

17    countries are not.  We call it a knockout search, right?

18         So if the client comes to us and says, I would like

19    to register the mark in the U.S., and you run the knockout

20    search and in the knockout search, you are knocked out in the

21    U.S., you can't do it and then you have to go find another

22    mark, but you do that in each country.

23         And I -- listen, I sympathize with companies as they

24    grow and they get bigger and enter new markets, but what

25    happens is they have to rebrand their products for some markets

```
 1   because it is simply not possible to market -- Total is the
 2   name that comes to my mind.  You see it all over Europe for
 3   gasoline stations, but Total is also very well known as a
 4   cereal and also I think a detergent in this country.
 5           So while I understand and appreciate there might be a
 6   relevance to intent generally, when you actually look at the
 7   issues and you look at these national trademark searches, what
 8   you are going to find is that our mark is on that search for
 9   the U.S., right?  So if you aren't paying attention to what the
10   search says, then you are not seeing that this registration
11   that we are here on today is a registration that was extant in
12   the U.S., applied for, then issued since 2018 and it says
13   warning, Don't go into the market with that mark because you
14   are risking a potential lawsuit, but more importantly you are
15   risking, you know, wasting funds on marketing a product, unless
16   perhaps the idea is that these products are so -- I don't know,
17   they have a limited life, it's good for a year.
18           That may be, we heard similar testimony to that.
19   Maybe the attitude of the Defendant who names a product and
20   sells it for a period of a year, because they know it is going
21   to become passe and get replaced by the next Geek Bar or that
22   Bar, I can tolerate a little trademark infringement, no big
23   deal, but the reality is they knew it existed and that's what
24   the trademark search shows.
25           THE COURT:  All right, let's move on.
```

```
 1              MR. ROTHMAN:  Actual confusion:  We have evidence, it

 2    is not necessary.  In fact, there was an amendment to clarify

 3    the Lanham Act that says that the likelihood of confusion for

 4    preliminary injunction under 1116 (A) is, in fact, inferred.

 5    But here, we have even more.  We have a -- evidence of at least

 6    one of my client's distributors being confused by the back and

 7    forth text messages thinking that ELF, which had been

 8    historically associated with my client, was also ELFBAR now

 9    associated with my client, and that turned out not to be the

10    case, and that was in Exhibit 11.  So even though we don't need

11    actual confusion evidence, we do have some.

12              THE COURT:  Are you perhaps overstating what one can

13    draw from that text message?

14              MR. ROTHMAN:  I could be certainly overstating it.

15    Hey, are you the one behind ELFBAR?

16              Why would you think that?

17              Lol, you know why.  Elf, wasn't that your device?

18              Certainly it indicates that the guy knows that my

19    client is the source, whether he really believed that my client

20    was also the source of ELFBAR, at the very least, he seems to

21    indicate that there is something wrong there.  He is not a

22    trademark practitioner, so he definitely sees there is

23    something -- something isn't right with that.

24              THE COURT:  There is no date on that chain from what

25    I remember from the text page or something.
```

1          MR. ROTHMAN:  I can't remember when it was that my

2   client testified that he received it, but my recollection was,

3   and we can look at the transcript, was that it was --

4          THE COURT:  We are not expanding the record, if it is

5   in there, it is in there.

6          MR. ROTHMAN:  Yeah, it was June of this year.

7          Okay.  So we have taken all of those factors

8   together.  We have demonstrated priority, we have demonstrated

9   Defendants' use in the marketplace, we have demonstrated all of

10  the factors indicating we have a mark.  The mark is strong, the

11  mark is protectable, we demonstrated that we have a likelihood

12  of success here on this case.

13         There is very little public interest that we really

14  can consider because the public interest does not favor

15  allowing marks to be infringed.  It favors allowing trademark

16  owners to exercise their rights and to protect their marks, so

17  there is very little public interest.

18         And before I address the bond, let's --

19         THE COURT:  On the injury, I mean, there seems to be

20  a little bit of a theme that maybe your client's companies are

21  very small players, so in the grand scheme of things, this

22  isn't maybe that offensive because it kind of had already -- I

23  don't know, dwindle in sales prior to the ramping of the

24  ELFBAR.  I'm summarizing, but that's a little bit of the tone

25  of the argument.

```
1          MR. ROTHMAN:  I have never seen a decision that says,

2   you know, The little player in the same exact market, okay, is

3   stripped of their trademark rights simply because a bigger

4   player came in and adopted their mark for exactly the same or

5   almost identical goods.

6          Really it would turn trademark law on its head if

7   that were the case.  Then it really wouldn't be law anymore, it

8   would just be survival of the fittest.

9          So what is the Defendant really arguing?  The

10  Defendant is really arguing that my client has been operating a

11  business and it's a good business, it is not the greatest

12  business, their business is the greatest.

13         Well, what makes their business great?  Perhaps it

14  has something to do with the fact that my client picked a mark

15  that they jumped onto that people like, but my client didn't

16  have the necessary marketing, he didn't choose the right

17  flavors, maybe he needed to sell it already full, but that

18  doesn't mean that my client doesn't have rights and that my

19  client doesn't have the ability to protect it.  It just means

20  that the Defendants were able to more effectively take

21  advantage, and I don't think that that is a -- that that inures

22  to the public interest.  I think the opposite, I think --

23         THE COURT:  All right.  Now on the unlawful use

24  piece, assuming it were relevant, which I think is doubtful as

25  I have already expressed, where would it fit in the analytical
```

```
 1   framework?

 2           MR. ROTHMAN:  Well, it is a defense if it is

 3   recognized, and it's a good question.  I can't quite figure it

 4   out on the preliminary injunction posture because it kind of

 5   fits into the category of an affirmative defense, which is

 6   almost never considered unless, you know, you are dealing with

 7   something that is so strong, like in a copyright, a fair use

 8   offense could potentially completely blow the Plaintiff's case

 9   out of the water on an injunction, so I don't really know.

10           What I can -- and I haven't found, because there is

11   very little law on it -- I haven't found something that says,

12   you know, where should the Court compartmentalize that.  And

13   maybe Defense Counsel has found something, but I haven't found

14   anything.

15           What I would rather do is just really quickly give

16   you the reasons why we don't need to deal with it here.  One,

17   is it's not recognized in the Eleventh Circuit, that's a simple

18   one.

19           Two, we are selling a product that arguably is not

20   unlawful, all right.  The expert testified FDA has done nothing

21   about our product, and except for a couple of exceptions that

22   really don't apply, it's done nothing about any product like my

23   client's product.  The Defendants' product is similarly

24   arguably unlawful or lawful, depending on how you look at it.

25           So, you know -- and their expert admitted that no
```

1    fruit or mint flavored pods have been authorized for sale,

2    supposedly they have applied.  I haven't seen any evidence of

3    their application for premarket authorization, but wouldn't

4    that really turn the whole unlawful use idea on its head if you

5    had a plaintiff and a defendant, both of whom arguably were

6    engaged in unlawful use, and I'm not admitting that at all, who

7    were able to rely in a case like this on that defense?  It

8    doesn't make sense.

9           Whether or not a product can be sold, which is my

10   next point, doesn't depend upon is it lawful.  It depends upon

11   the FDA, and the FDA's enforcement discretion is vast.

12   Obviously, it's resources are much smaller, right.  It's

13   generally not FDA's part to play to move into the market and

14   deal with trademark owners who are disputing over who gets the

15   right to sell what based upon a product category that is pretty

16   much in limbo and has been for many, many years.

17          The thing you can say, though, is that the mark was

18   issued on the principal register and when the USPTO issued it,

19   it knew what the mark was being used for, and the Lanham Act

20   says, in section 1052, that the use has to be lawful.  It also

21   can't be immoral, deceptive or scandalous, so now -- this isn't

22   the FDA's determination.  We are talking here about trademark

23   law.

24          You can look and many of the marks that have been

25   applied for over the years to use products that are illegal,

```
 1   like cannabis, still illegal under federal law, have been

 2   refused.  Why?  Because the trademark office views those as

 3   being marks for unlawful use.

 4              THE COURT:  All right.  No thank you, I think I

 5   understand your position on this.

 6              Let's turn to the bond.

 7              MR. ROTHMAN:  Okay.  Can I just -- one more point?

 8              THE COURT:  Sure.

 9              MR. ROTHMAN:  There are two cases, if Your Honor is

10   really on the edge and thinking, maybe I want to hit this

11   unlawful use thing, okay.  There are two cases out of

12   California that will convince you otherwise:  In re: Phantom,

13   which is 2016 Westlaw 11503066, and In re: Juul, which is 497

14   F.Supp. 3d, 552, okay.

15              Reading those cases ought to be enough to convince

16   you you don't want to go there because it is a morass.  I read

17   those cases and I shiver for what the judges were forced to

18   really have to slug through to get to issues because the issues

19   bound up in e-cigarettes are so complex, and this is a

20   trademark case.

21              Let's go to the bond.  What we heard was some

22   testimony about what these two distributors, and only these two

23   distributors, are going to potentially lose.  The last bit of

24   testimony we heard, I think was the most helpful because the

25   witness indicated that it would take approximately 90 days for
```

```
1    the ELFBAR void to be filled, right?  And we have his revenue

2    information, and if we looked at just the profit amount, we are

3    talking about an average monthly profit here of -- you know, it

4    appears to fluctuate from between 1 to 6 million or so on the

5    bottom set of statistics for gross profit.

6           THE COURT:  That is a lot of money.

7           MR. ROTHMAN:  It is a lot of money, right, and that

8    would be a really big bond for my client to have to post and

9    I'm not offering that.

10          What I'm offering is the following:  First of all,

11   you have to take into account that what we are dealing with

12   here is an industry that we have seen will fill the void, and

13   the void is going to get filled with other products.  I think

14   the testimony that, you know, there will be no substitutes is

15   really not credible.

16          I asked the gentleman specifically about this other

17   product called Lost Mary, which is actually one of the top ten

18   trending products next to ELFBAR on their website.  And I don't

19   think that you can consider either this counterfeit product

20   argument because think about this, who created the counterfeit

21   problem?  It wasn't my client, right.  It was the Defendants,

22   the Defendants created a product that became hot and other

23   people wanted to copy it, and so the numbers that we see, even

24   if you consider them high, I think that those numbers are a

25   result of conduct that really shouldn't be considered because
```

```
 1    it is not equitable conduct.  It's conduct by an infringer.

 2             Now, there aren't a lot of cases.  Your Honor's

 3    discretion is pretty much where the Eleventh Circuit and the

 4    other appeals courts begin and end when they talk about a bond,

 5    right?  It is in the district court's discretion, that's what

 6    they say.

 7             So there aren't very many cases that actually parse

 8    out what Your Honor is going to consider.  There is one case we

 9    found during the break, it's a case that Judge Gold decided and

10    the Westlaw cite is 2009 Westlaw 10700667.

11             And in this case, what happens is the Court's issuing

12    a preliminary injunction says the usual about the Court having

13    discretion to issue one without security, notwithstanding the

14    mandatory statements in the rule that security, citing '78

15    Fifth Circuit case, says that security is generally not

16    required where the party seeking the injunction has a high

17    probability of success on the merits or if no evidence is

18    presented that a party will suffer damages.

19             So we have a high probability of success here.  We do

20    have some evidence that the Defendants offer that they are

21    going to suffer damages from the issuance.

22             Then the Court says that at the evidentiary hearing,

23    plaintiff argued that a bond in this case should be in the

24    vicinity of 10 to $15,000.  It was a franchise situation, which

25    is not uncommon for trademark.  Defendants argued that the bond
```

1    should be much higher to account for the investment defendants

2    have put into the nightclub and the expected profits during the

3    ten year duration of the agreement and ask asked for a bond of

4    10 million.

5              So the defendants said, We made all of this

6    investment into this thing that we now know we don't have the

7    rights to; and therefore, the plaintiff should be required to

8    put up a very high bond.  The Court, Judge Gold, said, The

9    prevailing case law in this circuit does not support

10   defendant's basis for such a high bond, not least because

11   defendants continue to be in a position to operate the club,

12   even if less profitably at the outset, without the use of the

13   mark.  Further, the high probability of plaintiff's success on

14   the merits counsels against the imposition of a substantial

15   bond," and the court goes on, I think, to impose a bond of

16   maybe $15,000.

17             I mean, I look at this situation as one where,

18   analogous to here, there is a very high success rate of -- a

19   very potential for -- withdrawn.

20             THE COURT:  I understand that point.  I think at the

21   end of the day, you are recommending no bond or at the most,

22   what is your position?

23             MR. ROTHMAN:  $100,000, I think is a reasonable

24   amount considering the financials that have been demonstrated.

25   There is no doubt that I think -- I almost never ask for no

```
 1    bond any more because I think it is required, but I think under

 2    the circumstances, I think -- I don't know, I have a feeling

 3    that amount makes sense.

 4           I mean, you look at these numbers, it would make no

 5    sense to award a bond in the millions.  For what, for a product

 6    that according to the testimony may have just come to the end

 7    of its life anyway.

 8           THE COURT:  All right, thank you.  Anything further?

 9           MR. ROTHMAN:  No, Your Honor.

10           THE COURT:  All right.  Let me hear from Mr. Heyer.

11           MR. HEYER:  With Your Honor's indulgence, just given

12    the number of issues to address here, I would like to address

13    the unlawful use issue and the bond and potentially the balance

14    of harm and public interest, and then allow Ms. Shufflebarger

15    to address the factors of unlikelihood of confusion.

16           THE COURT:  Certainly, we can split it up that way.

17           MR. HEYER:  I'll echo Mr. Rothman's thanks for Your

18    Honor's close attention to this.  Over the two days of the

19    hearing, there has been a lot of evidence, a lot of testimony

20    presented.

21           I'm going to start a little bit in reverse on the

22    bond issue because it was the last thing addressed.  As Your

23    Honor saw, there are eight Defendants here, and I'm going t be

24    try and be expeditious.  We had two of the distributers come

25    in, one with substantially larger profit and sales than the
```

```
1   other, but between the two, that alone -- and one of them has

2   been selling for about 12 months, 12 or 13 months; the date of

3   the other, it was ten months of data, but right there, over

4   50 million dollars in profits.

5            I think it's fair to -- and we did not put evidence

6   in on the profits of the manufacturer, but those would

7   obviously be very substantial and likely more than what these

8   two distributors had.

9            We think it is a fair request to extrapolate out and

10  to request a bond of $200 million in this circumstance.

11  Certainly, 100,000, I think if we look at the numbers, I don't

12  even know if that's the profits on a single day's worth of

13  sales of this product.

14           And the trajectory -- what is particularly important

15  is the trajectory of the sales, and the testimony showed, and

16  Exhibits D21 and D22 show the trajectory is still increasing.

17  All of a sudden, if it hits a wall because of the injunction --

18  and we cited the case law.  The purpose of the bond is if at

19  the end of the case, the ultimate decision is that the bond was

20  improperly imposed, that is the sole and exclusive remedy that

21  our clients have to have any chance -- they would never be made

22  completely whole.

23           I think Mr. Glauser testified about the lost

24  goodwill, the lost customer relationships they would suffer.

25  It is sort of the flip side of the coin on a preliminary
```

```
 1    injunction to an irreparable harm argument, but to have at
 2    least some sort of or at least a partial remedy, this is it.
 3              Frankly, I think 200 million itself, given these
 4    numbers, is also understating it, but you know, at some point,
 5    they are such large numbers.
 6              And I would point Your Honor to some of the -- there
 7    is very good case law that does discuss the need for bonds and
 8    frankly for courts to be conservative in favor of the enjoining
 9    party in setting a bond out of the Seventh Circuit.  Focusing
10    on that and the realities of why the bond requirement exists
11    under Rule 65C, I would also point Your Honor to the case out
12    the Third Circuit that we cited that said, "Except in
13    circumstances where there is essentially zero evidence of any
14    potential loss, it is clearly reversible error not to require a
15    substantial bond."
16              So that's -- I agree with Mr. Rothman, there is not a
17    ton of developed case law around the country on this issue and
18    the Court does have a certain amount of discretion, but given
19    that this is the number one product, and there is no testimony
20    against that, in the country that's on a growing trajectory of
21    sales, it would be frankly calamitous for these Defendants to
22    be enjoined from selling this product.
23              When I say 200 million, I don't know how long it
24    would take to get to trial on the merits, I'm sort of assuming
25    that perhaps a year or so.
```

Thursday, December 1st, 2022

```
 1              THE COURT:  But you are making use of the word
 2   calamitous and that may be far more exaggerated than the
 3   testimony supports.  There was references to it being
 4   detrimental, profit margins where from maybe 25 to 50 percent,
 5   which certainly is substantial, but both of those companies
 6   sell a number of other -- or distribute a number of other
 7   brands and I think the market itself is fairly dynamic and
 8   adjusts, so I don't know if it is fair to say this would be
 9   calamitous, as you describe it.
10              MR. HEYER:  I think for any employees that are laid
11   off that have gotten jobs because of this growth in sales and
12   then have to be laid off because of --
13              THE COURT:  Certainly that's a human cost that's
14   quite difficult to absorb and I don't dispute that, from a
15   business-wide perspective.
16              MR. HEYER:  Right.  So that that's I think where we
17   are at on bond, but certainly 100,000 or anything that's --
18   that's so de minimis to not be near the realm of
19   reasonableness, I think.
20              THE COURT:  Do you discount that amount at all by the
21   likelihood of success?  As Mr. Rothman discussed, that sort of
22   the setting of the bond amount necessarily has to consider
23   Plaintiff's likelihood of success.  Of course, I know you
24   dispute that, but at what point does the Court temper that
25   substantially depending on where the merits lie?
```

```
 1              MR. HEYER:  Certainly the Court can take that into
 2     account.  I think -- I think frankly -- and I don't want to get
 3     ahead of myself.  I think frankly, we have a summary judgment
 4     motion on the lawful use issue, I think there is zero
 5     likelihood of success.  And then even on the factors of
 6     likelihood of confusion, our case is exceptionally strong and
 7     I'll let Ms. Shufflebarger speak to that.
 8              That's certainly part of the mix, but that certainly
 9     does not drive a number -- such a discount off of the numbers
10     that we have seen in D21 and D22 on profits and that.
11              Again, there are these harms that will necessarily be
12     suffered that are necessarily irreparable in terms of loss of
13     goodwill, and loss of customer relationships that no amount of
14     money can ever replace.
15              I think Mr. Rothman is fundamentally
16     mischaracterizing the reason for the bond and what the
17     testimony showed as far as how this market works, saying, Well,
18     other products will fill the void in 90 days.
19              Well, for the manufacturer of this product, that's
20     not going to be their products that would fill the void, and
21     they are going to be out -- I mean, we are on this increased
22     trajectory -- a massive amount of sales, a massive amount of
23     profits, as will potentially these distributors lose those
24     customers.
25              As Mr. Glauser, and I think every other fact
```

1   witnesses testified, it is this particular product, it is the

2   hottest product, it is the consumer demand for this particular

3   product that is driving it, so it's not -- and Mr. Glauser

4   testified for his company, this is a product that has a much

5   higher profit margin than the others.

6           So no matter from what direction you look at it, with

7   whatever lens, it's inappropriate to say, Well, other products

8   are going to come in and fill the void.  Even if they do, the

9   harm is going to be massive financially for our clients, so

10  that's, I think, what I would say on the bond issue.

11          Maybe I'm going to work my way backwards a little bit

12  on the analysis.  The public interest, I know often that sort

13  of gets short shrift in ruling on preliminary injunction

14  motions, at least in the written opinions.  Here, I think --

15  and especially, Your Honor heard the testimony about the

16  propensity for counterfeit versions of highly popular products

17  with high consumer demand in this industry to come in and

18  satisfy consumer demand and if for whatever reason, be it FDA

19  action, be it circumstances like contemplated here, be it

20  supply issues like was the case in July of this year, where the

21  authentic, popular product is not available or not available in

22  quantities consumers are demanding, and there is no way to

23  quantify this.  There is a very serious public health risk

24  because Mr. Glauser testified that these counterfeit products

25  that are already here and would likely only grow in

```
 1    distribution and sales to consumers would present -- there

 2    would be more people inhaling things like Mr. Glauser testified

 3    to with toxic metals, et cetera, and doing irreparable harm

 4    potentially to lungs and their physical well-being if these

 5    products are required to be taken off the market.

 6            I don't know how you quantify that, but I think the

 7    public interest factor is -- this is a rare case, but this is

 8    particularly important in this case given the public health

 9    implications.

10            THE COURT:  Basically for me to spin that out, these

11    two entities, right, they check if it is a reputable company,

12    one of them testified it conducts its own testing, so they

13    would be in the business of selling harmful products, is what

14    I'm hearing.  So I would have to assume that the other

15    companies out there would then start selling harmful products

16    and the FDA would be nowhere to be seen and that should be the

17    Court's public interest analysis.  It just seems quiet

18    amorphous and difficult really to grapple with under this

19    posture given the parties in this case.

20            MR. HEYER:  I think Your Honor has to rely --

21    Mr. Glauser, like I said, has been in the industry from the

22    ground floor.  This has been -- and I don't want to try to add

23    to the record, but essentially my practice is like the expert

24    that you heard and I, myself, have seen this.

25            I mean, I litigated the very first e-cigarette case
```

```
 1   against the FDA and I, myself, have seen this.  This is exactly

 2   what happens; the consumer demand drives these products.  And I

 3   think Mr. Rothman doesn't disagree, FDA's enforcement resources

 4   are finite and so this is a problem across-the-board.

 5           We, ourselves, are litigating many cases against

 6   counterfeiters for different brand owners and that, and these

 7   products find their way into the U.S. through one way or

 8   another, and it's a very serious public health risk, so it's --

 9   it's a fairly unique factor in this circumstance, but it is one

10   that I think the Court should not be quick to discount,

11   respectfully.

12           THE COURT:  All right.  I think we talked about bond,

13   public interest.

14           MR. HEYER:  I'll leave the balance of harms to

15   Ms. Shufflebarger.  I'll just note I don't think that was

16   really addressed at all by Mr. Rothman, and I'll leave that

17   prong to her, and I'll leave the likelihood of confusion in

18   terms of likelihood of success on the merits.

19           But one, Plaintiff has to show a substantial

20   likelihood, which I think is not just getting over the --

21   getting over the 50 percent threshold.

22           THE COURT:  Why is this not a substantial case?

23   Really at the end of the day, we are talking about ELF versus

24   ELFBAR.

25           How do you get beyond that, the similarity of the
```

```
 1    retail outlets, it does seem quite similar I have to admit.
 2               MR. HEYER:  I'll let Ms. Shufflebarger speak to the
 3    likelihood of confusion factors, but likelihood of success, the
 4    Court -- the first thing they have to prove is not only that
 5    they have senior rights, but that they have any rights at all.
 6               THE COURT:  This is entering your unlawful use
 7    doctrine.
 8               MR. HEYER:  Exactly, because this is actually a
 9    predicate to even looking at anything else.  They have to --
10    they have an obligation to show that they actually had any
11    lawful --
12               THE COURT:  So without unlawful use, what is your
13    argument?
14               MR. HEYER:  I'm going to leave that to
15    Ms. Shufflebarger.
16               THE COURT:  Let's get to that because really that's
17    the heart of this case.  I want to talk about substantial
18    likelihood of success, it is a preemptive factor and I think
19    that's where the Court needs to start her analysis.
20               MR. HEYER:  Should she come up and I'll hit unlawful
21    use after that?
22               THE COURT:  Yes.
23               MR. HEYER:  We will do that, then.
24               MS. SHUFFLEBARGER:  Thank you, Your Honor.
25               As Mr. Heyer was indicating and as you acknowledged,
```

1   the test for a preliminary injunction is not just of

2   51 percent, it is a substantial likelihood of success.  Courts

3   within the Eleventh Circuit also note that a preliminary

4   injunction is an extraordinary remedy and must be -- can't be

5   entered lightly and must be properly weighed.

6          As far as the burden, of course, that's on the

7   Plaintiff to prove this by a substantial likelihood.  With all

8   due respect, I believe that Mr. Rothman's reliance on some of

9   the evidence that he believes supports some of these factors

10  are a bit overstated by what he says.

11         First, to -- Mr. Heyer hit on this point, ownership

12  of a mark is not just the priority issue.  The standard is you

13  have to show ownership of a mark that, one, has priority; two,

14  it's valid; and three, it's protectable, so I believe that the

15  illegality point does come into play here.

16         No one has filed their answer yet, there has not been

17  an opportunity to challenge the validity, so that is still an

18  open factor, notwithstanding the fact that they do possess a

19  federal registration, we are not conceding that.

20         As far as the actual --

21         THE COURT:  So in terms of the timing, there is no

22  dispute that they have a registration.

23         MR. HEYER:  There is no dispute that they have a

24  registration.

25         THE COURT:  There is no dispute that your client

```
 1    didn't apply for one and did not get one, and that the PTO

 2    referenced Plaintiff's registration in the course of denying

 3    it?

 4            MS. SHUFFLEBARGER:  I would like to dispute the case

 5    law -- how the case law laid that out.  Would you like for me

 6    to address that?

 7            THE COURT:  Yes, please.

 8            MS. SHUFFLEBARGER:  First off, there is authority

 9    within this circuit, the Eleventh Circuit, that says as much

10    as -- you know, they are not bound by what exactly a trademark

11    examining attorney does at a lower level.

12            THE COURT:  Certainly it is not dispositive, but it

13    is relevant.

14            MS. SHUFFLEBARGER:  It's relevant, but it's not

15    dispositive.  There is at least three cases we cite where that

16    is not a determinative factor.

17            This also weighs in on the intent factor.  I believe

18    Mr. Rothman went a little far afield on what we were offering

19    the foreign search for.  He is saying that it shows intent that

20    the trademark office denied our client's registration, and we

21    did it anyway.

22            All we want to show is the test is not -- the intent

23    of the test is -- the language is, excuse me, the intent to

24    misappropriate the proprietor's goodwill.  So it's not, Well,

25    you found out about us and went on anyway.  Were we intending
```

1    to use their goodwill and the reason the foreign stuff is

2    relevant is because it shows that before we applied in the

3    United States, before Weiboli, not all of our defendants, of

4    course, before the USPTO issued that ruling, they had already

5    filed in other countries, so how do you say that we are

6    intending to trade on the goodwill of this client -- this

7    product, that even his client acknowledged he is humbled by how

8    small and not known they were.

9           So that was the only reason that we wanted to submit

10   that, and I appreciate that it's coming up in the Supreme

11   Court, but for the limited purpose of what we intended that to

12   show, it does not -- there is not evidence to show intent on

13   the part of our client.

14          Circling back to the -- do you have any other

15   questions on either of those, Your Honor, or should I circle

16   back to the earlier factors?

17          THE COURT:  I think the way Plaintiff cast it is more

18   of an inference that you applied for a trademark, you were

19   denied the trademark; and nevertheless, you proceeded forward

20   using --

21          MS. SHUFFLEBARGER:  Right.

22          THE COURT:  Using arguably, the Plaintiff argues, the

23   mark itself.

24          MS. SHUFFLEBARGER:  Yes, Your Honor.  I'll point Your

25   Honor to the case law we cited on page ten of our brief, which

```
1    is pretty much on all fours with the facts here.

2            One case involved UPS, there was one case here where

3    actually Mr. Rothman was counsel of record that acknowledged

4    that it is not conclusive of what the trademark office does.

5            In fact, the UPS case was on all fours.  They were

6    refused, they went forward, the Sixth Circuit ruled in favor of

7    them, so there is authority out there that undercuts the

8    argument that what the PTO did in that one decision.

9            Also I will note that our clients didn't appeal that.

10   It would hold a little more weight if it had been an

11   adjudication by the trademark trial and appeal board or

12   subsequently appealed to higher grounds.  This was basically an

13   examination attorney, an administrative professional.

14           THE COURT:  Gotcha, okay.  All right.  You can move

15   on then beyond the intent factors.

16           MS. SHUFFLEBARGER:  Sure.  I would like to back up to

17   another factor that Mr. Rothman hit pretty hard on; the

18   strength of his client's mark.  I don't think there is any

19   dispute that this is where it falls on the conceptual strength

20   scale.  It's at least perhaps suggestive, it's not a coined

21   term.

22           But what Mr. Rothman's analysis misses and what the

23   Eleventh Circuit indicates has to be considered, in addition to

24   conceptual strength, is commercial strength.  And the

25   commercial strength is the marketplace's recognition of the
```

1    value of that mark and by Mr. Frija's own testimony, there is

2    no marketplace recognition of the client's mark.

3              And how marketplace recognition is assessed is, one,

4    in terms of sales, and we have acknowledgment by him that his

5    sales vis-a-vis what our clients have done is minimal.

6              Another thing is advertising expenditures, we have

7    no -- Plaintiffs have put in no evidence as far as advertising

8    expenditures whatsoever, so they haven't bourne their burden on

9    that point.

10             Another factor that goes into the commercial strength

11   that you can show is third party recognition of your brand.  We

12   haven't gotten any evidence from Plaintiff showing third party

13   recognition of their brand.

14             Another way they can show that, and they have not

15   done, it is not mandatory, you can commission a survey to get

16   that in as far as the strength of the mark; granted, we are in

17   early stages.  I can tell you that in other preliminary

18   injunction cases, I have had plaintiffs come up and have that

19   to show the strength out of the gate and we don't have that

20   here.

21             So the other -- the final thing on conceptual

22   strength or commercial strength goes to other third party uses

23   in the marketplace.  It's not conclusive evidence here, but we

24   have some testimony that came in that there is some in the

25   marketplace now, albeit not perhaps prior to Plaintiff using

```
 1    it.
 2                THE COURT:  I'm sorry, I didn't follow that last
 3    point you just made.
 4                MS. SHUFFLEBARGER:  There are other third parties
 5    using ELF in the marketplace; in other words, they are not the
 6    only ELF in the marketplace at this point in time.
 7                THE COURT:  Okay.
 8                MS. SHUFFLEBARGER:  As far as the similarity of the
 9    marks, a couple of points to make on this.  Mr. Rothman --
10                THE COURT:  I guess, how does that cut?  Maybe it is
11    just a great mark and people want to use it, which is --
12                MS. SHUFFLEBARGER:  Well -- I'm sorry, I didn't mean
13    to --
14                THE COURT:  No, no.  Thank you.
15                MS. SHUFFLEBARGER:  A of couple things.  If there is
16    many in the mark, it shows that consumers can differentiate
17    between the various different users of the mark.
18                For example -- well, I don't know if it is in the
19    record, so I won't go there.  But on some of the materials on
20    the exhibits, there were some ELFs that weren't necessarily our
21    client's products and that's how this comes into play.
22                THE COURT:  Okay.
23                MS. SHUFFLEBARGER:  The second way is the Plaintiff's
24    failure to police the marketplace against other people's use of
25    it, except for our client.
```

```
 1              As far as the similarity of the marks, there are a
 2   couple of points I would like to make on that.  First off,
 3   there is not any dispute that Mr. Rothman's client has a
 4   registration for just the word mark ELF, but --
 5              THE COURT:  Under the class that we are talking
 6   about.
 7              MS. SHUFFLEBARGER:  Correct, correct, but likelihood
 8   of confusion in the trademark office, as opposed to real
 9   marketplace conditions, is not always coextensive.
10              So for example, the trademark office, what they are
11   deciding is if you get that registration.
12              THE COURT:  Could you slow down a little bit.
13              MS. SHUFFLEBARGER:  I apologize.
14              You get that piece of paper.  The trademark office is
15   not empowered to tell you how you use it, they don't assess how
16   it is used in the marketplace and whether that will cause
17   likelihood of confusion.
18              Here, as you can see from the exhibits that were
19   admitted, the manner and use of the mark is highly dissimilar.
20   Mr. Frija's product always has the circle with the ELF written
21   in that text; our client's does not, and that's just the
22   difference that --
23              THE COURT:  I don't know if that's true or not.  I
24   think maybe on some of the images that contain that little
25   circle have one, but then other times, it was the word itself.
```

1           MS. SHUFFLEBARGER:  The word ELF as opposed to --

2           THE COURT:  Yes, like on the box maybe.  Correct me

3    if I'm mistaken, but I don't know if it was limited to the

4    circle with the sort of oblong letters.

5           MS. SHUFFLEBARGER:  Sure.  I don't know, I don't have

6    it in front of me, Your Honor, you may be right.

7           It's a similar thing on similarity and dissimilarity

8    of the marks.  There is authority cited in our brief that it's

9    improper to dissect a mark, you have to consider the mark as a

10   whole.  So the parts that say, Well, ELF and ELFBAR, there are

11   all of these other bars, that was not dispositive, you have to

12   acknowledge and examine the mark as a whole.  Our clients use

13   it as ELFBAR, it is not ELF.

14          THE COURT:  How can you say it is not similar, just

15   similarity of the mark, how is it not similar?

16          MS. SHUFFLEBARGER:  It's a matter of degree.  I'm

17   just saying you have to consider -- when you are weighing these

18   factors and you are weighing the marks, you have to consider

19   it, it is a factual determination that Your Honor will have to

20   make.

21          THE COURT:  What is your argument that it is not very

22   similar, that the marks are not very similar?  I think this is,

23   you know, a requirement -- sorry, one of the seven factors in

24   determining likelihood of confusion and I'm just trying to

25   understand Defendants' argument as to why the similarity of the

```
 1   marks is not as strong as Plaintiff suggests.
 2           MS. SHUFFLEBARGER:  I'm just saying you have to --
 3   you acknowledge and assess the entirety of the marks.  There
 4   are cases out there that I have dealt with where you have had
 5   identical marks, but when you weigh all of the factors, it
 6   still comes out that there is not confusion.  I'm just saying
 7   that's --
 8           THE COURT:  Okay.  So you are agreeing that it is a
 9   similar mark, but you are saying the other factors outweigh
10   prong two.
11           MS. SHUFFLEBARGER:  Yes, and I'm saying the way it is
12   used is not identical.
13           THE COURT:  And by that you mean with the font, as
14   you were referencing earlier, that sometimes it's in the
15   circle.
16           MS. SHUFFLEBARGER:  And it is ELFBAR.  No one is
17   going to call Mr. Glauser and try to order some ELF product,
18   they are ordering ELFBAR.  And similarly with the Puff Bar,
19   they are known as Puff Bars, they don't call them Puff.
20           I can't remember any of the other instances that
21   Mr. Rothman's very busy website had on it, but same deal; those
22   are known as the entirety of the mark, not truncated just as
23   ELF.  I think that's a key point to make on that factor.
24           THE COURT:  Got it, okay.
25           MS. SHUFFLEBARGER:  The similarity and the
```

```
 1   dissimilarity of the goods, we don't dispute that they are

 2   similar.  They are not identical as far as what customers are

 3   seeking from those respective products, I think our witnesses

 4   today put on evidence, so I won't belabor the point on that.

 5            THE COURT:  What do you mean, that some are

 6   disposable and some are not, is that what you are getting at?

 7            MS. SHUFFLEBARGER:  I think Mr. Glauser sort of

 8   testified that customers seeking our client's product are

 9   essentially nicotine addicted people looking for an alternative

10   and people seeking his Plaintiff's product or that type of

11   product are more people seeking cannabis, and I acknowledge

12   that they have acknowledged that their products are for

13   nicotine.

14            THE COURT:  Okay.

15            MS. SHUFFLEBARGER:  As far as the similarity and

16   dissimilarity of the parties' retail outlets and customers, I

17   appreciate that testimony from Mr. Frija both on Friday, the

18   18th and today, says that he sells to connivence stores, to

19   vape shops, but I point out there has been no examples of that,

20   no concrete examples have ever been given that show that they

21   are used in the same stores.  And our people have been to -- I

22   think Mr. Glauser said thousands of these vape stores and have

23   never seen these people in the same place, and that also goes

24   to the next factor, which is similarity of advertising methods.

25            We had testimony from both of our gentleman today
```

```
 1    that they attend a substantial number of trade shows, which is
 2    given limitations on advertising.  That's a key way you get out
 3    there and, you know, you press the flesh and you make
 4    connections and sell your products and advertise yourself.
 5              I think we have seen one advertisement in a B2B
 6    magazine that they put into evidence, that's it.  So there is
 7    no evidence that the Plaintiffs have put in to bear their
 8    burden that the advertising is the same.
 9              In fact, when they put the magazines today in front
10    of our Defendant clients, they admitted they don't even read
11    those publications, so I think that was of limited probative
12    value on that -- on that point.
13              Now, as far as the intent, I think I hit on that
14    earlier, Your Honor, as far as the Eleventh Circuit said that
15    that shouldn't be persuasive authority and our client was
16    already applying all over in developing a worldwide brand, it
17    wasn't that they were trying to trade on the Plaintiff's
18    goodwill.
19              THE COURT:  So you are saying the Eleventh Circuit
20    has said it's not persuasive or not determinative?
21              MS. SHUFFLEBARGER:  It's not determinative and some
22    case law actually said it would be an error to give it much
23    weight at all.  That case was -- I can't find it right now.
24              THE COURT:  That's okay -- if it is cited in your
25    papers, I will --
```

```
1            MS. SHUFFLEBARGER:  "The Eleventh Circuit has stated
2    that the district court deciding trademark infringement is not
3    bound by, nor should it even be persuaded by a registration
4    decision rendered by an examining attorney."  That's the *Play*
5    *Nation* case from 2010, Eleventh Circuit.
6            THE COURT:  I'll take a look at that.  Anything else
7    on the likelihood of confusion factors?
8            MS. SHUFFLEBARGER:  One last one, Your Honor, and I
9    think you already hit on this, which is the one instance of
10   alleged confusion.
11           Consumer confusion is when the confusion involves a
12   purchasing decision.  It is not just somebody saying something
13   like, Hey, is that you.  Mr. Frija did not put on any testimony
14   that his friend here, the lol guy, was contacting him to buy
15   ELFBAR, nor is he indicating that a transaction was consummated
16   or lost as a consequence of that exchange.
17           And there is also case law from the Eleventh Circuit
18   we have cited, I think it was a Florida State University or
19   Florida Atlantic University case, where just a single instance
20   is not sufficient to carry your burden of showing actual
21   confusion, and I think that's all I have on confusion factors,
22   Your Honor.
23           THE COURT:  All right.  Thank you very much.
24           So Mr. Heyer, are you going to take us to unlawful
25   use now?
```

```
 1            MR. HEYER:  Yes, Your Honor.  I did want to hit on

 2   the balance of harms factor, which is important, especially

 3   when we consider -- when we consider the relative sizes and the

 4   number of sales.  That requires the Court to weigh the harm to

 5   the Plaintiff in the event the injunction does not issue and

 6   essentially the status quo continues versus the harm to the

 7   Defendants if an injunction is issued, and I think the numbers

 8   here, the sales numbers speak for themselves.  Over four and a

 9   half years, 2.4 million dollars in sales, I think about a

10   million dollars in profit, versus here the figures on the

11   revenues and the profit, just from these two Defendants alone,

12   is over 50 million dollars.

13            And then going back to the issue of lost goodwill,

14   kind of what I hit on before; the lost goodwill, the employees

15   that could potentially be laid off et, cetera, clearly the

16   balance of harm weighs in favor of the Defendants.

17            And I will point out that in weighing these factors,

18   the Eleventh Circuit has said they need to carry their burden

19   on all of them, the Plaintiff, VPR, does.

20            And so I think here as well -- and I talked about the

21   public interest a few minutes ago from the public health and

22   safety concerns about counterfeit products, but with respect to

23   balance of harms here, the harm to the Defendants if the

24   injunction issues is significantly more overwhelming than the

25   minimal harm that the Plaintiff will suffer, especially given
```

1    Mr. Frija's admissions just a short while ago that he is

2    embarrassed by how low their sales actually are.  We never saw

3    month to month sales, we don't know if the bulk of their sales

4    were back in 2018, 2019, and they actually have declined over

5    time.

6          And that actually goes to another point, which I

7    think does go to this issue of potential confusion, just to

8    circle back on something that Ms. Shufflebarger referenced.

9          The two Defendants here didn't even start selling

10   this product until -- the earliest was October of last year, so

11   this is -- and the sales, like I said, have ramped up.

12         Mr. Frija testified in his direct examination

13   testimony that he saw the sales of their products drop off in

14   2020 and 2021.  That as well indicates there is not any real

15   confusion going on here, he is not losing any sales because of

16   the fact that the ELFBAR products are now on the market.

17         There is a temporal disconnect there of at least a

18   year, Your Honor, where their sales are already falling off,

19   potentially because the technology is older or what have you,

20   before ELFBAR even -- the sales even ramp up, and I think D21

21   and D22 show that ramp up in the sales and revenues

22   accordingly, so there's a massive temporal disconnect on that

23   point as well.

24         So I'm finally going to circle back to what I think

25   should actually be the very first point in the analysis, which

1   is are there any valid and enforceable trademark rights here to

2   enforce, which gets us to the issue of unlawful use.  And this

3   is -- if this case were to be appealed, it would actually go up

4   to the Federal Circuit and the Federal Circuit would have to

5   apply Eleventh Circuit case law because there is a patent claim

6   involved here, it is a unique circumstance.  And the Eleventh

7   Circuit hasn't ruled on this issue yet, but the Federal Circuit

8   itself has, as has the Ninth, as has the Tenth and the Federal

9   Circuit decisions go all the way back to 1987.

10          We cited one case, *Gray v. Daffy Dan's Bargaintown*,

11   in our brief.  There was another case from the Federal Circuit

12   in 1987, it's *Ultacashmere House, Ltd v. Spring Mills, Inc*.,

13   828 F.2d 1580.

14          I would respectfully submit that given that there is

15   no circuit split on this issue, the likelihood that the Federal

16   Circuit would come in and interpret the absence of Eleventh

17   Circuit case law on this issue to create effectively a circuit

18   split with itself and the Ninth and Tenth Circuits would be

19   extremely unlikely on this issue of the illegality.

20          Additionally, I know that Mr. Rothman has a Middle

21   District of Florida case where the Court declined to take this

22   up, but there are two other Southern District of Florida cases

23   where it has been take up.  One we did cite in our brief, which

24   is the *Plant Food versus Agrisource, Inc*., (phonetic) case from

25   2016.  It's a Lexis citation and that had to do with, I

```
 1    believe, EPA labeling requirements and if I recall correctly on

 2    that case, and I think it is particularly relevant here, part

 3    of the concern of the Court was this issue of illegality.

 4            The court didn't feel that it necessarily needed to

 5    resolve it potentially at the preliminary injunction stage, but

 6    it created enough of a cloud and enough of uncertainty that the

 7    plaintiff was not going to carry its burden of substantial

 8    likelihood of success.

 9            So even if the Court isn't convinced that we have

10    nailed down every last fact without having discovery,

11    et cetera, to definitively prove that there is a per se

12    violation here of the Food, Drug and Cosmetic Act, I think the

13    cloud alone that's been created by the evidence here about

14    whether these products have ever been legally marketed and

15    whether there are any valid trademark mark rights whatsoever in

16    the ELF Mark for VPR alone, without looking at anything else,

17    should foreclose the entry of a preliminary injunction here,

18    respectfully.

19            There is also a second --

20            THE COURT:  On the issue of the Federal Circuit and

21    the law that applies, so even though the preliminary junction

22    is being sought only on the trademark claim, your position is

23    that any appeal of an order on that would necessarily go to the

24    Federal Circuit, which then would apply Eleventh Circuit law

25    that hasn't at this point recognized the doctrine.
```

1           MR. HEYER:  Correct, Your Honor.  It's -- we had

2     dropped a footnote, I could be off on this because I don't -- I

3     think it is the *Oracle* case that sort of clarified that

4     whenever there is a patent claim that is ever included in the

5     case, it necessarily goes up to the Federal Circuit, even

6     though the motion here isn't -- even thought the patent claim

7     was dismissed, and yet the appeal still had to go to the

8     Federal Circuit.  So it is one of those vagaries of how the

9     statute is written.  I think it's -- let me see if I can find

10    it, it's towards the first part I think.

11          THE COURT:  That's okay.  Just slow down, please.

12          On the unlawful use, I think you briefed that and

13    it's well argued at this point, it does seem, you know, there

14    is a merging area of the law, it is unclear, but at the end of

15    the day, the FDA is certainly capable of stepping in if it

16    wants to.

17          It just seems quite hard to fathom Federal District

18    Courts basically engaging in that threshold inquiry when there

19    is no private right of action, so it seems, at least to me,

20    somewhat of an end-run around that absence of a private right

21    of action, and anyhow very interesting.

22          MR. HEYER:  If I could address that, Your Honor, I'm

23    very familiar with the line of case law that I think our expert

24    was talking about on this.  He says this it is an important

25    distinction legally and when he says there is no private right

```
 1    of action, and I have actually briefed this as well, that's a

 2    private offensive right of action.  And that's things like a

 3    state attorney general coming in and saying, Well, because you

 4    violated the Food, Drug and Cosmetic Act, you have necessarily

 5    also violated the State Unfair Trade Practices statute.

 6           And there is case law out there that says Congress

 7    gave the sole authority to enforce the Food, Drug and Cosmetic

 8    Act to FDA and to the Department of Justice, and so we are not

 9    going to have private plaintiffs come in and build causes of

10    action premised on that, but that's not the circumstance here.

11           The circumstance here is VPR is coming into this

12    Court seeking relief against our clients as Defendants, and we

13    are not using it as a sword, we are using it as it shield.  And

14    part of their obligation is to show affirmatively that they

15    have valid trademark rights here and just showing that they

16    have a registration is not enough if they cannot show that they

17    have lawful use of that, and here, I think actually the record

18    is -- this could be a very complex thing.

19           Mr. Rothman has these cases can of California that

20    say this is a morass, but it's legally not because at the end

21    of the day, it's a question of is there a per se violation of

22    the Federal Food, Drug and Cosmetic Act.

23           THE COURT:  Well, thank you.  I disrespectfully

24    disagree.  I think the case law against you on this issue is

25    more persuasive and I am not inclined to basically step in and
```

1    declare a mark invalid, even in a defensive posture.

2           To the extent the arguments are relevant, I think

3    within -- within the overall analysis, maybe there is something

4    there, but even if it were considered, I think ultimate factual

5    conclusion is itself indeterminate, so we are left with that.

6           But I would like to wrap up our hearing up, so do you

7    have any additional argument to set forth now, Mr. Heyer, on

8    any other issues?

9           MR. HEYER:  I just want to cite to the Court the

10   other Southern District case on that.

11          THE COURT:  It is in your papers?

12          MR. HEYER:  No, this one actually isn't, which is why

13   I wanted to cite it.  It's *Craft Kratom Lab, Inc. v. Mancini*,

14   2013 U.S. District Lexis, 105852.

15          And just on this point, I would ask if the Court -- I

16   would move orally that if the Court does grant the injunction,

17   I move that the Court stay the order to allow us to take an

18   emergency appeal, then, to the Circuit Court of Appeals to stay

19   the injunction, particularly based on this illegality point and

20   perhaps based on the other points as well.

21          THE COURT:  If you want to seek a stay, you are

22   welcome to brief that, but an oral request won't be sufficient.

23   Like I said, I haven't decided what to do on the injunction.

24          MR. HEYER:  I think that's everything I have, then,

25   Your Honor.

1               THE COURT:  Okay.

2               MR. HEYER:  Thank you.

3               THE COURT:  All right.  Mr. Rothman, I'll give you

4     two minutes to wrap up, if you want.  Otherwise we will --

5               MR. ROTHMAN:  Great.

6               THE COURT:  -- conclude the hearing.

7               MR. ROTHMAN:  Thank you.

8               Addressing a few of the issues that were raised.

9               The video hookup.

10              So one of our exhibits, as Your Honor remembered, is

11    filed at 35-5, shows the ELF in the plain E-L-F characters, as

12    well as in the stylized version.  Also, that's seen in

13    Exhibit 4, you see the world ELF as well as the stylized

14    version, so it comes in a few different flavors.

15              There was testimony in the record at the first

16    hearing by Zoom, right around pages 22 through 25, about the

17    advertising my client does.  Included in that is this exhibit,

18    Exhibit 6, that is a point of sale display for the ELF product,

19    so there is many different ways we can advertise things, and

20    this is one of the ways.

21              You know, Ms. Shufflebarger said that my client said

22    there was no market place recognition.  He didn't testify to

23    that.  He has marketplace recognition, he was modest about his

24    sales because his sales are modest compared to the Defendants,

25    but Mr. Glauser sells my client's products on his website and

```
 1    he is aware of my client's other brands.

 2            The counterfeit issue is an issue that I think is

 3    really interesting, the idea that the Defendants are victims of

 4    counterfeit ELFBARS.  Well, you know, I looked at -- I was

 5    looking on line for that and, in fact, there are -- you know,

 6    Your Honor could do the Google search yourself and find, you

 7    know, ELFBAR counterfeit things.

 8            If you think about it, who is in a better position to

 9    deal with that, the Defendant who has no trademark rights or my

10    client that has a registered trademark; and therefore, has the

11    ability to file counterfeiting claims against the offenders.

12            Obviously, my client does.  The Defendants may

13    complain about counterfeits, but they have no real power to

14    address the problem, so enjoining them and enjoining them with

15    a reasonable bond so that my client has money leftover to

16    pursue the counterfeiters and address this problem is actually

17    in the public interest.

18            If we are very concerned -- and no one is standing

19    here saying we are not concerned about people inhaling heavy

20    metals; of course, it is not a good thing.  I don't know if

21    it's my client's fault, but if that's a real concern, then if

22    Counsel is in favor of granting the injunction and allowing my

23    client the resources it has to pursue other counterfeits so

24    that this stops.  In the process, we perhaps resolve problem.

25            Finally, I will say that the case law indicates that
```

```
 1   avoiding confusion in and of itself is in the public interest.
 2   Quote, "A preliminary injunction is not adverse to the public
 3   interest because the public interest is served by preventing
 4   consumer confusion in the marketplace," period.
 5           Thank you, Your Honor, for your time.  I appreciate
 6   it.
 7           THE COURT:  All right.  Do the parties both want to
 8   file post hearing briefs, findings of fact, conclusions of law?
 9   I think that was Mr. Rothman's suggestion.
10           Mr. Heyer, do you agree?
11           MR. HEYER:  We agree.
12           THE COURT:  How much time does each side request for
13   that process, Mr. Rothman?
14           MR. ROTHMAN:  Perhaps we could do it as quickly as a
15   week from tomorrow, though perhaps two weeks might be a bit
16   more reasonable.
17           THE COURT:  Mr. Heyer, what's your position?
18           MR. HEYER:  Yeah, I don't know how quickly we can get
19   the transcript, I think two weeks definitely would be best.
20           THE COURT:  Two weeks it is then, the deadline is
21   December 16th.
22           MR. ROTHMAN:  Shall we observe the local rules on
23   page limits, Your Honor, or do you want --
24           THE COURT:  Yes, and if you need more, than please
25   file a motion explaining in detail why.
```

```
1              Any such papers, of course, should endeavor to cite

2    with as much specificity as possible to the transcript and to

3    the exhibits so I can follow along.

4              Any other procedural matters to take up before we

5    recess?

6              MR. ROTHMAN:  How does Your Honor wish to handle the

7    physical exhibits, the items in the magazines?  I have no issue

8    leaving them with Your Honor and we typically pick them up from

9    the clerk when the clerk notifies us.

10             THE COURT:  I think they should be conventionally

11   filed with the clerk by the parties, so you should take them

12   with you, and then get that done.  And if you want to, just for

13   organization's sake, you know, photograph them and identify

14   them as such in your exhibit filings on CM/ECF, that way we

15   know what it is that they are, but otherwise the parties should

16   take care of the conventional filing of those exhibits.

17             MR. ROTHMAN:  Great.

18             THE COURT:  Anything else, Mr. Heyer?

19             MR. HEYER:  I think that's it, Your Honor, for us.

20   Thank you.

21             THE COURT:  Thank you all very much for being here.

22   It has been nice to see you in person, I think it's easier to

23   manage the hearing.

24             I hope you enjoyed your brief stay in Florida, and

25   the Court will take the motion under advisement.  Thank you
```

```
 1   all.

 2            MR. ROTHMAN:  Thank you, Your Honor.

 3        (PROCEEDINGS ADJOURNED AT 3:45 P.M.)

 4                 C-E-R-T-I-F-I-C-A-T-E

 5            I hereby certify that the foregoing is

 6        an accurate transcription and proceedings in the

 7        above-entitled matter.

 8
     12/6/2022                    /s/DIANE MILLER
 9     DATE                    DIANE MILLER, RMR, CRR, CRC
                               Official Court Reporter
10                             United States District Court
                               101 South U.S. Highway 1
11                             Fort Pierce, FL  34950
                               772-467-2337
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**BY MR. HEYER:**
**[38]** 13/5 15/8
15/20 22/2 28/13
31/13 32/19 33/19
34/24 35/18 36/4
36/21 37/2 37/15
40/20 52/22 54/19
58/10 59/4 59/12
60/2 61/12 63/11
65/14 66/10 67/20
68/1 70/3 76/15
85/6 89/12 95/3
96/3 96/10 97/7
122/16 123/12
129/19
**BY MR.
ROTHMAN: [35]**
42/2 42/13 43/2
43/14 44/15 44/25
45/14 46/17 49/25
73/2 76/5 76/23
78/2 78/22 80/3
81/7 81/12 82/9
104/9 105/20
107/21 109/14
110/4 113/13
114/4 114/19
115/22 116/23
117/3 118/13
120/14 120/21
121/8 121/15
127/21
**BY THE COURT:
[1]** 125/24
**MR. HEYER: [90]**
3/17 7/3 9/1 10/9
11/19 12/1 12/11
12/16 12/24 13/2
15/14 32/10 32/13
32/15 33/24 35/23
36/17 36/20 37/9
40/19 41/8 45/6
49/22 52/20 53/24
54/7 54/16 59/3
65/13 67/16 68/10
68/23 69/3 69/8
70/1 72/21 77/14
78/18 81/6 83/9
83/17 83/20 84/2
84/19 85/2 85/4
95/13 95/17 96/24

104/2 104/5 105/7
105/11 109/10
109/19 116/7
116/10 118/3
118/9 120/12
121/2 121/12
122/14 123/18
123/25 129/17
130/14 150/11
150/17 153/10
153/16 154/1
156/20 157/14
158/2 158/8
158/14 158/20
158/23 159/23
171/1 175/1
175/22 177/9
177/12 177/24
178/2 180/11
180/18 181/19
**MR. ROTHMAN:
[94]** 3/10 3/16
4/10 4/21 6/5 8/5
8/24 11/11 11/25
15/17 34/2 34/6
34/14 34/17 35/25
37/12 41/11 41/14
41/22 41/24 42/10
42/24 44/10 44/13
52/18 68/22 68/24
69/4 69/12 69/16
72/25 76/4 76/12
77/8 77/12 77/22
78/20 79/15 79/22
79/24 80/1 82/5
82/8 83/6 84/4
84/9 84/13 95/16
97/3 104/7 107/16
109/13 110/3
114/2 114/15
116/5 116/8
116/13 116/17
116/20 118/1
118/6 120/18
121/3 122/10
123/4 124/13
124/23 125/10
125/19 127/18
129/15 130/23
131/10 134/10
138/23 141/1
141/14 142/1
142/6 143/1 144/2

146/7 146/9 147/7
149/23 150/9
178/5 178/7
180/14 180/22
181/6 181/17
182/2
**MS.
SHUFFLEBARGE
R: [32]** 5/14 6/13
6/24 32/12 79/21
124/3 158/24
160/4 160/8
160/14 161/21
161/24 162/16
164/4 164/8
164/12 164/15
164/23 165/7
165/13 166/1
166/5 166/16
167/2 167/11
167/16 167/25
168/7 168/15
169/21 170/1
170/8
**THE CLERK: [1]**
3/5
**THE COURT:
[219]**
**THE
COURTROOM
DEPUTY: [6]**
12/19 12/21 54/12
84/23 125/13
125/15
**THE WITNESS:
[45]** 12/23 20/13
20/21 21/15 21/22
28/8 30/16 30/22
31/4 40/6 40/16
43/13 45/9 46/10
46/13 54/10 54/14
58/9 60/1 61/10
62/16 62/22 63/6
63/9 65/2 65/9
65/25 66/9 67/19
68/15 68/18 68/20
75/23 84/25 94/22
95/24 96/2 105/17
112/23 113/9
121/13 123/7
123/21 125/17
130/18

**$**
**$100,000 [1]**
149/23
**$15,000 [2]**
148/24 149/16
**$200 [1]** 151/10
**$200 million [1]**
151/10
**$86,000 [1]**
137/22

**'**
**'21 [5]** 68/24 69/1
69/3 96/7 106/13
**'22 [4]** 68/25 69/2
96/8 106/13
**'78 [1]** 148/14

**/**
**/s/DIANE [1]**
182/8

**1**
**1,000 [2]** 56/4
58/5
**10 [5]** 127/22
127/23 129/20
129/25 148/24
**10 million [2]**
28/3 149/4
**10,000 [1]** 126/19
**100 [2]** 1/17 101/9
**100,000 [3]**
127/10 151/11
153/17
**101 [2]** 2/2 182/10
**104 [1]** 2/18
**1052 [1]** 145/20
**105852 [1]** 177/14
**10700667 [1]**
148/10
**10:17 [2]** 41/16
41/19
**10:30 [1]** 41/18
**10:31 [1]** 41/20
**11 [9]** 15/2 15/5
15/6 15/7 15/11
15/15 15/18 15/19
141/10
**11/21/17 [1]**
132/21
**11/24 [1]** 132/21
**1116 [1]** 141/4

**11503066 [1]**
146/13
**11:39 [1]** 84/14
**12 [2]** 151/2 151/2
**12/6/2022 [1]**
182/8
**122 [1]** 2/19
**125 [1]** 2/21
**127 [1]** 2/22
**128 million [1]**
106/14
**129 [1]** 2/23
**12:55 [1]** 84/15
**12th [1]** 70/6
**13 [4]** 2/10 86/9
136/11 151/2
**14 [1]** 136/11
**15 [5]** 41/17 83/24
84/2 86/16 106/21
**15 percent [2]**
119/14 119/15
**150 million [1]**
106/18
**1508477 [1]** 10/14
**1580 [1]** 173/13
**15th [3]** 18/12
18/16 41/3
**16 [11]** 33/13
33/16 33/18 33/25
34/23 47/25 48/2
48/6 48/11 49/15
115/11
**16th [1]** 180/21
**17 [9]** 35/17 35/24
36/1 36/3 36/17
49/14 49/16
115/11 132/21
**18 [11]** 36/16
36/22 36/23 36/24
37/1 37/10 37/13
37/14 48/14 49/14
49/16
**18,000 [1]** 51/5
**18th [3]** 3/23
122/18 168/18
**19 [7]** 12/3 42/25
43/3 43/24 44/18
59/23 95/20
**1919 [1]** 1/22
**1987 [2]** 173/9
173/12
**1993 [1]** 13/14
**1998 [2]** 13/15

**1**

**1998... [1]**  13/22
**1999 [1]**  13/23
**19th [1]**  137/15
**1:50 [1]**  84/6
**1:59 [1]**  125/6
**1st [1]**  13/11

**2**

**2.4 [1]**  171/9
**20 [2]**  66/3 66/3
**20 percent [1]**
106/21
**20,000 [1]**  51/5
**200 million [2]**
152/3 152/23
**2003 [1]**  14/1
**20036 [1]**  1/22
**2007 [7]**  13/11
18/12 18/16 24/19
24/20 41/3 86/15
**2009 [5]**  14/17
18/1 20/2 86/1
148/10
**2010 [1]**  170/5
**2011 [1]**  86/7
**2013 [3]**  10/14
10/15 177/14
**2015 [3]**  10/19
10/20 63/9
**2016 [11]**  20/8
22/13 22/24 25/6
25/9 25/16 28/5
39/21 55/19
146/13 173/25
**2017 [4]**  23/9
39/22 41/5 132/21
**2018 [9]**  23/3 23/6
55/10 55/12 55/21
64/15 128/2
140/12 172/4
**2019 [2]**  27/1
172/4
**2020 [15]**  23/17
23/18 25/12 25/17
27/2 29/22 32/1
32/7 32/22 47/21
48/9 49/13 122/23
123/13 172/14
**2021 [9]**  88/12
96/11 97/19
122/24 123/16
123/17 137/15

137/21 172/14
**2022 [21]**  1/7
23/11 48/15 48/18
57/17 57/18 57/22
68/19 68/20 69/10
70/6 70/6 70/23
71/21 88/15 96/11
97/19 98/11
106/22 128/2
182/8
**209 [1]**  1/8
**21 [9]**  67/15 67/24
68/2 69/14 69/25
70/2 70/4 70/8
70/12
**21301 [1]**  1/17
**21CFR1143.1 [1]**
52/8
**22 [24]**  44/11
44/16 44/24 45/4
45/10 47/7 95/14
95/16 96/4 96/9
96/25 97/2 97/4
97/6 97/8 104/2
104/4 106/10
106/25 112/5
119/10 123/15
137/20 178/16
**22-cv-81576-CAN
NON [2]**  1/3 3/5
**23 [6]**  76/13 76/17
76/21 77/12 77/19
77/20
**2337 [2]**  2/3
182/11
**2385 [1]**  1/24
**24 [7]**  76/13 76/17
76/21 77/12 77/19
77/20 132/21
**25 [16]**  47/24
61/19 76/13 76/17
76/22 77/12 77/19
77/21 82/1 82/4
102/13 105/24
106/17 126/20
153/4 178/16
**25 percent [1]**
89/8
**26 [7]**  114/17
114/22 115/21
115/24 118/2
118/8 118/12
**27 [8]**  32/22 48/9

49/13 116/4 117/2
118/2 118/8
118/12
**27th [1]**  47/21
**283 [1]**  85/23
**29 percent [1]**
119/10
**2958 [1]**  10/19
**2:00 [1]**  84/5
**2:11 [1]**  125/7

**3**

**30,000 [1]**  86/22
**31 [1]**  70/6
**32 [1]**  91/14
**33 [2]**  5/16 6/23
**33433 [2]**  1/17
1/24
**34 [1]**  132/19
**34950 [2]**  2/3
182/11
**35 percent [4]**
89/8 105/24 106/1
106/17
**35-10 [1]**  127/22
**35-5 [1]**  178/11
**3:45 [1]**  182/3
**3d [1]**  146/14

**4**

**40 [3]**  55/8 112/12
112/14
**400 [1]**  1/24
**42 [1]**  2/11
**467-2337 [1]**  2/3
**497 [1]**  146/13

**5**

**5,000 [1]**  87/7
**50 [3]**  61/11 90/15
171/12
**50 million [1]**
151/4
**50 percent [4]**
59/16 72/1 153/4
157/21
**500 [1]**  106/2
**51 percent [1]**
159/2
**510 [5]**  117/9
117/11 117/12
117/20 117/23
**52 [1]**  2/12

**54 [1]**  2/14
**552 [1]**  146/14

**6**

**6 million [1]**
147/4
**600 [1]**  106/18
**600 million [4]**
105/19 105/21
106/2 106/19
**65C [1]**  152/11

**7**

**700 [1]**  1/22
**73 [1]**  2/15
**772 [1]**  2/3
**772-467-2337 [1]**
182/11

**8**

**828 [1]**  173/13
**85 [1]**  2/17

**9**

**90 [5]**  112/12
112/14 137/23
146/25 154/18
**902.6 [1]**  77/9
**910 [1]**  17/22
**99 percent [1]**
87/18
**9th [2]**  25/12
25/17

**A**

**a.m [3]**  41/19
41/20 84/14
**abbreviation [1]**
94/23
**ability [5]**  4/14
33/11 129/11
143/19 179/11
**above [2]**  108/3
182/7
**above-entitled [1]**
182/7
**absence [3]**
112/15 173/16
175/20
**absolutely [9]**
28/18 86/19 93/10
94/16 99/3 99/23
103/4 104/1
114/12

**absorb [1]**  153/14
**accept [1]**  118/4
**acceptable [1]**
5/25
**access [2]**  80/20
84/9
**accessible [1]**
95/12
**according [8]**
34/11 48/24
106/10 106/12
106/25 119/17
124/20 150/6
**accordingly [1]**
172/22
**account [3]**
147/11 149/1
154/2
**accurately [3]**
70/4 70/8 70/12
**accused [1]**  7/10
**acknowledge [3]**
166/12 167/3
168/11
**acknowledged [4]**
158/25 161/7
162/3 168/12
**acknowledgment
[1]**  163/4
**acquired [1]**
62/14
**acronym [1]**
42/16
**across [8]**  88/20
103/22 105/4
106/8 115/18
117/25 119/14
157/4
**Act [19]**  17/23
18/2 18/23 21/25
28/1 38/1 39/17
40/23 40/25 46/2
46/15 46/22
139/10 141/3
145/19 174/12
176/4 176/8
176/22
**action [31]**  20/9
21/13 21/24 27/5
27/10 29/15 30/10
30/14 30/17 32/2
37/24 38/2 38/3
38/4 45/15 45/16

VPB BRANDS, LP v. SHENZHEN WEIBOLI TECH

**A**

action... [15] 45/21 46/14 47/7 51/24 52/1 81/14 102/19 137/9 137/21 155/19 175/19 175/21 176/1 176/2 176/10

actions [7] 17/19 45/23 46/24 47/9 47/12 47/13 53/19

activate [1] 79/17

activated [1] 79/20

actively [1] 130/12

activities [2] 17/12 62/6

activity [2] 17/8 17/16

adapter [2] 117/11 117/12

adapting [1] 99/25

add [5] 6/12 60/8 64/5 124/22 156/22

addicted [4] 92/15 92/21 95/8 168/9

adding [1] 96/17

addition [3] 16/3 71/13 162/23

address [11] 4/12 139/5 139/9 142/18 150/12 150/12 150/15 160/6 175/22 179/14 179/16

adheres [1] 28/1

ADJOURNED [1] 182/3

adjudication [1] 162/11

adjusts [1] 153/8

Administration [1] 14/9

administrative [1] 162/13

admission [8] 15/14 33/24 35/23

37/9 68/10 69/14 96/24 118/1

admissions [1] 172/1

admit [2] 69/17 158/1

admitted [30] 12/3 12/5 13/17 13/19 13/22 15/18 15/19 32/9 34/21 34/23 36/1 36/3 37/13 37/14 69/24 70/2 77/19 77/20 97/5 97/6 116/12 116/20 118/10 118/12 124/5 124/8 130/25 144/25 165/19 169/10

admitting [1] 145/6

adopt [2] 6/15 22/19

adopted [1] 143/4

ads [1] 136/22

adult [2] 94/6 94/9

adulterated [2] 73/24 74/23

adults [4] 92/15 104/21 104/23 120/11

advance [1] 73/5

advanced [1] 23/12

advantage [1] 143/21

adverse [1] 180/2

advertise [3] 76/19 169/4 178/19

advertised [5] 49/2 91/2 91/9 91/18 136/25

advertisement [1] 169/5

advertising [12] 48/18 52/24 81/22 135/23 136/15 136/21 163/6 163/7 168/24 169/2 169/8 178/17

advisement [1] 181/25

advisory [1] 16/20

advocacy [1] 14/23

advocates [1] 104/20

affiliated [1] 54/20

affirmative [1] 144/5

affirmatively [1] 176/14

afield [1] 160/15

aftermath [1] 111/24

afternoon [2] 104/10 104/11

afterward [1] 65/12

agency [1] 24/7

aggressive [2] 17/19 46/24

agreement [3] 6/21 7/5 149/3

Agrisource [1] 173/24

AILEEN [1] 1/13

AK [1] 80/5

al [1] 3/7

albeit [1] 163/25

alleged [1] 170/10

allow [5] 34/21 116/5 125/19 150/14 177/17

allowed [1] 5/10

allowing [3] 142/15 142/15 179/22

allows [2] 26/4 131/14

almost [13] 64/18 86/16 86/17 100/1 100/6 100/21 103/22 110/18 117/10 132/22 143/5 144/6 149/25

alone [6] 28/16 28/22 151/1 171/11 174/13

174/16

alternative [8] 61/5 79/9 92/16 92/21 104/21 114/5 119/22 168/9

Although [1] 38/15

amended [1] 18/2

amendment [1] 141/2

amendments [1] 18/24

amongst [1] 92/5

amorphous [1] 156/18

amount [15] 8/23 66/1 70/18 107/1 118/22 138/8 147/2 149/24 150/3 152/18 153/20 153/22 154/13 154/22 154/22

analogous [1] 149/18

analysis [7] 131/7 155/12 156/17 158/19 162/22 172/25 177/3

analytical [1] 143/25

ANNA [2] 1/21 3/19

answer [9] 25/13 52/3 95/22 120/2 120/6 120/8 122/9 124/24 159/16

answers [2] 42/19 109/20

anticipate [2] 5/7 101/14

anyhow [1] 175/21

anymore [2] 134/1 143/7

Anytime [1] 99/23

apologize [4] 29/14 77/23 89/10 165/13

appeal [5] 162/9 162/11 174/23 175/7 177/18

appealed [2] 162/12 173/3

appealing [1] 120/1

appeals [2] 148/4 177/18

appearance [1] 4/3

appearances [2] 1/14 3/8

application [9] 23/5 23/21 23/22 23/25 25/3 27/22 103/18 139/9 145/3

applications [4] 31/5 31/22 94/20 94/22

applied [8] 78/12 78/23 78/25 140/12 145/2 145/25 161/2 161/18

applies [2] 70/9 174/21

apply [7] 14/12 131/5 139/11 144/22 160/1 173/5 174/24

applying [1] 169/16

appreciate [8] 4/3 110/25 120/19 131/15 140/5 161/10 168/17 180/5

approach [5] 12/1 12/13 67/16 95/13 116/6

approached [1] 47/2

approaching [2] 90/24 101/9

April 27 [3] 32/22 48/9 49/13

April 27th [1] 47/21

arbitrary [2] 133/24 134/13

area [4] 51/16 51/19 63/1 175/14

areas [1] 120/20

aren't [6] 9/4

## A

aren't... [5] 68/22
121/14 140/9
148/2 148/7
arguably [5]
34/13 144/19
144/24 145/5
161/22
argued [3] 148/23
148/25 175/13
argues [1] 161/22
arguing [2] 143/9
143/10
argument [9]
131/3 142/25
147/20 152/1
158/13 162/8
166/21 166/25
177/7
arguments [1]
177/2
arises [1] 131/6
arm [2] 20/19
20/23
array [1] 46/7
arrival [1] 122/24
articulation [1]
6/2
arts [1] 13/14
aspects [2] 22/7
132/3
assembly [1]
29/10
assert [1] 21/3
asserted [1] 21/3
assess [2] 165/15
167/3
assessed [1]
163/3
assets [1] 101/19
assistance [1]
46/21
associate [2]
128/20 128/22
associated [2]
141/8 141/9
associates [1]
3/11
association [5]
16/13 16/16
104/16 104/18
104/19

associations [1]
16/19
assume [3] 29/2
130/21 156/14
assuming [4]
7/15 39/15 143/24
152/24
Atlantic [1]
170/19
atomizers [1]
63/25
attach [2] 117/4
117/19
attached [1]
117/6
attempt [4] 10/9
122/22 137/10
137/10
attend [4] 53/13
60/19 90/12 169/1
attended [1] 53/8
attenuated [1]
34/19
attitude [1]
140/19
attorney [6] 13/7
14/4 160/11
162/13 170/4
176/3
attorney's [1] 7/6
attorney-client [1]
14/4
attorneys [1]
131/14
attorneys's [1]
84/10
attracting [1]
136/20
attractive [2]
120/10 120/11
attracts [1]
136/21
attribute [2] 95/4
129/11
attributed [1]
122/23
attributes [1]
115/14
August 2016 [1]
28/5
August 8 [5]
22/24 25/6 25/9
25/16 39/21

Australia [1] 53/5
authentic [3]
73/10 74/23
155/21
authenticating [2]
5/20 77/10
authenticity [3]
34/2 34/4 73/23
authorities [2]
51/18 130/8
authority [14]
18/2 20/2 20/3
20/6 21/8 28/20
51/15 51/22 101/3
160/8 162/7 166/8
169/15 176/7
authorization [29]
17/22 18/5 21/20
22/9 22/15 23/1
23/20 23/24 24/2
25/10 26/25 27/5
27/11 28/10 28/15
30/21 31/10 31/17
38/1 39/18 39/23
39/25 41/6 41/7
43/16 43/20 45/3
45/10 145/3
authorizations [3]
31/1 31/6 31/7
authorized [5]
24/14 31/19 45/11
45/12 145/1
auto [6] 60/5
89/14 89/22
100/10 122/23
130/3
avail [2] 39/19
41/4
average [4] 87/7
90/14 119/13
147/3
avoid [1] 19/24
avoiding [1]
180/1
award [1] 150/5

## B

B2B [1] 169/5
bachelor [1]
13/14
background [1]
13/12
backwards [1]

155/11
balance [5]
150/13 157/14
171/2 171/16
171/23
bar [34] 1/8 13/22
82/16 82/17 82/19
82/21 82/21 82/24
83/3 102/13
102/16 102/18
108/12 108/15
108/18 108/24
108/24 111/15
119/6 119/6
119/12 133/11
133/11 133/12
133/12 133/12
133/12 133/13
133/15 133/16
133/17 140/21
140/22 167/18
barely [1] 134/6
Bargaintown [1]
173/10
bars [2] 166/11
167/19
base [1] 112/11
basis [12] 61/24
62/3 62/20 67/1
89/4 100/19
110/13 111/19
136/17 136/18
139/6 149/10
batteries [2]
28/21 64/1
battery [13] 26/17
28/24 66/1 66/7
116/8 116/9 117/1
117/4 117/7
117/10 117/19
128/25 130/11
bear [1] 169/7
behind [2] 15/9
141/15
belabor [1] 168/4
below [6] 74/6
108/10 108/16
134/3 134/4 134/5
benefit [3] 55/14
93/13 125/5
besides [3] 43/16
63/16 98/20
beyond [7] 45/7

45/23 46/24
105/11 123/5
157/25 162/15
Biff [4] 108/15
108/24 119/6
119/11
bigger [5] 93/22
111/5 134/16
139/24 143/3
biggest [3] 107/4
107/9 107/11
binder [4] 15/1
26/19 29/19 32/3
binders [1] 12/13
biography [1]
15/6
blade [1] 26/10
block [1] 46/6
blocked [1]
106/11
blog [2] 16/1 16/3
blow [1] 144/8
board [2] 103/22
104/15 105/4
106/8 157/4
162/11
boards [1] 16/20
Boca [2] 1/17
1/24
body [1] 95/2
bond [32] 8/19
8/23 132/12
142/18 146/6
146/21 147/8
148/4 148/23
148/25 149/3
149/8 149/10
149/15 149/15
149/21 150/1
150/5 150/13
150/22 151/10
151/18 151/19
152/9 152/10
152/15 153/17
153/22 154/16
155/10 157/12
179/15
bonds [1] 152/7
bottle [1] 56/21
bottom [2] 11/22
147/5
bound [3] 146/19
160/10 170/3

Page 187

VPR BRANDS, LP vs. SHENZHEN WEIBOLI TECH
Case 9:22-cv-81576-AMC   Document 60   Entered on FLSD Docket 12/14/2022   Page 187 of 209

**B**

bourne [1]  163/8
box [2]  71/14
  166/2
boxes [1]  95/20
brand [36]  6/15
  44/17 56/8 56/18
  56/20 58/1 58/6
  58/16 58/19 59/6
  59/8 59/14 59/18
  63/16 63/18 68/17
  74/8 80/18 80/23
  82/2 82/13 88/11
  88/18 90/7 102/9
  107/5 107/6
  121/22 121/24
  122/1 122/7
  129/22 157/6
  163/11 163/13
  169/16
branded [19]
  40/22 57/1 57/12
  57/20 58/24 62/7
  62/11 63/15 71/2
  88/4 91/2 91/8
  91/13 91/17 91/22
  92/1 92/9 100/10
  101/24
brands [20]  1/4
  3/6 3/12 3/13
  56/18 56/19 57/5
  61/9 61/11 75/24
  75/25 88/7 100/2
  113/22 114/1
  121/16 128/21
  132/19 153/7
  179/1
Brands' [2]  60/5
  89/14
breakdown [1]
  129/21
brick [1]  90/21
bridge [1]  95/10
brief [6]  161/25
  166/8 173/11
  173/23 177/22
  181/24
briefed [3]  131/17
  175/12 176/1
briefs [1]  180/8
broad [2]  6/18
  105/14

broken [1]  132/9
BRYAN [5]  2/9
  12/11 12/20 12/23
  13/7
Buffalo [1]  85/15
build [1]  176/9
bulk [1]  172/3
bullet [1]  32/24
burden [6]  159/6
  163/8 169/8
  170/20 171/18
  174/7
Burma [1]  101/12
business [21]
  9/10 55/4 62/23
  71/25 72/4 85/16
  86/4 89/6 96/22
  99/24 101/6
  121/18 128/6
  138/25 143/11
  143/11 143/12
  143/12 143/13
  153/15 156/13
business-wide [1]
  153/15
busy [1]  167/21

**C**

C-A-I-R-N-S [1]
  10/14
C-E-R-T-I-F-I-C-A-
T-E [1]  182/4
C-H-E-M-E-N-C-E
[1]  10/17
Cairns [1]  10/13
calamitous [3]
  152/21 153/2
  153/9
calculated [1]
  97/14
Caliburn [4]  33/4
  33/4 35/1 37/3
California [3]
  63/1 146/12
  176/19
camera [1]  11/21
Canada [2]  53/5
  126/4
cancel [1]  132/23
candidly [1]  44/4
candy [2]  120/9
  133/13
cannabis [3]

92/25 146/1
  168/11
CANNON [3]  1/3
  1/13 3/5
capable [1]
  175/15
capacity [2]  66/2
  66/6
capitalizing [1]
  133/16
capture [1]
  107/18
captured [1]  6/14
CARRIE [2]  1/20
  3/19
carry [3]  170/20
  171/18 174/7
cartridge [11]
  26/6 26/7 26/15
  26/16 26/17 27/7
  27/7 27/12 31/7
  31/9 36/7
cartridges [3]
  26/1 26/12 31/12
cast [1]  161/17
catch [1]  56/15
categories [9]
  9/23 10/24 22/8
  58/14 88/20 106/6
  115/2 117/25
  134/21
category [29]
  20/4 27/4 27/12
  58/8 58/9 58/12
  58/18 58/19 59/1
  59/1 64/12 64/22
  86/25 87/1 93/6
  93/7 102/20 108/8
  114/23 115/1
  115/4 115/18
  116/24 134/8
  135/8 135/15
  135/20 144/5
  145/15
CBD [2]  92/22
  92/23
cease [1]  87/25
center [8]  1/24
  50/23 51/1 51/7
  51/10 53/14 80/9
  107/25
centers [1]  50/24
CEO [1]  3/12

cereal [1]  140/4
certificate [4]
  73/23 73/24
  132/17 134/25
certify [1]  182/5
cetera [5]  52/14
  95/2 156/3 171/15
  174/11
chain [4]  56/16
  63/3 74/3 141/24
challenge [2]
  21/16 159/17
challenged [1]
  23/14
challenges [1]
  20/25
challenging [1]
  109/7
chance [1]
  151/21
channels [2]  56/6
  87/14
characteristics
[1]  29/13
characterization
[1]  9/18
characterize [1]
  97/21
characters [3]
  134/24 135/2
  178/11
charge [1]  53/14
Charlotte [2]  55/2
  55/2
chart [2]  97/25
  107/3
charts [1]  99/13
cheaper [1]  72/20
Chemence [1]
  10/17
chemically [1]
  92/25
chemistry [1]
  95/1
chief [1]  85/11
children [2]
  120/10 120/11
China [7]  56/24
  86/2 86/15 87/17
  99/4 121/18 130/5
Chinese [4]  48/25
  98/22 99/24 130/8
choice [1]  36/15

choose [2]  26/4
  143/16
chose [3]  19/20
  25/19 138/16
Cig [2]  29/22
  30/14
cigar [5]  44/1
  44/2 44/3 44/5
  44/7
cigarette [65]
  14/14 14/17 14/21
  17/7 23/11 24/13
  25/3 25/15 25/21
  25/22 25/22 25/23
  26/7 26/9 26/13
  27/8 27/24 28/15
  31/16 35/21 37/18
  39/3 55/11 55/15
  55/18 55/24 56/3
  56/7 56/22 58/9
  58/13 59/7 60/5
  60/20 61/2 61/15
  61/18 61/23 63/12
  65/7 65/21 65/23
  66/2 72/11 78/16
  78/16 78/23 86/10
  86/13 86/21 89/14
  90/12 90/19 90/22
  93/16 93/16 93/17
  94/1 94/6 94/7
  94/7 94/12 132/20
  132/20 156/25
cigarettes [62]
  15/22 16/7 16/21
  20/5 22/4 22/20
  24/11 24/20 27/4
  27/16 28/22 29/16
  31/22 33/9 39/1
  39/1 52/24 53/3
  53/6 57/1 57/12
  57/20 58/1 58/19
  58/24 59/5 59/15
  59/19 62/11 63/22
  63/22 64/9 64/19
  66/3 66/20 70/13
  85/20 87/9 87/15
  87/18 88/4 88/11
  88/14 88/19 89/1
  89/5 89/22 90/1
  90/8 91/9 91/13
  91/23 92/1 92/13
  92/14 92/16 93/4
  94/4 95/25 109/8

VPB BRANDS, LP vs. SHENZHEN WEIBOLI TECH
Page 188

Case 9:22-cv-81576-AMC   Document 60   Entered on FLSD Docket 12/14/2022   Page 188 of 209

# C

cigarettes... [2] 132/19 146/19
circle [8] 135/1 161/15 165/20 165/25 166/4 167/15 172/8 172/24
Circling [2] 27/21 161/14
circuit [34] 144/17 148/3 148/15 149/9 152/9 152/12 159/3 160/9 160/9 162/6 162/23 169/14 169/19 170/1 170/5 170/17 171/18 173/4 173/4 173/5 173/7 173/7 173/9 173/11 173/15 173/16 173/17 173/17 174/20 174/24 174/24 175/5 175/8 177/18
Circuits [1] 173/18
circulation [1] 69/20
circumstance [6] 40/8 151/10 157/9 173/6 176/10 176/11
circumstances [4] 34/19 150/2 152/13 155/19
citation [1] 173/25
citations [2] 10/11 52/9
cite [6] 148/10 160/15 173/23 177/9 177/13 181/1
cited [7] 151/18 152/12 161/25 166/8 169/24 170/18 173/10
cities [1] 63/2
citing [1] 148/14

civil [1] 11/1
claim [4] 173/5 174/22 175/4 175/6
claims [1] 179/11
clarification [1] 124/4
clarified [1] 175/3
clarify [3] 65/13 110/25 141/2
clarifying [1] 110/25
class [4] 132/19 135/22 137/17 165/5
classified [2] 38/17 100/22
classify [5] 99/2 100/21 101/7 102/19 104/25
clear [4] 14/20 46/8 52/12 54/3
clerk [4] 77/24 181/9 181/9 181/11
clerkship [1] 13/23
click [1] 115/4
client [48] 5/10 6/6 6/15 6/18 8/11 9/2 9/11 14/4 78/16 113/21 113/22 113/24 114/6 114/14 114/21 116/14 131/11 133/4 136/22 136/23 137/15 138/9 139/18 141/8 141/9 141/19 141/19 142/2 143/10 143/14 143/15 143/18 143/19 147/8 147/21 159/25 161/6 161/7 161/13 164/25 165/3 169/15 178/17 178/21 179/10 179/12 179/15 179/23
client's [21] 34/7 47/5 113/14

115/24 134/23 135/11 136/5 136/13 137/13 141/6 142/20 144/23 160/20 162/18 163/2 164/21 165/21 168/8 178/25 179/1 179/21
clients [14] 11/3 13/25 14/6 14/14 14/16 14/22 17/6 151/21 155/9 162/9 163/5 166/12 169/10 176/12
close [1] 150/18
closed [7] 25/22 25/24 58/12 58/14 58/18 59/1 64/2
cloud [2] 174/6 174/13
club [1] 149/11
clue [1] 50/22
CM [2] 124/8 181/14
CM/ECF [2] 124/8 181/14
CO [1] 1/7
coextensive [2] 51/21 165/9
cofounder [1] 85/11
coin [1] 151/25
coined [1] 162/20
Colombia [1] 13/20
column [2] 70/17 70/18
combustible [1] 92/16
comfortable [1] 8/15
comment [1] 4/17
commentary [1] 19/20
commerce [1] 132/21
commercial [6] 10/3 10/23 162/24 162/25 163/10 163/22
commercially [3]

18/15 25/15 28/4
commission [1] 163/15
commissioner [2] 23/10 23/14
committee [2] 16/25 17/1
committees [1] 16/20
common [3] 17/17 46/4 90/4
commonly [2] 49/5 133/14
compact [1] 134/17
companies [19] 14/8 14/12 14/19 14/21 14/25 17/13 18/4 19/22 20/14 40/5 47/2 74/2 75/21 122/4 139/2 139/23 142/20 153/5 156/15
company [34] 3/6 21/18 29/22 30/14 32/21 48/9 55/20 66/12 66/25 67/1 67/8 69/22 74/7 75/24 78/12 78/23 78/25 80/4 81/1 82/10 94/14 101/19 105/1 108/24 110/1 110/6 113/7 113/14 114/9 121/17 128/21 129/9 155/4 156/11
company's [10] 17/18 47/13 67/10 68/2 70/9 96/21 97/14 105/24 107/23 123/3
comparable [1] 118/24
compare [3] 24/18 94/3 119/11
compared [3] 65/23 113/7 178/24
compares [1] 65/24
comparison [1]

24/4
compartmentalize [1] 144/12
competitive [3] 66/21 67/11 127/6
competitively [1] 7/19
competitor [1] 62/1
competitors [4] 21/19 61/22 66/22 66/23
compilation [3] 68/6 96/20 128/1
complaint [1] 109/20
complex [2] 146/19 176/18
compliance [7] 30/8 30/9 30/17 39/17 39/20 41/4 53/16
compliant [1] 39/13
comply [2] 14/25 21/19
component [7] 19/7 19/10 19/13 28/18 28/24 29/5 52/13
components [8] 19/3 19/9 19/19 28/15 29/7 29/8 38/18 64/1
compound [1] 78/18
computer [2] 41/12 131/21
concealer [7] 60/5 89/14 89/22 100/10 122/23 128/25 130/3
conceding [1] 159/19
concept [2] 22/3 26/13
conceptual [3] 162/19 162/24 163/21
concern [5] 11/5 73/13 75/7 174/3 179/21
concerns [7] 4/12

# C

**concerns... [6]**
66/14 66/18 72/15
103/2 124/16
171/22
**conclude [1]**
178/6
**concluded [3]**
20/10 30/1 30/2
**concluding [1]**
111/19
**conclusion [2]**
124/7 177/5
**conclusions [3]**
29/25 131/24
180/8
**conclusive [2]**
162/4 163/23
**concrete [2]**
87/11 168/20
**conditions [1]**
165/9
**conduct [4]** 17/18
147/25 148/1
148/1
**conducted [1]**
113/7
**conducts [2]**
110/1 156/12
**confer [1]** 69/5
**conference [2]**
17/1 84/10
**conferences [3]**
16/14 16/17 53/13
**confidential [4]**
7/18 8/1 8/12
66/25
**confidentiality [3]**
4/13 4/19 7/2
**confused [2]**
80/24 141/6
**confusion [33]**
6/8 63/14 91/22
91/25 92/4 92/7
92/10 113/6 113/8
132/9 133/21
138/17 141/1
141/3 141/11
150/15 154/6
157/17 158/3
165/8 165/17
166/24 167/6

170/7 170/10
170/11 170/11
170/21 170/21
172/7 172/15
180/1 180/4
**Congress [3]**
20/3 20/5 176/6
**connect [1]**
117/10
**connection [5]**
41/12 107/16
107/17 117/9
133/9
**connections [1]**
169/4
**connivence [1]**
168/18
**connotes [1]**
134/17
**conscious [1]** 8/5
**consent [1]** 47/2
**consequence [1]**
170/16
**conservative [1]**
152/8
**consideration [2]**
6/9 132/1
**consistent [3]** 7/4
51/4 62/20
**constantly [1]**
91/15
**constituents [3]**
99/14 103/19
103/19
**construction [1]**
21/8
**consumable [6]**
25/24 26/1 26/14
33/12 36/14 43/21
**consume [4]**
19/24 39/9 104/21
104/23
**consumed [1]**
93/2
**consumer [26]**
26/4 26/15 26/16
33/11 35/7 36/10
36/14 62/13 65/16
65/17 72/10 78/7
82/22 83/1 92/12
92/14 94/4 95/7
102/5 113/6 155/2
155/17 155/18

157/2 170/11
180/4
**consumers [15]**
36/11 36/12 38/11
40/9 57/21 64/10
80/20 91/25 92/2
92/5 92/18 136/18
155/22 156/1
164/16
**consummated [1]**
170/15
**consumption [5]**
19/3 19/12 29/11
38/20 38/23
**contain [11]** 19/6
19/10 19/23 20/1
20/15 26/3 28/6
31/3 31/9 38/15
165/24
**containing [3]**
26/1 28/17 135/9
**contains [3]**
15/11 25/24 49/10
**contemplated [1]**
155/19
**content [1]** 6/21
**contents [2]** 10/7
29/24
**context [2]** 10/12
30/16
**contexts [1]** 22/5
**continuation [1]**
3/22
**continuing [1]**
101/15
**contract [1]** 130/5
**control [5]** 18/23
28/1 39/17 40/25
102/11
**convenience [13]**
61/14 65/10 87/22
88/23 89/2 90/18
90/20 94/9 95/6
95/11 126/1
127/11 135/20
**convenient [1]**
64/3
**conventional [1]**
181/16
**conventionally [1]**
181/10
**convince [2]**
146/12 146/15

**convinced [1]**
174/9
**copyright [1]**
144/7
**corner [1]** 48/13
**corporate [4]** 7/8
121/4 126/9 130/8
**corrective [3]**
30/9 30/14 30/17
**correlates [1]**
49/15
**corresponds [2]**
47/24 49/13
**Cosmetic [12]**
17/22 18/2 21/25
38/1 40/23 46/2
46/15 46/22
174/12 176/4
176/7 176/22
**counter [1]** 81/22
**counterfeit [26]**
71/9 72/16 75/5
75/8 75/9 98/23
98/25 99/19 102/8
102/23 103/16
103/25 109/2
112/9 112/16
112/21 112/22
112/23 147/19
147/20 155/16
155/24 171/22
179/2 179/4 179/7
**counterfeit-type
[1]** 99/19
**counterfeiter [1]**
113/2
**counterfeiters [2]**
157/6 179/16
**counterfeiting [3]**
73/9 81/14 179/11
**counterfeits [18]**
71/3 71/5 72/13
72/17 72/19 80/24
81/3 81/5 81/24
94/19 99/8 100/4
102/17 111/18
112/3 138/1
179/13 179/23
**countries [6]** 53/4
53/7 139/13
139/16 139/17
161/5
**country [12]**

60/22 85/17 92/11
126/19 127/4
127/11 139/5
139/5 139/22
140/4 152/17
152/20
**court [66]** 1/2 2/1
2/2 2/21 3/5 5/1
8/6 8/7 10/11 12/1
12/7 13/6 14/5
17/25 21/2 21/5
21/13 21/21 23/15
27/22 45/25 46/4
46/5 46/11 47/4
52/12 56/5 56/12
71/23 89/9 94/21
96/5 101/4 108/23
110/19 110/23
112/6 131/13
139/8 144/12
148/12 148/22
149/8 149/15
152/18 153/24
154/1 157/10
158/4 158/19
161/11 170/2
171/4 173/21
174/3 174/4 174/9
176/12 177/9
177/15 177/16
177/17 177/18
181/25 182/9
182/10
**court's [11]** 9/24
29/14 34/19 55/14
69/23 79/18 95/13
130/14 148/5
148/11 156/17
**courtroom [4]**
3/13 4/14 7/25
8/17
**courts [4]** 148/4
152/8 159/2
175/18
**covered [4]** 14/4
17/11 120/20
134/23
**covers [2]** 14/7
134/24
**Craft [1]** 177/13
**CRC [2]** 2/1 182/9
**CRD [1]** 125/12
**create [3]** 8/7

Page 190

VPB BRANDS, LP vs. SHENZHEN WEIBOLI TECH
Case 9:22-cv-81576-AMC   Document 60   Entered on FLSD Docket 12/14/2022   Page 190 of 209

**C**

create... [2] 66/22
173/17
created [6] 68/3
96/21 147/20
147/22 174/6
174/13
creates [1] 137/4
credible [1]
147/15
cross [14] 2/11
2/15 2/18 2/23
5/10 41/10 42/1
72/24 73/1 104/6
104/8 123/5
127/17 129/18
cross-examinatio
n [10] 2/11 2/15
2/18 2/23 41/10
42/1 72/24 73/1
104/8 129/18
cross-examine [1]
5/10
crowded [4]
128/14 128/16
129/7 129/8
CROWLEY [1]
1/23
CRR [2] 2/1 182/9
Cuba [2] 44/2
44/3
cumulative [1]
129/25
curious [1]
124/21
customer [8]
63/13 63/16 76/1
91/21 101/17
101/20 151/24
154/13
customers [14]
62/10 87/6 91/12
101/13 119/19
127/8 128/7 128/7
128/9 128/10
154/24 168/2
168/8 168/16
customs [3]
100/24 101/1
110/17
cut [1] 164/10
cv [2] 1/3 3/5

**D**

D.C [2] 1/22 21/2
D1 [2] 31/14
31/18
D16 [3] 34/21
34/25 35/4
D17 [1] 35/13
D19 [3] 11/23
12/5 112/24
D2 [1] 26/19
D21 [9] 7/7 67/22
68/11 68/22 69/10
69/17 151/16
154/10 172/20
D22 [5] 7/7 96/20
151/16 154/10
172/21
D5 [1] 45/18
D6 [5] 32/3 32/20
35/2 37/4 37/23
Daffy [1] 173/10
daily [1] 65/22
damages [2]
148/18 148/21
Dan's [1] 173/10
dangers [1] 46/19
data [6] 66/22
96/20 105/13
111/5 111/8 151/3
database [2]
47/10 47/11
day's [1] 151/12
de [1] 153/18
deadline [5]
23/10 23/13 23/16
32/1 180/20
dealt [1] 167/4
December 16th
[1] 180/21
deceptive [1]
145/21
decided [5] 22/18
27/2 27/3 148/9
177/23
decision [8]
23/15 31/24 34/20
143/1 151/19
162/8 170/4
170/12
decisions [1]
173/9
declaration [1]

6/7
declare [1] 177/1
decline [1]
122/23
declined [2]
172/4 173/21
decreased [1]
71/1
decree [1] 47/2
dedicated [1]
16/13
deem [1] 20/6
deeming [11]
19/18 19/25 21/1
22/12 22/18 22/24
26/25 28/23 29/8
39/11 52/6
default [2] 27/19
27/20
defendant [13]
5/8 34/12 34/20
54/20 60/4 120/22
137/12 140/19
143/9 143/10
145/5 169/10
179/9
defendant's [4]
29/18 115/10
124/4 149/10
defendants [38]
1/11 1/19 3/18
4/15 7/8 8/15
11/12 12/11
109/15 131/23
132/15 133/4
133/9 136/15
137/9 137/15
138/11 139/4
143/20 147/21
147/22 148/20
148/25 149/1
149/5 149/11
150/23 152/21
161/3 171/7
171/11 171/16
171/23 172/9
176/12 178/24
179/3 179/12
Defendants' [44]
4/12 6/7 6/22 6/24
11/14 15/2 15/5
15/15 30/11 31/14
32/3 32/9 33/13

33/25 35/24 36/16
36/22 36/23 42/25
43/3 43/24 44/17
47/6 47/24 48/11
67/15 69/14 69/25
70/4 96/4 96/25
97/2 97/4 97/8
104/2 132/7 133/3
133/8 133/14
133/19 137/19
142/9 144/23
166/25
defense [34] 5/12
12/3 12/5 12/20
15/7 15/18 15/19
32/14 33/18 34/12
34/14 34/23 35/17
36/1 36/3 37/1
37/13 37/14 54/5
54/7 54/11 67/24
70/2 82/3 84/19
84/22 95/20 96/9
97/6 104/4 144/2
144/5 144/13
145/7
defensive [1]
177/1
deferred [5] 22/3
22/19 25/4 25/7
25/14
deficiency [1]
71/8
defined [7] 18/9
19/8 20/4 20/7
27/3 27/12 29/8
definition [14]
9/21 18/10 18/22
18/25 20/20 28/19
29/6 29/9 35/11
37/21 38/3 39/10
40/11 52/16
definitions [1]
52/15
definitively [4]
89/3 102/2 121/20
174/11
delivery [6] 24/22
42/17 43/12 43/15
80/13 80/22
Delta [2] 92/21
92/23
demand [56]
59/18 72/10 85/8

85/9 85/10 85/12
85/14 85/16 85/22
85/25 86/21 87/2
87/6 87/8 88/10
89/4 91/15 96/22
97/22 97/24 98/6
98/9 99/21 99/23
99/24 100/1 101/4
101/15 101/23
102/5 102/10
102/24 105/1
105/2 107/22
111/10 111/10
111/14 112/7
114/5 114/23
115/2 117/23
118/19 119/7
119/20 119/25
120/5 123/13
123/15 135/13
137/22 155/2
155/17 155/18
157/2
demanding [1]
155/22
demonstrate [1]
35/1
demonstrated [5]
142/8 142/8 142/9
142/11 149/24
demonstratively
[1] 111/7
denied [2] 160/20
161/19
denote [1] 134/21
denying [1] 160/2
Department [7]
17/19 46/20 46/20
46/23 47/1 47/3
176/8
depend [4] 40/13
40/17 101/20
145/10
dependent [1]
25/8
depending [4]
65/22 93/2 144/24
153/25
depends [7]
56/18 56/19 65/25
66/5 66/6 74/8
145/10
depict [1] 35/6

**D**

**depicted [9]** 33/7 34/17 36/9 37/3 45/10 47/18 48/2 48/3 48/20

**depicting [1]** 36/25

**depleted [2]** 26/14 26/16

**deposition [3]** 42/4 42/6 42/20

**Deputy [1]** 3/4

**deregistered [1]** 130/8

**derivatives [1]** 19/11

**derived [5]** 19/1 38/16 92/24 92/25 96/17

**description [1]** 14/5

**descriptions [1]** 137/18

**descriptive [1]** 134/6

**descriptor [1]** 82/7

**design [1]** 33/3

**desist [1]** 87/25

**despite [4]** 49/19 50/3 108/23 120/10

**detail [1]** 180/25

**detergent [1]** 140/4

**determination [6]** 20/22 21/13 100/23 112/6 145/22 166/19

**determinative [3]** 160/16 169/20 169/21

**determined [1]** 20/19

**detrimental [3]** 101/7 103/5 153/4

**developed [1]** 152/17

**developing [1]** 169/16

**device [11]** 31/8 31/9 33/12 71/12

94/12 108/9 115/3 115/5 115/9 116/25 141/17

**devices [16]** 31/10 31/11 31/22 43/20 43/22 56/22 71/9 78/16 79/9 93/15 115/3 115/5 116/1 117/14 119/9 119/14

**devoted [1]** 136/11

**diane [4]** 2/1 2/4 182/8 182/9

**difference [5]** 25/21 26/6 63/21 135/16 165/22

**differences [1]** 24/7

**differentiate [1]** 164/16

**difficult [3]** 30/25 153/14 156/18

**diligence [1]** 98/14

**direct [16]** 2/10 2/14 2/17 2/22 13/4 32/22 54/18 56/11 85/5 105/23 109/25 111/9 113/5 123/5 127/20 172/12

**direction [1]** 155/6

**director [1]** 53/14

**disagree [2]** 157/3 176/24

**disagreement [2]** 135/6 135/7

**disclosed [2]** 7/19 67/12

**disconnect [2]** 172/17 172/22

**discount [3]** 153/20 154/9 157/10

**discovery [2]** 109/10 174/10

**discrete [1]** 52/2

**discretion [8]** 22/11 25/5 25/14 145/11 148/3 148/5 148/13

152/18

**discussion [3]** 69/7 114/3 138/19

**discussions [1]** 8/18

**dismissed [1]** 175/7

**display [1]** 178/18

**displayed [1]** 126/24

**disposable [39]** 26/8 26/11 26/13 27/15 27/18 58/9 58/14 58/18 59/1 63/21 64/8 64/12 64/12 64/22 64/24 65/1 65/4 65/8 65/10 65/12 65/15 65/20 66/1 72/11 80/12 80/22 82/18 93/4 93/6 93/25 95/19 95/23 95/25 107/6 108/9 122/8 135/10 136/2 168/6

**disposables [6]** 61/4 64/19 94/3 94/9 95/5 95/10

**dispose [1]** 65/11

**disposes [1]** 26/15

**disposition [1]** 20/18

**dispositive [4]** 137/6 160/12 160/15 166/11

**dispute [15]** 52/10 132/13 133/8 133/20 135/3 136/14 153/14 153/24 159/22 159/23 159/25 160/4 162/19 165/3 168/1

**disputing [2]** 50/8 145/14

**disrespectfully [1]** 176/23

**dissect [1]** 166/9

**dissimilar [1]** 165/19

**dissimilarity [3]**

166/7 168/1 168/16

**distinction [1]** 175/25

**distribute [8]** 61/9 85/17 87/23 100/18 128/11 132/16 136/16 153/6

**distributed [4]** 51/13 83/2 114/9 133/5

**distributers [2]** 87/9 150/24

**distributes [1]** 108/24

**distributing [2]** 57/12 88/10

**distribution [12]** 1/8 1/9 55/21 56/6 56/17 63/3 74/4 74/4 75/24 86/5 87/14 156/1

**distributor [13]** 55/5 56/10 56/19 56/19 73/21 74/5 74/6 74/10 74/17 80/7 87/19 87/20 101/23

**distributors [27]** 56/9 56/9 61/21 74/5 74/6 74/11 74/12 74/19 75/14 75/14 91/5 126/9 127/2 127/3 127/3 127/4 127/9 128/8 128/9 128/11 128/17 135/21 141/6 146/22 146/23 151/8 154/23

**distributors' [2]** 62/2 91/10

**district [22]** 1/2 1/2 1/13 2/2 10/11 10/14 10/15 10/17 10/19 10/20 13/19 21/2 21/5 131/13 148/5 170/2 173/21 173/22 175/17 177/10 177/14 182/10

**diverted [1]** 112/8

**DIVISION [1]** 1/3

**docket [3]** 5/16 6/23 11/11

**doctrine [2]** 158/7 174/25

**document [2]** 29/20 68/13

**DOJ [1]** 47/15

**dollar [1]** 107/1

**dollars [7]** 28/3 105/5 106/3 151/4 171/9 171/10 171/12

**domain [1]** 48/25

**double [1]** 119/15

**doubled [1]** 59/20

**doubt [2]** 102/2 149/25

**doubtful [1]** 143/24

**Dr [1]** 1/24

**drastically [1]** 119/4

**draw [2]** 10/10 141/13

**drill [1]** 14/13

**drop [1]** 172/13

**dropped [1]** 175/2

**drug [20]** 14/9 16/11 16/12 16/14 16/23 16/23 17/22 18/1 18/1 21/24 38/1 40/23 46/2 46/15 46/22 53/13 174/12 176/4 176/7 176/22

**duration [1]** 149/3

**dwindled [1]** 142/23

**dynamic [1]** 153/7

**E**

**E-Cig [2]** 29/22 30/14

**e-cigarette [11]** 14/21 26/13 58/9 61/2 65/7 78/16 78/16 78/23 94/1 94/12 156/25

**e-cigarettes [7]**

**E**

**e-cigarettes... [7]**
22/20 24/20 39/1
87/18 95/25 109/8
146/19
**e-juice [3]** 49/3
49/5 49/9
**E-L-F [1]** 178/11
**e-liquid [11]**
28/16 35/8 49/6
49/9 65/11 65/18
66/1 99/14 103/20
117/13 117/20
**e-liquids [4]**
56/21 61/3 64/1
93/19
**earliest [1]**
172/10
**early [2]** 27/2
163/17
**earmarked [1]** 5/5
**earned [1]** 105/2
**ease [1]** 94/2
**easier [2]** 95/7
181/22
**easy [3]** 64/2 64/4
94/6
**Ebling [2]** 5/19
5/24
**ECF [2]** 124/8
181/14
**echo [1]** 150/17
**ECTO [2]** 1/8 85/8
**edge [1]** 146/10
**educational [1]**
13/12
**effect [4]** 21/23
81/16 122/21
122/22
**effective [2]**
22/12 22/24
**effectively [9]**
7/17 19/22 23/23
24/4 33/12 35/11
135/15 143/20
173/17
**efficient [1]** 93/24
**efforts [1]** 132/23
**eight [1]** 150/23
**elaborate [2]**
22/21 73/20
**electron [1]** 90/19

**electronic [97]**
14/14 14/17 15/22
16/7 16/21 17/7
22/4 23/10 24/11
24/13 25/3 25/15
25/20 25/22 25/23
26/7 26/8 27/4
27/8 27/16 27/24
28/15 28/21 31/16
31/22 33/9 35/20
37/18 39/1 39/3
42/17 43/11 43/15
52/24 53/3 53/6
55/11 55/15 55/18
55/24 56/2 56/6
56/22 57/1 57/12
57/20 58/1 58/13
58/19 58/24 59/5
59/6 59/14 59/18
60/5 60/20 61/14
61/18 61/23 62/11
63/12 63/21 63/22
64/8 64/19 66/20
70/13 72/11 80/12
85/19 86/9 86/13
86/20 87/9 87/14
88/3 88/11 88/14
88/19 89/1 89/5
89/14 89/21 89/25
90/8 90/12 90/22
91/9 91/13 91/22
92/1 92/12 92/14
93/4 94/4 132/19
132/20
**electronics [2]**
61/4 93/22
**Eleventh [15]**
144/17 148/3
159/3 160/9
162/23 169/14
169/19 170/1
170/5 170/17
171/18 173/5
173/6 173/16
174/24
**ELF [76]** 1/8 7/10
38/7 38/13 39/13
40/22 43/1 57/2
60/5 62/7 62/11
63/15 63/16 71/14
71/14 71/17 71/19
79/10 79/13 88/4
89/14 90/9 91/2

91/8 91/13 91/17
91/22 92/1 92/9
98/19 100/10
111/25 113/8
113/10 114/14
115/24 122/23
124/17 124/17
125/25 128/6
128/18 129/22
130/3 130/11
132/14 132/18
133/4 133/9
133/14 133/15
134/7 134/15
134/15 134/16
134/16 134/23
134/24 135/1
135/2 141/7
141/17 157/23
164/5 164/6 165/4
165/20 166/1
166/10 166/13
167/17 167/23
174/16 178/11
178/13 178/18
**ELFBAR [140]**
44/17 57/12 57/20
58/1 58/6 58/16
58/20 58/24 59/8
59/9 59/14 59/18
60/9 60/11 60/15
63/14 63/17 63/18
64/8 67/23 68/14
68/15 68/17 68/18
70/5 70/13 70/19
71/1 71/24 72/11
73/9 73/10 74/9
74/11 74/12 75/4
78/17 78/24 79/1
80/9 80/13 80/16
80/20 80/23 81/1
82/19 82/22 83/2
88/1 88/11 88/14
88/18 89/5 89/21
90/7 91/23 92/1
92/10 93/4 96/8
96/15 97/22 98/7
98/13 98/20 99/15
99/16 99/17 99/21
100/3 101/5
101/14 101/15
101/24 102/20
104/24 104/25

105/23 106/13
107/7 107/25
108/5 108/7
108/11 108/16
108/20 108/25
109/1 110/14
111/2 111/13
112/7 112/15
112/22 113/8
115/13 118/14
118/17 118/19
118/21 118/24
119/5 119/16
119/19 119/21
119/25 120/5
120/9 121/23
122/24 123/3
123/13 127/1
127/9 133/10
133/11 134/23
135/3 135/10
135/16 136/5
136/12 136/22
137/23 137/25
141/8 141/15
141/20 142/24
147/1 147/18
157/24 166/10
166/13 167/16
167/18 170/15
172/16 172/20
179/7
**ELFBARs [3]**
79/4 109/2 179/4
**ELFs [1]** 164/20
**elicit [3]** 5/17 9/3
9/19
**Elmo [2]** 77/25
79/15
**embarrassed [3]**
125/2 126/15
172/2
**emergency [1]**
177/18
**employee [1]**
96/6
**employees [26]**
50/21 50/22 51/3
51/5 55/6 59/17
59/21 59/25 60/9
67/1 71/25 72/2
72/3 72/5 72/6
79/3 79/7 85/22

101/8 101/10
101/11 118/14
118/18 118/19
153/10 171/14
**empowered [1]**
165/15
**empty [3]** 35/6
36/12 135/18
**end-run [1]**
175/20
**endeavor [1]**
181/1
**ENDS, [1]** 42/7
**ENDS, E-N-D-S
[1]** 42/7
**energy [1]** 101/18
**enforce [7]** 21/24
22/6 46/15 51/24
52/4 173/2 176/7
**enforceable [1]**
173/1
**enforcement [44]**
17/1 17/8 17/12
17/15 17/19 20/9
20/18 20/19 20/23
21/12 21/16 22/3
22/11 22/19 25/5
25/8 25/14 25/18
26/24 27/4 27/10
27/19 27/20 29/15
37/24 38/2 38/3
39/14 45/15 45/16
45/21 45/23 46/1
46/24 47/7 47/8
47/12 51/22 52/1
53/10 53/16 53/19
145/11 157/3
**enforcing [1]**
52/5
**engage [1]** 50/23
**engaged [1]**
145/6
**engagements [2]**
15/10 15/12
**engaging [1]**
175/18
**English [4]** 50/6
52/24 53/4 53/7
**enhance [1]**
137/3
**enjoin [2]** 71/23
101/4
**enjoined [2]**

**E**

enjoined... [2]
101/15 152/22
enjoining [4]
109/1 152/8
179/14 179/14
enjoyed [1]
181/24
enter [3] 70/25
98/19 139/24
entertain [1] 9/22
entirety [2] 167/3
167/22
entities [1]
156/11
entitled [5] 8/14
25/5 25/14 132/24
182/7
entry [2] 6/23
174/17
EPA [1] 174/1
equitable [1]
148/1
equivalence [8]
23/22 24/3 24/3
24/12 24/12 25/1
25/2 25/11
equivocally [1]
102/3
ERIC [2] 1/19
3/17
ERP [1] 97/14
error [2] 152/14
169/22
especially [7]
46/19 95/7 103/6
138/24 155/15
171/2 171/25
ESQ [9] 1/15 1/15
1/16 1/19 1/19
1/20 1/20 1/21
1/23
essentially [5]
117/17 152/13
156/23 168/9
171/6
establish [4] 9/20
10/7 34/12 34/25
established [1]
123/9
establishment [1]
17/15

estimate [10]
27/23 58/15 59/13
62/1 64/13 90/21
90/24 105/18
106/2 137/23
estimated [1]
83/18
estimating [1]
106/24
estimation [7]
9/24 37/25 38/23
58/6 58/20 59/6
87/5
et [6] 3/7 52/14
95/2 156/3 171/15
174/11
et al [1] 3/7
et cetera [1]
174/11
Europe [1] 140/2
evade [1] 99/10
evenly [1] 106/8
event [1] 171/5
everybody [1]
127/5
everybody's [2]
4/3 125/5
everyday [1]
95/11
everywhere [1]
139/14
evidence [54] 4/2
11/24 12/5 15/7
15/19 26/20 29/23
31/15 32/4 33/14
33/18 34/23 35/17
36/3 37/1 37/14
44/24 66/19 67/24
70/2 76/21 77/9
77/20 96/9 97/6
104/3 104/4
115/21 117/2
118/7 118/12
121/10 127/24
129/23 130/22
133/1 141/1 141/5
141/11 145/2
148/17 148/20
150/19 151/5
152/13 159/9
161/12 163/7
163/12 163/23
168/4 169/6 169/7

174/13
evidenced [2]
30/24 41/6
evident [1] 4/1
evidentiary [1]
148/22
evidently [2]
36/11 38/11
evolution [2]
93/11 93/15
evolved [1] 90/3
exaggerated [1]
153/2
examination [26]
2/10 2/11 2/12
2/14 2/15 2/17
2/18 2/19 2/21
2/22 2/23 13/4
41/10 42/1 52/21
54/18 72/24 73/1
85/5 104/8 122/15
125/23 127/20
129/18 162/13
172/12
examine [2] 5/10
166/12
examiner [1]
137/11
examining [2]
160/11 170/4
examples [9]
15/24 16/9 17/11
52/2 111/21 133/3
133/10 168/19
168/20
exceed [1] 106/25
Excellent [1] 3/21
exception [2]
24/12 139/10
exceptionally [1]
154/6
exceptions [2]
27/15 144/21
exchange [1]
170/16
exclusive [2]
51/15 151/20
exculpatory [1]
53/19
excuse [2] 134/4
160/23
excused [4] 54/4
83/13 123/22

130/20
Executive [1]
1/24
exemption [1]
24/3
exercise [1]
142/16
exhaustive [1]
103/19
Exhibit 11 [3]
15/6 15/11 141/10
Exhibit 16 [2]
33/16 48/2
Exhibit 17 [1]
36/17
Exhibit 18 [2]
36/24 37/10
Exhibit 19 [1]
44/18
Exhibit 2 [1]
26/23
Exhibit 21 [3]
68/2 70/8 70/12
Exhibit 22 [9]
45/10 47/7 96/25
106/10 106/25
112/5 119/10
123/15 137/20
Exhibit 25 [1]
82/1
Exhibit 26 [1]
115/24
Exhibit 3 [1]
137/13
Exhibit 4 [1]
178/13
Exhibit 7 [1] 6/25
exist [2] 24/21
92/5
existence [2]
137/12 138/10
exists [1] 152/10
expanding [1]
142/4
expectation [3]
31/21 39/8 72/9
expediency [1]
11/14
expedited [1]
109/20
expeditious [1]
150/24
expenditures [2]

163/6 163/8
expenses [2]
97/11 97/12
expensive [2]
30/20 30/24
experience [45]
14/13 17/6 17/12
18/8 18/20 24/10
27/23 27/25 28/14
28/25 29/15 30/6
39/2 46/3 52/23
53/18 55/11 55/24
56/7 56/23 64/14
64/17 72/8 75/9
77/6 86/9 86/11
86/12 87/13 89/25
90/7 91/1 91/20
92/5 92/6 100/2
100/12 100/15
100/17 102/3
110/21 110/24
111/20 123/2
123/8
expert [5] 17/2
144/20 144/25
156/23 175/23
explanations [1]
53/9
explicitly [1]
100/15
expressed [1]
143/25
extant [2] 132/22
140/11
extend [1] 22/10
extended [2]
23/10 23/17
extensive [2]
24/10 51/18
extent [7] 24/20
88/8 105/11
107/18 114/11
134/14 177/2
external [1] 67/3
extra [2] 59/25
66/23
extraordinary [1]
159/4
extrapolate [1]
151/9
extrapolating [1]
40/3
extraterritorial [1]
139/9

Page 194

VPR BRANDS, LP vs. SHENZHEN WEIBOLI TECH
Case 9:22-cv-81576-AMC   Document 60   Entered on FLSD Docket 12/14/2022   Page 194 of 209

**E**

**extremely [3]**
129/8 129/8
173/19
**eyes [1]** 7/6

**F**

**F-R-I-J-A [1]**
125/17
**F.2d [1]** 173/13
**F.Supp [1]** 146/14
**face [1]** 132/24
**faced [1]** 111/22
**facets [1]** 121/19
**facilities [1]** 99/7
**fact [33]** 7/16
9/20 19/23 20/19
30/24 39/9 40/14
40/16 50/3 50/5
69/22 72/14 78/12
88/24 102/25
105/9 108/23
110/19 119/19
120/10 130/7
131/24 141/2
141/4 143/14
154/25 159/18
162/5 169/9
172/16 174/10
179/5 180/8
**factor [15]** 5/23
95/11 133/8
133/21 156/7
157/9 158/18
159/18 160/16
160/17 162/17
163/10 167/23
168/24 171/2
**factors [21]** 40/13
131/16 132/6
132/9 132/10
137/8 142/7
142/10 150/15
154/5 158/3 159/9
161/16 162/15
166/18 166/23
167/5 167/9 170/7
170/21 171/17
**facts [1]** 162/1
**factual [3]** 124/16
166/19 177/4
**failure [1]** 164/24
**fall [7]** 74/7 74/9

108/8 114/22
116/24 135/7
135/22
**falling [1]** 172/18
**falls [3]** 134/7
135/14 162/19
**fanciful [4]** 134/3
134/7 134/11
134/20
**fashion [1]** 92/10
**faster [1]** 98/3
**fathom [1]** 175/17
**fault [1]** 179/21
**favor [6]** 9/14
142/14 152/8
162/6 171/16
179/22
**favors [1]** 142/15
**FDA [119]** 14/18
14/20 15/22 16/7
16/13 16/21 17/4
17/8 17/13 17/17
18/2 18/3 18/5
18/14 18/18 18/20
19/8 19/18 20/2
20/6 20/7 20/9
20/19 21/3 21/8
22/4 22/5 22/10
22/18 23/1 23/5
23/9 23/24 26/8
26/21 26/24 27/2
27/3 27/10 27/17
28/1 28/2 28/10
28/14 28/20 28/25
29/7 29/15 29/21
29/25 30/2 30/3
30/4 30/5 30/7
30/24 31/6 31/10
31/16 31/19 31/23
31/23 32/2 32/6
37/24 38/3 39/10
39/13 40/1 40/4
40/11 42/16 43/7
44/4 44/6 45/10
45/12 45/20 45/23
45/24 46/2 46/5
46/9 46/10 46/16
46/18 46/23 47/7
47/8 47/11 47/12
47/12 48/17 50/10
50/21 50/22 50/23
51/5 51/18 51/25
52/1 52/4 53/9

53/12 53/15 53/18
100/13 100/19
100/25 102/19
103/23 110/16
144/20 145/11
155/18 156/16
157/1 175/15
176/8
**FDA's [12]** 20/22
21/5 21/13 41/6
45/11 47/10 50/12
51/15 145/11
145/13 145/22
157/3
**feature [1]** 133/18
**February 15th [3]**
18/12 18/16 41/3
**federal [18]** 21/13
21/21 23/15 23/15
146/1 159/19
173/4 173/4 173/7
173/8 173/11
173/15 174/20
174/24 175/5
175/8 175/17
176/22
**Fifth [1]** 148/15
**figure [1]** 144/3
**figures [1]** 171/10
**file [7]** 21/21 25/2
25/9 124/8 179/11
180/8 180/25
**filings [1]** 181/14
**fill [8]** 35/7 99/25
101/24 103/1
147/12 154/18
154/20 155/8
**filled [13]** 36/13
36/13 65/17 72/12
111/14 111/18
112/7 112/17
117/12 117/14
135/19 147/1
147/13
**fills [2]** 99/24
111/10
**final [3]** 32/2
83/16 163/21
**finally [2]** 172/24
179/25
**financial [5]** 7/7
66/12 68/3 68/7
96/21

**financially [1]**
155/9
**financials [2]**
95/19 149/24
**finder [1]** 105/9
**findings [2]**
131/24 180/8
**finished [1]** 94/8
**finite [1]** 157/4
**firsthand [1]**
100/12
**fit [3]** 56/16 74/3
143/25
**fits [1]** 144/5
**fittest [1]** 143/8
**fixed [1]** 69/12
**FL [2]** 2/3 182/11
**flavor [6]** 43/25
44/1 44/19 44/21
44/22 44/23
**flavored [5]** 27/16
43/24 45/2 45/2
145/1
**flavors [7]** 24/23
27/8 27/13 43/19
120/9 143/17
178/14
**flesh [3]** 137/24
138/20 169/3
**flip [1]** 151/25
**flood [1]** 81/24
**floor [2]** 86/18
156/22
**FLORIDA [19]** 1/2
1/6 1/17 1/24
10/15 55/2 57/7
57/8 58/2 58/4
58/15 58/21 59/7
63/1 170/18
170/19 173/21
173/22 181/24
**flsd.uscourts.gov
[1]** 2/4
**fluctuate [1]**
147/4
**Flum [4]** 108/6
108/10 108/25
119/6
**fly [1]** 99/8
**focus [2]** 14/9
19/5
**focused [1]** 131/4
**Focusing [1]**

152/9
**follow-up [2]**
124/25 125/21
**font [1]** 167/13
**food [21]** 14/9
16/11 16/12 16/14
16/22 16/23 17/22
18/1 18/1 21/24
38/1 40/22 46/2
46/15 46/21 53/13
173/24 174/12
176/4 176/7
176/22
**fooled [1]** 75/15
**footnote [2]**
27/17 175/2
**forced [2]** 79/2
146/17
**foreclose [1]**
174/17
**foregoing [1]**
182/5
**foreign [2]** 160/19
161/1
**forgive [1]** 73/5
**form [4]** 38/12
87/18 100/22
135/12
**formal [1]** 14/19
**formulated [1]**
40/3
**FORT [4]** 1/3 1/6
2/3 182/11
**Forty [1]** 87/4
**Forty-nine [1]**
87/4
**forums [1]** 16/9
**foundation [5]**
5/17 7/15 77/14
81/6 120/12
**foundational [1]**
66/13
**founded [2]** 55/9
85/25
**founding [1]**
55/12
**fours [2]** 162/1
162/5
**fourth [2]** 35/5
37/17
**framework [1]**
144/1
**franchise [1]**

# F

**franchise... [1]** 148/24

**frankly [5]** 152/3 152/8 152/21 154/2 154/3

**free [1]** 137/4

**frequently [6]** 16/14 16/17 60/19 60/24 61/14 90/12

**Friday [1]** 168/17

**friend [1]** 170/14

**FRIJA [16]** 2/20 3/13 11/10 11/15 11/21 124/23 125/2 125/11 125/14 125/17 129/20 130/17 136/8 168/17 170/13 172/12

**Frija's [4]** 122/17 163/1 165/20 172/1

**front [6]** 15/1 29/19 105/17 107/25 166/6 169/9

**fruit [2]** 120/9 145/1

**fulfilled [1]** 112/2

**function [3]** 100/21 117/13 117/16

**functions [1]** 93/1

**fundamentally [1]** 154/15

**funds [1]** 140/15

# G

**G-L-A-U-S-E-R [1]** 85/1

**G-O-O-D-S [1]** 54/21

**gain [1]** 14/18

**gained [1]** 100/7

**gap [1]** 95/10

**gasoline [1]** 140/3

**gate [1]** 163/19

**Geek [5]** 108/18 108/24 119/6 133/12 140/21

**general [11]** 9/23

10/23 14/5 27/23 62/18 66/14 93/3 110/1 110/24 111/4 176/3

**generate [1]** 11/4

**generating [1]** 119/20

**generic [1]** 134/6

**generically [1]** 49/11

**gentleman [2]** 147/16 168/25

**George [1]** 13/15

**Georgia [2]** 10/17 10/20

**gets [4]** 135/18 145/14 155/13 173/2

**gives [1]** 94/25

**glance [1]** 47/25

**GLAUSER [22]** 2/16 83/15 84/19 84/22 84/25 85/7 89/9 96/4 97/9 104/10 122/17 123/20 151/23 154/25 155/3 155/24 156/2 156/21 167/17 168/7 168/22 178/25

**Gold [2]** 148/9 149/8

**goods [28]** 1/8 54/21 54/21 54/22 54/24 55/1 55/6 55/9 55/12 55/22 56/3 56/16 57/11 59/9 60/3 60/19 64/18 70/15 71/23 78/7 78/8 135/5 135/7 135/8 135/15 135/24 143/5 168/1

**Goods' [5]** 55/3 58/23 59/13 68/4 70/5

**goodwill [9]** 6/17 151/24 154/13 160/24 161/1 161/6 169/18 171/13 171/14

**Google [1]** 179/6

**Gotcha [1]** 162/14

**gotten [3]** 15/2 153/11 163/12

**Gottlieb's [1]** 23/15

**Government [1]** 99/10

**grand [4]** 96/13 96/14 106/11 142/21

**grandfathered [3]** 18/18 24/5 24/19

**grant [2]** 6/22 177/16

**granted [2]** 31/2 163/16

**granting [1]** 179/22

**grapple [1]** 156/18

**gravitated [1]** 94/11

**Gray [1]** 173/10

**great [9]** 11/17 52/9 78/12 79/16 126/13 143/13 164/11 178/5 181/17

**greatest [2]** 143/11 143/12

**gross [11]** 67/23 70/9 70/12 70/15 96/7 97/10 97/11 97/18 106/5 106/9 147/5

**ground [3]** 63/5 86/18 156/22

**grounds [2]** 77/17 162/12

**grow [3]** 62/24 139/24 155/25

**growing [3]** 60/16 88/16 152/20

**growth [2]** 153/11

**guidance [3]** 22/6 26/22 28/1

# H

**HAITHAM [4]** 2/13 54/7 54/11 54/14

**halfway [1]** 32/23

**Hamilton [1]** 13/9

**handle [3]** 59/18 90/18 181/6

**handled [2]** 14/6 139/3

**hardware [3]** 61/3 64/6 106/6

**Hardy [1]** 115/5

**harm [12]** 105/10 109/3 110/14 150/14 152/1 155/9 156/3 171/4 171/6 171/16 171/23 171/25

**harmful [10]** 7/19 67/10 72/20 99/13 99/13 103/18 103/18 103/21 156/13 156/15

**harms [4]** 154/11 157/14 171/2 171/23

**HAYNES [18]** 2/9 12/12 12/20 12/23 13/6 13/7 13/8 15/21 26/19 31/14 32/23 34/25 36/5 40/21 42/3 52/23 53/24 54/2

**hazards [1]** 72/18

**HDMI [1]** 107/17

**health [10]** 24/9 46/19 72/18 73/16 103/2 103/5 155/23 156/8 157/8 171/21

**hearing [23]** 1/12 3/23 4/1 4/4 4/5 4/21 5/5 8/9 8/18 10/1 76/16 89/17 113/16 124/7 124/8 148/22 150/19 156/14 177/6 178/6 178/16 180/8 181/23

**hearsay [1]** 120/12

**heart [1]** 158/17

**heavily [2]** 71/10 79/6

**heavy [2]** 103/12 179/19

**helpful [3]** 8/17

54/3 146/24

**here -- is [1]** 29/9

**here where [1]** 162/2

**hereby [1]** 182/5

**Hetherington [2]** 1/23 3/20

**HEYER [23]** 1/19 2/10 2/14 2/17 2/19 2/23 3/17 10/6 11/18 12/10 44/12 84/18 123/23 127/16 129/16 150/10 158/25 159/11 170/24 177/7 180/10 180/17 181/18

**higher [5]** 98/3 99/14 149/1 155/5 162/12

**highest [1]** 119/9

**highly [5]** 7/18 24/24 92/6 155/16 165/19

**Highway [2]** 2/2 182/10

**Hine [2]** 1/21 3/18

**hire [2]** 59/17 139/2

**hiring [1]** 60/9

**historical [2]** 111/5 111/8

**historically [4]** 26/8 64/18 93/9 141/8

**history [4]** 85/24 102/3 109/5 112/12

**hit [8]** 146/10 158/20 159/11 162/17 169/13 170/9 171/1 171/14

**hits [1]** 151/17

**hold [4]** 81/9 107/12 110/16 162/10

**holding [4]** 43/23 45/4 115/23 116/25

**home [1]** 84/1

**honest [1]** 103/22

## H

**honestly [1]**  95/6
**HoneyStick [3]**
113/23 113/25
114/6
**Honor [130]**  3/14
3/17 4/10 4/22 5/8
5/14 5/23 6/13
6/25 7/3 7/15 7/23
8/5 9/1 10/9 10/13
10/21 11/16 11/19
11/20 12/1 12/11
12/13 12/14 12/24
15/14 20/21 21/15
21/22 30/18 32/16
33/24 35/23 37/9
41/8 41/11 41/22
41/24 42/24 43/13
45/6 45/16 46/14
52/20 54/7 54/10
54/16 56/5 67/16
67/17 68/10 68/12
69/16 70/1 72/22
72/25 77/8 77/15
83/6 83/9 83/10
84/4 84/20 85/2
89/11 95/24 96/24
97/3 104/7 105/13
107/18 109/10
109/19 112/23
113/3 118/7 118/9
120/19 121/2
122/11 122/14
123/4 123/18
123/21 123/25
124/3 124/13
125/19 129/17
130/15 130/16
130/23 131/10
131/12 131/17
131/19 131/23
132/2 132/4 136/7
146/9 148/8 150/9
150/23 152/6
152/11 155/15
156/20 158/24
161/15 161/24
161/25 166/6
166/19 169/14
170/8 170/22
171/1 172/18
175/1 175/22

177/25 178/10
179/6 180/5
180/23 181/6
181/8 181/19
182/2
**Honor's [11]**  4/14
6/9 7/5 10/10
11/11 124/24
131/13 132/1
148/2 150/11
150/18
**HONORABLE [1]**
1/13
**hookup [1]**  178/9
**hope [3]**  42/10
84/17 181/24
**hot [1]**  147/22
**hottest [1]**  155/2
**hour [4]**  83/19
83/24 83/25 84/2
**house [3]**  94/17
103/4 173/12
**housekeeping [1]**
12/6
**huge [2]**  101/17
102/22
**huh [1]**  78/9
**human [4]**  19/3
95/2 121/7 153/13
**humbled [2]**
126/14 161/7
**hundred [1]**
106/3
**hundreds [1]**
127/3
**Hyde [5]**  100/6
107/5 107/6 108/3
111/21

## I

**I-N-D-E-X [1]**  2/7
**ice [1]**  44/22
**identical [6]**
100/21 110/18
143/5 167/5
167/12 168/2
**identification [4]**
44/11 44/16 76/13
116/17
**illegal [2]**  145/25
146/1
**illegality [4]**
159/15 173/19

174/3 177/19
**images [1]**
165/24
**immediate [4]**
27/4 27/10 100/1
111/24
**immediately [2]**
22/17 27/14
**immoral [1]**
145/21
**impact [2]**  71/25
101/6
**implement [1]**
30/9
**implicated [1]**
132/15
**implications [1]**
156/9
**implicitly [1]**  9/5
**import [6]**  81/13
94/15 100/18
121/23 122/2
132/16
**importation [2]**
46/6 74/18
**imported [1]**
99/19
**impose [1]**
149/15
**imposed [1]**
151/20
**imposition [1]**
149/14
**improper [1]**
166/9
**improperly [1]**
151/20
**inappropriate [1]**
155/7
**INC [6]**  1/9 1/10
10/13 173/12
173/24 177/13
**inclined [2]**  9/15
176/25
**increase [2]**  71/3
72/18
**increased [4]**
64/20 64/21 95/4
154/21
**increasing [2]**
53/10 151/16
**indeed [1]**  49/19
**independent [1]**

25/18
**independently [1]**
98/16
**indeterminate [1]**
177/5
**indication [1]**
83/22
**individual [2]**
86/24 87/1
**indulgence [3]**
95/13 130/14
150/11
**industries [2]**
10/19 13/25
**industry [43]**  14/6
14/14 14/17 16/5
16/18 17/7 24/11
26/22 39/12 55/12
55/15 55/18 55/25
56/7 60/20 63/7
63/13 67/11 73/21
86/10 86/13 86/18
87/13 90/3 90/6
90/9 90/13 91/20
93/8 93/14 100/8
109/5 109/7
113/17 117/9
123/8 129/2 129/6
129/7 136/24
147/12 155/17
156/21
**inference [6]**
137/4 137/5 137/7
138/15 138/15
161/18
**inferred [1]**  141/4
**inferring [1]**
40/10
**information [29]**
7/7 7/18 8/2 8/2
8/11 8/13 9/9 9/10
9/11 9/15 9/23
10/3 10/8 10/23
11/3 66/12 66/15
66/25 67/5 67/7
67/12 69/19 69/23
69/24 73/25
124/17 131/19
136/6 147/2
**infringe [1]**  137/2
**infringed [1]**
142/15
**infringement [2]**

140/22 170/2
**infringer [1]**
148/1
**ingredients [1]**
38/16
**inhaled [1]**
103/13
**inhaling [3]**
103/10 156/2
179/19
**inherently [1]**
40/14
**initial [1]**  20/3
**initially [1]**  36/14
**injunction [30]**
1/12 3/24 45/25
46/5 101/25
105/10 109/21
122/19 132/5
141/4 144/4 149/9
148/12 148/16
151/17 152/1
155/13 159/1
159/4 163/18
171/5 171/7
171/24 174/5
174/17 177/16
177/19 177/23
179/22 180/2
**injury [1]**  142/19
**inquired [2]**  62/10
91/12
**inquiry [2]**  110/2
175/18
**insight [1]**  94/25
**inspection [1]**
100/20
**inspections [1]**
17/15
**instance [2]**
170/9 170/19
**instances [1]**
167/20
**instead [2]**  83/3
119/22
**Institute [5]**  16/12
16/14 16/23 16/24
53/13
**Instruments [1]**
10/13
**insure [1]**  19/22
**intellectual [1]**
131/14

**I**

**intend [5]** 7/3
7/12 7/14 109/17
137/2
**intended [13]**
19/2 19/11 19/21
21/7 21/10 29/11
38/19 38/22 39/3
39/4 39/6 40/13
161/11
**intending [2]**
160/25 161/6
**intent [20]** 5/23
6/2 6/7 6/16 49/11
137/1 137/1 137/3
137/4 137/8
138/14 138/20
140/6 160/17
160/19 160/22
160/23 161/12
162/15 169/13
**interacted [1]**
40/4
**interacting [1]**
100/12
**interest [16]**
132/12 136/20
142/13 142/14
142/17 143/22
150/14 155/12
156/7 156/17
157/13 171/21
179/17 180/1
180/3 180/3
**international [3]**
135/22 138/19
138/25
**internationally [1]**
85/18
**interviewed [1]**
120/4
**introduce [2]**
13/6 124/2
**introduced [6]**
41/1 41/3 41/5
71/9 71/17 131/1
**inures [1]** 143/21
**invalid [1]** 177/1
**invariably [1]**
10/3
**investment [2]**
149/1 149/6

**involvement [1]**
47/15
**IP [2]** 139/11
139/13
**irrelevant [3]**
105/9 105/13
138/24
**irreparable [4]**
105/10 152/1
154/12 156/3
**issuance [1]**
148/21
**issue [45]** 4/22
8/7 8/21 8/22 9/18
11/5 17/17 20/24
24/17 30/1 34/21
47/2 69/15 95/19
102/10 105/12
124/21 127/17
128/24 132/13
133/6 137/1 137/2
139/9 148/13
150/13 150/22
152/17 154/4
155/10 159/12
171/5 171/13
172/7 173/2 173/7
173/15 173/17
173/19 174/3
174/20 176/24
179/2 179/2 181/7
**issued [13]** 14/24
23/16 27/10 29/7
29/22 30/25 32/6
137/9 140/12
145/18 145/18
161/4 171/7
**issues [22]** 4/16
5/2 7/2 14/7 16/13
30/4 52/14 53/17
70/19 73/9 88/9
98/5 100/3 132/11
140/7 146/18
146/18 150/12
155/20 171/24
177/8 178/8
**issuing [1]**
148/11
**items [3]** 11/13
128/1 181/7

**J**

**January 12th [1]**

70/6
**January 1st [1]**
13/11
**January 2022 [1]**
57/18
**job [2]** 61/13
126/14
**jobs [1]** 153/11
**JOEL [2]** 1/15
3/10
**joined [2]** 14/1
14/2
**JON [4]** 2/16
83/15 84/19 84/22
**Jonathan [1]**
84/25
**judge [5]** 1/13
23/15 131/14
148/9 149/8
**judges [1]** 146/17
**judgment [1]**
154/3
**judicial [7]** 4/22
5/15 6/22 32/12
32/13 32/15 124/5
**juice [3]** 49/3 49/5
49/9
**July 19th [1]**
137/15
**jumped [1]**
143/15
**junction [1]**
174/21
**jurisdiction [5]**
14/19 14/21 20/7
21/3 50/12
**jurisdictions [1]**
13/17
**Justice [7]** 17/20
46/20 46/21 46/24
47/1 47/3 176/8
**Juul [4]** 89/1
100/6 111/21
146/13

**K**

**K-O-K-O [1]** 33/4
**KEVIN [4]** 2/20
3/13 125/14
125/17
**key [2]** 167/23
169/2
**kinds [1]** 103/21

**KINGDOM [2]**
1/10 53/5
**kit [6]** 33/4 33/5
114/14 115/15
117/17 117/18
**kits [5]** 115/4
115/4 115/12
116/1 117/14
**knocked [1]**
139/20
**knockoff [2]** 71/3
71/5
**knockoffs [2]**
71/13 100/3
**knockout [3]**
139/17 139/19
139/20
**knowing [1]**
102/7
**knows [1]** 141/18
**Koko [2]** 33/4
37/3
**Kratom [1]**
177/13
**KRUPA [1]** 1/19

**L**

**lab [2]** 94/17
177/13
**labeling [2]** 69/18
174/1
**lack [5]** 71/8
77/14 81/6 112/17
120/12
**lacked [1]** 37/25
**laid [5]** 77/17
153/10 153/12
160/5 171/15
**language [4]**
19/15 19/21 52/24
160/23
**Lanham [3]**
139/10 141/3
145/19
**large [5]** 22/16
51/14 79/3 129/8
152/5
**largely [1]** 129/6
**larger [1]** 150/25
**largest [1]** 87/9
**lasts [1]** 65/21
**late [1]** 27/1
**lately [1]** 129/1

**latter [2]** 24/4
33/2
**law [44]** 13/15
13/16 13/18 13/21
14/2 15/6 16/11
16/12 16/14 16/23
16/24 18/9 20/7
21/23 22/7 30/17
53/13 131/6
131/24 137/3
143/6 143/7
144/11 145/23
146/1 149/9
151/18 152/7
152/17 160/5
160/5 161/25
169/22 170/17
173/5 173/17
174/21 174/24
175/14 175/23
176/6 176/24
179/25 180/8
**Law360 [1]** 16/4
**lawful [6]** 144/24
145/10 145/20
154/4 158/11
176/17
**lawfully [1]** 40/25
**laws [1]** 52/5
**lawsuit [9]** 21/21
56/25 57/4 60/4
74/14 88/6 89/13
113/11 140/14
**lay [1]** 7/15
**LAYLA [2]** 1/15
3/11
**layoff [8]** 72/6
72/7 79/2 79/7
101/10 118/14
118/18 118/19
**lead [2]** 109/1
112/16
**leads [1]** 43/8
**learned [1]** 47/17
**leave that [1]**
158/14
**leeway [1]** 34/9
**left-hand [3]**
48/13 80/5 108/14
**leftover [1]**
179/15
**legal [2]** 13/24
34/20

**L**

**legally [4]**  101/11 174/14 175/25 176/20
**legitimate [5]** 99/6 99/16 99/17 112/17 112/18
**lengthy [2]**  30/20 30/23
**lens [1]**  155/7
**letter [20]**  20/17 20/22 29/21 29/24 30/4 30/5 32/5 32/6 32/21 35/2 37/23 38/3 38/4 47/18 47/20 48/9 48/17 49/12 53/22 87/25
**letters [15]**  17/16 20/14 40/4 45/17 45/20 45/24 46/3 46/25 47/9 47/11 49/20 50/4 50/11 53/19 166/4
**levels [1]**  103/21
**Lexis [4]**  10/14 10/19 173/25 177/14
**LI [2]**  1/20 3/19
**licensing [1]** 14/10
**life [3]**  23/8 140/17 150/7
**lifespan [1]** 123/10
**light [2]**  6/20 94/8
**lighters [1]** 132/20
**lightly [1]**  159/5
**lights [1]**  86/6
**likelihood [22]** 131/7 132/11 141/3 142/11 153/21 153/23 154/5 154/6 157/17 157/18 157/20 158/3 158/3 158/18 159/2 159/7 165/7 165/17 166/24 170/7 173/15 174/8

**liken [1]**  26/10
**limbo [1]**  145/16
**limitations [1]** 169/2
**limited [10]**  3/12 5/19 6/8 9/21 68/14 127/17 140/17 161/11 166/3 169/11
**limits [1]**  180/23
**link [1]**  79/19
**liquid [17]**  25/25 26/4 28/16 35/8 36/14 49/6 49/6 49/9 65/11 65/18 66/1 66/6 99/14 103/20 117/7 117/13 117/20
**liquids [5]**  56/21 61/3 64/1 93/19 93/19
**list [9]**  15/9 15/11 15/11 31/16 31/18 41/7 45/11 103/19 124/9
**listen [2]**  138/23 139/23
**literally [2]**  22/17 31/10
**litigated [1]** 156/25
**litigating [1]** 157/5
**litigation [6]**  17/3 20/25 23/13 88/9 100/9 113/17
**LLC [8]**  1/8 1/8 1/8 1/9 1/9 29/22 54/21 85/8
**LLP [2]**  1/23 13/9
**local [2]**  3/20 180/22
**localities [1]** 51/25
**location [1]**  99/10
**locations [2]** 62/15 62/19
**lol [2]**  141/17 170/14
**losing [1]**  172/15
**losses [1]**  121/10
**lower [4]**  48/24 97/8 106/7 160/11

**LP [2]**  1/4 3/6
**LTD [3]**  1/8 3/6 173/12
**Luffbar [4]** 108/16 108/18 108/24 119/6
**lunch [4]**  83/24 84/7 84/14 84/17
**lungs [2]**  103/11 156/4

**M**

**magazine [1]** 169/6
**magazines [8]** 16/5 76/19 76/24 76/24 135/25 136/17 169/9 181/7
**mailed [1]**  77/3
**mainly [1]**  92/20
**mainstream [2]** 93/7 100/7
**maintain [3]**  4/14 16/1 101/19
**maintained [2]** 68/3 96/22
**maintenance [2]** 63/24 64/3
**majority [1]**  128/6
**manage [1]** 181/23
**manager [1]** 54/23
**Mancini [1]** 177/13
**mandatory [3]** 43/7 148/14 163/15
**manner [3]** 105/14 117/16 165/19
**manufacture [1]** 99/7
**manufactured [4]** 56/23 130/4 130/12 133/5
**manufacturer [10]** 56/8 74/20 81/13 99/5 99/6 113/2 130/4 130/7 151/6 154/19
**manufacturers [3]** 98/22 103/1

129/5
**manufactures [1]** 86/3
**manufacturing [1]** 99/9
**margin [13]**  66/24 67/4 67/12 70/9 70/15 96/7 97/10 119/8 119/9 119/11 119/11 119/14 155/5
**margins [7]**  7/10 9/9 10/25 66/15 66/20 69/20 153/4
**MARION [2]**  1/16 3/11
**market [52]**  20/14 22/23 22/25 23/3 23/4 24/20 25/4 25/6 25/9 27/14 39/20 58/4 59/10 61/25 62/24 63/2 66/21 71/9 71/10 71/15 71/20 73/10 75/8 75/25 79/2 79/8 79/9 79/11 80/16 81/24 93/20 99/15 100/7 101/21 102/18 112/15 118/15 118/18 118/20 122/25 138/3 138/11 139/14 140/1 140/13 143/2 145/13 153/7 154/17 156/5 172/16 178/22
**marketed [13]** 18/15 19/22 25/16 38/7 38/13 39/13 40/25 51/12 53/1 53/4 53/6 100/15 174/14
**marketers [1]** 129/6
**marketing [23]** 14/11 23/1 23/20 23/24 25/10 27/5 27/11 28/4 30/25 31/17 37/25 39/25 40/22 41/6 41/7 43/16 50/11 50/16

86/3 126/14 137/16 140/15 143/16
**marketplace [21]** 21/18 70/25 90/1 98/19 102/22 103/7 128/12 128/14 128/15 142/9 163/2 163/3 163/23 163/25 164/5 164/6 164/24 165/9 165/16 178/23 180/4
**marketplace's [1]** 162/25
**markets [2]** 139/24 139/25
**markings [1]** 112/25
**Mary [3]**  122/1 122/7 147/17
**Mason [1]**  13/16
**masses [1]**  95/12
**massive [4]** 154/22 154/22 155/9 172/22
**master [15]**  56/9 56/10 56/18 74/5 74/6 74/10 74/11 74/12 74/17 74/19 75/14 87/19 87/22 127/1 127/4
**match [1]**  48/5
**matches [1]** 48/11
**material [3]**  9/13 72/19 72/20
**materials [2]** 29/10 164/19
**math [3]**  84/6 106/11 106/12
**matter [10]**  9/23 10/2 11/19 12/6 14/4 47/4 95/6 155/6 166/16 182/7
**matters [7]**  4/8 4/19 5/13 14/6 17/3 131/13 181/4
**Matthew [1]** 84/25
**McDowell [2]**

**M**

McDowell... [2]
1/23 3/20

mean and [1]
71/6

measures [1]
46/1

Medline [1] 10/19

member [4] 16/11
16/12 16/19
104/15

members [2] 8/9
16/22

memorizing [1]
52/9

men's [1] 125/3

menthol [2] 27/9
27/13

Merchants [1]
16/16

Merely [1] 69/18

merging [1]
175/14

merits [5] 148/17
149/14 152/24
153/25 157/18

message [1]
141/13

messages [1]
141/7

metals [4] 99/12
103/12 156/3
179/20

methods [5]
135/15 135/23
136/4 136/14
168/24

metric [1] 87/11

MICHELLE [2]
1/20 3/19

Middle [2] 10/14
173/20

miller [4] 2/1 2/4
182/8 182/9

milliliters [1] 66/5

million [18] 28/3
105/19 105/21
106/2 106/3
106/14 106/18
106/19 107/1
147/4 149/4 151/4
151/10 152/3

152/23 171/9
171/10 171/12

millions [1] 150/5

Mills [1] 173/12

mindful [1] 12/8

minimal [2] 163/5
171/25

minimis [1]
153/18

mint [1] 145/1

minus [1] 115/19

mirror [1] 87/16

misappropriate
[1] 160/24

misbranded [2]
73/25 74/24

mischaracterizing
[1] 154/16

misleading [1]
98/1

mispronounce [1]
73/5

misses [1] 162/22

mission [1]
104/18

mistaken [1]
166/3

misunderstood
[1] 106/4

mix [2] 61/6 154/8

model [1] 99/24

modest [2]
178/23 178/24

modified [1]
27/18

moment [3] 78/19
79/17 83/9

monitor [2] 45/18
61/21

monopolizing [1]
133/17

month [7] 65/21
107/1 112/9
129/21 129/21
172/3 172/3

monthly [2] 97/18
147/3

months [10] 86/3
97/18 112/9 112/9
137/22 138/4
138/10 151/2
151/2 151/3

morass [2]

146/16 176/20

mortar [1] 90/21

mostly [2] 43/18
135/9

motion [9] 3/24
6/22 107/19 131/8
132/4 154/4 175/6
180/25 181/25

motions [2] 4/20
155/14

MOTTA [2] 1/23
3/20

mouth [1] 94/8

mouthpiece [1]
117/21

mouthpieces [1]
117/23

movie [1] 134/15

Mr [56] 2/10 2/11
2/14 2/15 2/17
2/18 2/19 2/22
2/23 4/9 5/24 11/9
13/6 13/8 15/21
26/19 31/14 32/23
34/25 36/5 40/21
42/3 44/12 52/23
53/24 54/2 69/8
69/15 89/9 109/24
116/12 124/11
124/22 125/2
125/9 125/18
127/15 130/21
131/8 152/16
153/21 154/15
155/3 157/16
159/8 160/18
162/3 162/17
162/22 163/1
165/3 172/1
173/20 178/3
180/9 180/13

Mr. [69] 5/19 5/20
6/4 6/13 7/4 7/12
8/4 10/6 11/10
11/15 11/18 11/21
12/10 12/11 54/20
56/12 59/5 65/15
66/11 67/22 70/4
73/3 76/16 83/11
83/21 84/18 85/7
96/4 97/9 102/12
104/10 115/5
122/17 122/17

123/20 123/23
124/23 125/11
127/16 129/16
129/20 130/17
136/8 150/10
150/17 151/23
154/25 155/24
156/2 156/21
157/3 158/25
159/11 164/9
165/20 167/17
167/21 168/7
168/17 168/22
170/13 170/24
172/12 176/19
177/7 178/25
180/10 180/17
181/18

Mr. Bryan [1]
12/11

Mr. Ebling [1]
5/19

Mr. Frija [11]
11/10 11/15 11/21
124/23 125/11
129/20 130/17
136/8 168/17
170/13 172/12

Mr. Frija's [2]
122/17 165/20

Mr. Glauser [15]
85/7 96/4 97/9
104/10 122/17
123/20 151/23
154/25 155/24
156/2 156/21
167/17 168/7
168/22 178/25

Mr. Hardy [1]
115/5

Mr. Heyer [15]
10/6 11/18 12/10
84/18 123/23
127/16 129/16
150/10 158/25
159/11 170/24
177/7 180/10
180/17 181/18

Mr. Rothman [9]
5/20 6/4 6/13 7/4
7/12 8/4 157/3
164/9 176/19

Mr. Rothman's [2]
150/17 167/21

Mr. Shriteh [11]
54/20 56/12 59/5
65/15 66/11 67/22
70/4 73/3 76/16
83/11 102/12

Mr. Shriteh's [1]
83/21

MRD [2] 10/18
10/18

Ms [3] 154/7
158/2 172/8

Ms. [5] 139/3
150/14 157/15
158/15 178/21

Ms. Shufflebarger
[5] 139/3 150/14
157/15 158/15
178/21

multiple [3] 55/20
78/25 121/19

mundane [1]
17/14

myuwell.com [1]
48/25

**N**

nailed [1] 174/10

Nation [1] 170/5

national [2] 139/1
140/7

nationwide [2]
87/6 88/19

nature [11] 8/2
9/21 10/3 55/3
66/21 76/6 85/16
90/3 105/13 106/3
106/21

near [1] 153/18

necessary [6] 4/6
9/4 116/13 137/6
141/2 143/16

negligible [1]
112/2

negotiation [1]
56/20

neighbor [1]
127/7

neither [1] 39/24

newer [1] 75/24

NGUYEN [2] 1/15
3/11

nice [4] 3/15
84/16 84/17

**N**

nice... [1]  181/22
Nicopure [3]  21/1
21/2 21/15
nicotine [42]
13/25 14/8 16/25
19/2 19/6 20/11
20/15 21/4 21/9
21/10 24/22 25/25
26/3 28/6 28/16
29/3 31/3 31/9
38/11 38/16 39/5
39/9 40/10 42/17
43/7 43/7 43/8
43/11 43/15 49/6
49/10 80/13 80/22
92/15 92/18
100/15 104/22
104/23 117/13
135/9 168/9
168/13
nightclub [1]
149/2
nine [1]  87/4
Nineteen [1]
59/25
Ninth [2]  173/8
173/18
nitrosamines [1]
103/21
non [1]  92/21
non-addicted [1]
92/21
noncompliance
[1]  53/11
noncompliant [1]
53/20
none [3]  24/14
27/5 116/11
nonrechargeable
[1]  65/5
nontobacco [1]
45/12
norm [1]  52/3
Northern [2]
10/16 10/19
notably [1]  39/18
notice [11]  4/22
5/15 6/23 32/12
32/13 32/16 70/25
99/18 124/5
138/12 138/13

noticed [1]  98/18
notified [1]  138/7
notifies [1]  181/9
notwithstanding
[2]  148/13 159/18
November 18 [1]
48/14
nowhere [1]
156/16
number [36]  3/5
18/4 20/13 22/16
23/14 31/4 50/22
51/2 51/14 58/3
59/9 59/23 61/10
61/19 69/9 72/2
72/3 72/4 78/12
79/3 88/21 92/11
95/21 96/17
102/22 106/23
107/20 119/13
129/5 150/12
152/19 153/6
153/6 154/9 169/1
171/4
number one [1]
102/22
numbered [1]
82/5
numbers [24]
7/20 7/22 7/25
8/17 8/20 67/21
70/17 77/11 96/18
97/17 98/1 98/2
103/6 105/17
124/9 147/23
147/24 150/4
151/11 152/4
152/5 154/9 171/7
171/8
numerous [1]
53/7
NW [2]  1/22 1/24

**O**

object [2]  6/8
34/3
objection [42]
7/13 11/25 12/4
15/16 15/17 15/18
34/1 34/2 34/5
34/22 35/25 36/2
37/11 37/12 37/13
45/6 49/22 69/13

77/13 77/18 78/18
78/21 81/6 81/10
81/11 97/1 97/5
105/7 105/15
109/10 109/19
109/23 116/14
118/1 118/8 118/9
118/11 120/12
120/13 121/2
121/12 123/4
obligation [2]
158/10 176/14
oblong [1]  166/4
observation [2]
57/19 88/13
observe [1]
180/22
obtain [5]  18/5
23/24 28/10 30/20
39/23
obtained [2]
39/25 41/6
obtaining [1]
70/19
October 2021 [4]
88/12 96/11 97/19
123/17
October 2022 [2]
96/11 97/19
October 31 [1]
70/6
offenders [1]
179/11
offense [1]  144/8
offensive [2]
142/22 176/2
offer [5]  33/11
36/10 94/9 132/1
148/20
offering [6]  6/10
6/14 6/19 147/9
147/10 160/18
office [10]  53/16
137/9 137/21
138/13 146/2
160/20 162/4
165/8 165/10
165/14
officer [2]  12/2
85/11
Official [2]  2/1
182/9
officially [1]  86/7

oh [3]  69/4 80/1
127/19
older [2]  63/23
172/19
omnidistro.com
[1]  82/10
online [5]  61/21
62/7 91/18 126/1
126/6
open [34]  4/14
4/23 5/1 11/5
24/23 25/20 25/21
26/3 28/5 28/8
29/16 30/3 31/2
31/22 33/9 35/4
35/12 36/6 36/10
37/17 37/19 37/22
63/22 63/23 64/7
64/19 65/16 86/5
93/18 94/3 99/9
100/14 106/6
159/18
opening [1]  64/4
openness [1]
9/14
operate [3]  56/20
72/4 149/11
operating [2]
55/20 143/10
Operations [1]
54/23
opinion [7]  38/2
38/17 39/12 39/15
40/3 40/21 94/5
opinions [2]
38/12 155/14
opportunity [5]
5/17 33/3 38/12
131/1 159/17
opposed [4]  36/7
51/17 165/8 166/1
opposing [2]  7/23
34/9
opposite [1]
143/22
options [2]  24/1
36/10
Oracle [1]  175/3
oral [1]  177/22
orally [2]  9/3
177/16
order [11]  7/5 8/7
23/16 25/4 25/13

39/19 106/14
128/11 167/17
174/23 177/17
orders [1]  30/25
ordinary [1]  69/23
organization [1]
104/20
organization's [1]
181/13
organizations [1]
23/14
original [2]  113/1
130/4
otherwise the [1]
118/4
ought [1]  146/15
outcome [1]
112/19
outlets [8]  61/17
62/6 62/8 90/22
91/3 135/14 158/1
168/16
outset [1]  149/12
outweigh [1]
167/9
over 50 [1]
171/12
overall [10]  58/23
59/13 89/5 89/8
101/9 105/5
105/24 106/1
106/17 177/3
overcome [1]
9/13
overcoming [1]
11/7
overhead [1]
97/11
overrule [2]  77/18
105/15
Overruled [2]
45/8 123/6
overstated [1]
159/10
overstating [2]
141/12 141/14
overtaken [1]
111/2
overview [1]
132/2
overwhelming [1]
171/24
owned [1]  132/18

VPR BRANDS, LP v. SHENZHEN WEIBOLI TECH

**O**

owners [5]  54/24
85/12 142/16
145/14 157/6
ownership [2]
159/11 159/13

**P**

P-R-O-C-E-E-D-I-
N-G-S [1]  2/25
P.A [1]  1/16
p.m [4]  84/15
125/6 125/7 182/3
pack [2]  66/3 94/7
packaging [2]
71/12 112/25
page [21]  2/8
32/20 32/23 35/5
35/9 37/20 49/3
49/4 80/4 80/9
82/1 82/3 82/12
118/25 136/1
136/1 136/1 136/2
141/25 161/25
180/23
pages [4]  1/8
35/6 37/17 178/16
paltry [1]  126/15
pandemic [1]
23/18
paper [2]  134/1
165/14
papers [3]  169/25
177/11 181/1
parameters [1]
18/20
paraphrasing [3]
19/1 21/4 29/9
parse [1]  148/7
part [19]  9/5 19/5
19/14 29/5 31/7
52/13 71/20 98/19
112/11 117/19
133/15 133/16
136/6 145/13
154/8 161/13
174/2 175/10
176/14
partial [2]  34/22
152/2
participate [1]
16/15
particularized [1]

11/4
parties [8]  9/22
72/19 83/24
156/19 164/4
180/7 181/11
181/15
parties' [2]  6/21
168/16
partner [3]  13/9
13/10 13/11
partners [1]  86/5
Partnership [1]
3/12
party [7]  94/17
148/16 148/18
152/9 163/11
163/12 163/22
passe [1]  140/21
passionate [1]
104/12
paste [3]  71/9
71/11 71/12
PATEL [1]  1/19
patent [4]  88/9
173/5 175/4 175/6
pathway [7]
23/25 24/13 25/1
25/10 25/19 28/11
31/19
pathways [5]
23/19 23/23 24/2
24/15 24/16
PDF [2]  107/17
107/19
peaked [1]  88/16
Pebble [1]  108/25
pedigree [2]
109/5 109/6
pen [1]  116/8
pending [4]  31/5
31/23 31/23 71/24
people [23]  16/15
49/10 50/6 53/16
91/14 92/20 93/1
99/8 103/9 110/14
112/16 119/25
136/8 143/15
147/23 156/2
164/11 168/9
168/10 168/11
168/21 168/23
179/19
people's [1]

164/24
Pepper [1]  13/9
peppered [1]  10/5
percentage [2]
89/4 106/16
perception [1]
92/3
performance [1]
29/13
perhaps [15]  40/3
95/21 101/22
111/12 115/12
140/16 141/12
143/13 152/25
162/20 163/25
177/20 179/24
180/14 180/15
period [18]  9/2
9/4 23/5 68/19
68/20 70/10 70/14
70/22 70/24 98/5
112/1 112/2
118/20 123/9
128/2 130/1
140/20 180/4
periodically [1]
26/17
periodicals [2]
77/6 77/10
permissible [1]
21/7
permission [1]
11/11
permit [2]  5/9
34/20
permits [1]  11/16
person [2]  3/15
181/22
personal [2]  11/2
86/11
perspective [3]
94/2 94/15 153/15
persuade [1]
105/9
persuaded [1]
170/3
persuasive [3]
169/15 169/20
176/25
pertain [1]  14/8
pertains [1]  22/7
Phantom [1]
146/12

phonetic [2]  3/11
173/24
photograph [1]
181/13
pick [4]  13/1
127/8 138/2 181/8
picked [2]  127/9
143/14
pictures [2]
114/20 116/20
piece [3]  4/19
143/24 165/14
pieces [1]  70/17
PIERCE [4]  1/3
1/6 2/3 182/11
pipes [1]  61/6
place [2]  168/23
178/22
plain [2]  135/2
178/11
plaintiff [28]  1/6
3/9 3/12 3/25 5/3
21/2 38/6 57/5
88/7 97/1 124/15
125/14 132/16
133/7 145/5
148/23 149/7
157/19 159/7
161/17 161/22
163/12 163/25
167/1 171/5
171/19 171/25
174/7
plaintiff's [32]
3/24 34/21 44/10
44/16 44/24 45/4
76/13 76/21 77/19
77/20 82/4 95/21
95/22 102/13
114/17 114/22
115/21 116/4
117/2 118/12
127/23 129/20
129/25 132/7
132/8 144/8
149/13 153/23
160/2 164/23
168/10 169/17
plaintiffs [5]  1/15
163/7 163/18
169/7 176/9
plan [2]  4/5 5/5
plans [2]  83/25

84/3
plant [2]  92/25
173/24
play [4]  145/13
159/15 164/21
170/4
player [2]  143/2
143/4
players [1]
142/21
plus [3]  43/21
74/14 127/10
PMTA [11]  23/21
23/24 25/13 25/16
27/21 27/24 27/25
28/11 31/19 94/22
98/17
PMTAs [3]  31/23
31/25 98/13
pod [10]  27/8
33/4 33/5 35/7
35/9 35/11 36/11
36/12 64/5 64/5
podium [2]  12/25
13/2
pods [2]  37/21
145/1
point [44]  8/18
10/1 10/6 14/20
21/6 27/1 55/23
86/8 89/20 102/20
103/3 107/11
116/15 124/22
125/25 133/20
136/6 138/24
145/10 146/7
149/20 152/4
152/6 152/11
153/24 159/11
159/15 161/24
163/9 164/3 164/6
167/23 168/4
168/19 169/12
171/17 172/6
172/23 172/25
174/25 175/13
177/15 177/19
178/18
points [4]  32/24
164/9 165/2
177/20
police [1]  164/24
policies [1]  39/14

# P

**policy [9]** 22/20
22/21 25/8 25/18
26/24 27/19 27/20
39/20 41/4
**politics [1]** 127/6
**pop [1]** 99/9
**pop-ups [1]** 99/9
**popular [17]**
57/20 58/6 58/15
58/20 58/22 59/7
64/10 64/22 88/14
90/5 93/12 93/12
126/23 128/25
134/15 155/16
155/21
**popularity [6]**
14/18 57/25 88/16
88/18 93/3 95/5
**Port [2]** 55/2 55/2
**portfolio [2]** 6/18
139/5
**pose [1]** 46/19
**position [12]**
60/19 73/22 90/11
91/6 91/14 110/13
146/5 149/11
149/22 174/22
179/8 180/17
**possess [1]**
159/18
**post [3]** 58/6
147/8 180/8
**posture [4]** 131/5
144/4 156/19
177/1
**potential [9]**
73/16 82/21
102/21 105/10
113/6 140/14
149/19 152/14
172/7
**potentially [20]**
17/8 19/8 53/23
99/13 101/10
103/12 103/18
103/20 112/15
115/19 117/8
118/21 144/8
146/23 150/13
154/23 156/4
171/15 172/19

174/5
**pound [1]** 96/15
**power [2]** 93/22
179/13
**Powerline [1]**
1/17
**practice [5]** 13/17
13/19 13/23 68/4
156/23
**Practices [1]**
176/5
**practicing [1]**
13/21
**practitioner [1]**
141/22
**Pre [1]** 94/21
**precise [1]** 6/2
**precision [1]**
124/10
**predicate [1]**
158/9
**preemption [2]**
51/18 51/21
**preemptive [1]**
158/18
**preexisting [1]**
18/19
**prefer [2]** 4/15
83/24
**preference [1]**
12/24
**prefilled [3]** 36/7
36/12 64/5
**preliminarily [1]**
101/4
**preliminary [19]**
1/12 3/24 4/7
11/19 109/21
122/18 132/5
141/4 144/4
148/12 151/25
155/13 159/1
159/3 163/17
174/5 174/17
174/21 180/2
**premarket [14]**
17/21 21/20 22/9
22/15 23/20 23/25
26/25 27/21 28/14
39/18 94/20 94/22
103/17 145/3
**premised [1]**
176/10

**preparation [1]**
4/3
**prepared [2]** 68/2
96/20
**present [8]** 60/17
89/16 122/17
123/24 124/12
130/22 131/14
156/1
**presentation [1]**
132/3
**presentations [3]**
16/6 16/10 53/9
**preserves [1]** 8/1
**press [3]** 8/16
47/17 169/3
**presumption [3]**
9/14 11/7 132/24
**presumptive [1]**
23/25
**prevailing [1]**
149/9
**preventing [1]**
180/3
**primary [1]**
133/15
**primely [1]** 87/21
**primitive [1]**
93/20
**principal [4]** 14/9
39/7 118/4 145/18
**principle [1]**
51/21
**printout [7]** 33/16
33/20 35/15 35/19
36/24 37/6 48/13
**printouts [1]**
49/17
**priority [8]** 132/7
132/8 132/13
133/6 133/19
142/8 159/12
159/13
**private [12]** 11/3
13/23 21/21 21/24
46/11 46/14 51/24
175/19 175/20
175/25 176/2
176/9
**privilege [2]** 14/4
17/11
**probability [3]**
148/17 148/19

149/13
**probative [2]**
135/25 169/11
**probe [1]** 110/1
**problem [11]** 66/9
66/23 81/14
102/23 138/11
139/1 147/21
157/4 179/14
179/16 179/24
**problematic [1]**
98/9
**procedural [3]**
4/8 4/19 181/4
**proceed [7]** 7/4
30/13 41/23 54/16
85/2 105/16
138/18
**proceeded [1]**
161/19
**proceeding [4]**
10/4 20/18 21/12
21/16
**proceedings [5]**
41/19 84/14 125/6
182/3 182/6
**process [4]** 30/20
30/23 179/24
180/13
**produce [1]**
107/17
**product [194]**
**product's [1]**
29/12
**products [259]**
**professional [3]**
16/19 86/11
162/13
**proffer [2]** 118/3
118/5
**profit [36]** 7/10
9/9 10/25 66/15
66/19 66/24 67/4
67/11 67/23 69/20
70/9 96/7 97/10
97/12 97/18 101/9
104/20 105/6
106/5 106/7 106/9
118/23 119/8
119/9 119/10
119/11 119/14
119/15 147/2
147/3 147/5

150/25 153/4
155/5 171/10
171/11
**profitable [4]**
118/21 118/24
119/5 119/21
**profitably [1]**
149/12
**profits [13]** 7/11
9/9 10/25 65/4
67/11 69/20 70/13
149/2 151/4 151/6
151/12 154/10
154/23
**progressed [1]**
93/18
**progresses [1]**
10/2
**prominent [1]**
126/24
**promote [1]**
128/11
**promulgated [2]**
22/19 27/1
**prong [2]** 157/17
167/10
**pronouncements
[1]** 22/6
**proof [1]** 136/6
**propensity [1]**
155/16
**properly [1]** 159/5
**property [1]**
131/14
**proposed [2]**
14/23 131/24
**proprietor's [1]**
160/24
**propriety [1]** 7/18
**prosecuting [1]**
46/21
**prospect [2]**
112/20 113/8
**protect [3]** 129/12
142/16 143/19
**protectable [4]**
134/6 139/16
142/11 159/14
**prove [4]** 111/1
158/4 159/7
174/11
**proveable [1]**
111/7

VPB BRANDS, LP vs. SHENZHEN WEIBOLI TECH

**P**

**proven [1]** 94/10
**province [1]**
46/16
**proving [1]** 24/6
**PTO [2]** 160/1
162/8
**public [33]** 7/24
8/10 9/12 9/14
10/1 10/24 24/9
41/6 47/14 47/18
66/15 66/18 103/2
103/5 132/12
142/13 142/14
142/17 143/22
150/14 155/12
155/23 156/7
156/8 156/17
157/8 157/13
171/21 171/21
179/17 180/1
180/2 180/3
**publically [1]**
53/9
**publications [7]**
15/10 15/12 16/4
76/8 136/19
136/23 169/11
**publicly [2]** 7/19
67/12
**publish [1]** 16/3
**published [1]**
15/25
**publishing [2]**
66/14 67/4
**Puff [14]** 82/2
82/13 82/15 82/17
82/21 82/21 82/24
83/3 102/13
102/16 102/18
167/18 167/19
167/19
**pull [2]** 94/7 96/6
**pulled [1]** 102/18
**purchase [5]** 75/4
83/3 111/13 136/6
136/8
**purchasers [1]**
109/2
**purchases [1]**
83/1
**purchasing [5]**

80/22 112/16
112/21 113/20
170/12
**purposes [2]** 29/2
116/18
**Pursuant [1]** 77/9
**pursue [4]** 46/24
47/4 179/16
179/23
**push [1]** 102/10

**Q**

**qualifies [1]**
20/20
**qualify [2]** 20/11
103/20
**quality [4]** 72/17
73/13 98/24 99/1
**quantify [2]**
155/23 156/6
**quantities [1]**
155/22
**question [34]**
22/22 28/19 29/2
29/4 29/14 40/12
52/4 58/17 58/25
60/8 62/16 65/13
66/17 75/6 75/19
81/4 81/10 82/25
95/18 105/8
105/14 106/4
108/19 109/23
110/11 113/4
114/7 114/25
120/2 122/9
124/15 124/16
144/3 176/21
**questioning [2]**
7/16 110/21
**questions [20]**
24/9 40/2 42/18
51/20 52/18 53/25
66/11 66/13 72/21
73/7 83/7 122/11
123/19 124/24
125/20 127/14
127/19 129/15
130/16 161/15
**quick [3]** 4/3
95/18 157/10
**quickly [3]** 144/15
180/14 180/18
**quiet [1]** 156/17

**QUINTERO [2]**
1/16 3/11
**quit [1]** 86/1
**quo [1]** 171/6
**quote [6]** 19/9
24/8 28/8 28/24
111/9 180/2
**quoting [1]** 111/9

**R**

**raise [5]** 4/8 4/16
12/19 24/8 125/13
**raised [2]** 73/13
178/8
**ramp [3]** 62/14
172/20 172/21
**ramped [1]**
172/11
**ramping [2]** 138/3
142/23
**random [1]** 94/18
**range [3]** 14/7
17/14 93/22
**rank [2]** 57/25
88/18
**Rapidly [1]** 60/16
**rare [1]** 156/7
**rate [1]** 149/18
**Raton [2]** 1/17
1/24
**razor [2]** 26/10
65/3
**razors [2]** 26/11
26/11
**re [2]** 146/12
146/13
**reached [1]** 29/25
**reaction [1]**
126/11
**realistic [2]** 82/23
83/1
**realities [1]**
152/10
**reality [1]** 140/23
**realm [3]** 134/5
134/19 153/18
**reasonableness**
**[1]** 153/19
**rebrand [1]**
139/25
**rebut [2]** 6/6
133/1
**rebuttal [3]** 5/5

5/9 11/15
**rebutted [1]**
132/25
**recent [1]** 15/9
**recently [2]** 18/17
18/18
**recess [6]** 41/17
41/19 84/5 84/14
125/6 181/5
**rechargeable [1]**
65/4
**recipient [2]** 30/5
30/7
**recognition [7]**
162/25 163/2
163/3 163/11
163/13 178/22
178/23
**recognize [6]**
29/19 29/21 30/12
31/15 76/18
128/18
**recognized [3]**
144/3 144/17
174/25
**recollection [1]**
142/2
**recommending**
**[1]** 149/21
**record [21]** 4/24
7/21 7/23 8/1
12/22 34/10 34/20
54/13 69/5 69/7
84/24 86/23 114/3
125/16 132/17
142/4 156/23
162/3 164/19
176/17 178/15
**records [3]** 68/3
68/7 96/21
**recreational [1]**
92/20
**rectangle [1]**
133/13
**redirect [8]** 2/12
2/19 52/19 52/21
83/8 83/10 122/13
122/15
**reduce [1]** 4/25
**reference [2]**
35/10 37/20
**referenced [5]**
19/25 25/20 26/6

160/2 172/8
**references [3]**
69/3 69/10 153/3
**referencing [2]**
67/21 167/14
**refill [2]** 63/25
93/19
**refillable [6]** 35/9
35/11 37/21 65/16
65/17 135/11
**refilled [2]** 36/13
65/16
**reflect [4]** 70/5
70/8 98/1 106/2
**reframe [1]** 49/23
**refugees [1]**
101/11
**refused [2]** 146/2
162/6
**register [3]**
137/10 139/19
145/18
**registerable [1]**
137/12
**registered [4]**
132/14 132/19
137/16 179/10
**registration [16]**
132/17 134/23
134/25 137/13
139/13 140/10
140/11 159/19
159/22 159/24
160/2 160/20
165/4 165/11
170/3 176/16
**registrations [2]**
138/20 138/22
**regular [1]** 100/19
**regularly [3]** 16/3
90/16 90/17
**regulate [1]** 30/7
**regulated [2]**
20/23 30/3
**regulation [9]**
15/22 16/21 17/3
19/24 21/6 22/4
22/14 28/23 52/13
**regulations [18]**
14/23 14/24 14/24
19/8 19/17 19/18
19/20 21/1 21/16
22/12 22/19 22/24

**R**

regulations... [6] 27/1 28/1 29/8 39/11 39/13 52/7
regulatory [8] 14/7 16/13 18/2 20/20 23/9 51/17 98/17 101/2
relation [1] 113/5
relationship [4] 75/15 87/18 99/5 101/13
relationships [4] 101/18 101/20 151/24 154/13
relative [1] 171/3
relatively [2] 17/14 24/22
release [1] 100/23
released [1] 100/25
relevance [8] 34/5 34/8 34/13 45/6 77/14 105/7 138/14 140/6
relevancy [1] 77/17
reliance [2] 111/5 159/8
relief [1] 176/12
rely [7] 73/22 73/25 109/17 110/20 128/10 145/7 156/20
relying [8] 74/22 109/16 110/7 110/10 110/12 111/1 111/4 112/3
remain [1] 84/21
remained [1] 27/19
remains [1] 71/24
remedies [1] 46/7
remedy [3] 151/20 152/2 159/4
removed [3] 79/2 118/18 118/20
removing [1] 110/14
rendered [1] 170/4

rep [1] 91/21
repetitive [1] 29/14
rephrase [3] 81/10 110/11 118/16
replace [3] 26/16 137/25 154/14
replaceable [1] 26/12
replaced [2] 111/24 140/21
report [3] 8/16 25/3 96/6
reporter [6] 2/1 12/7 56/13 89/9 94/21 182/9
reports [1] 17/2
representative [2] 120/25 121/4
representatives [2] 7/9 126/9
reputable [6] 74/2 75/21 75/22 76/7 102/25 156/11
request [9] 5/15 25/9 25/11 32/15 69/24 151/9 151/10 177/22 180/12
requested [1] 91/16
requests [1] 10/5
required [6] 4/2 131/5 148/16 149/7 150/1 156/5
requirement [8] 17/21 21/20 22/10 22/16 22/17 39/18 152/10 166/23
requirements [11] 14/10 14/10 18/3 18/4 18/5 22/8 26/25 39/17 52/1 103/17 174/1
research [3] 62/13 63/5 86/4
researching [1] 76/7
resell [1] 136/17
resellers [1] 126/2
reservoir [1]

117/20
resolve [2] 174/5 179/24
resources [3] 145/12 157/3 179/23
respectfully [3] 157/11 173/14 174/18
respective [1] 168/3
response [2] 5/22 137/10
responsibilities [2] 51/3 61/13
restraint [1] 8/7
restrict [1] 4/13
restrictions [1] 14/11
result [5] 27/12 60/3 89/13 119/20 147/25
resume [1] 84/17
resumed [3] 41/20 84/15 125/7
retail [11] 55/13 55/20 61/17 62/6 62/22 87/6 90/22 128/7 136/18 158/1 168/16
retailers [1] 87/5
return [1] 83/12
reusable [1] 136/1
reused [1] 135/19
Reuters [1] 120/4
revenue [21] 66/24 67/12 67/23 68/15 68/21 72/1 79/6 89/8 96/14 105/2 105/3 105/5 105/6 105/24 106/1 106/7 106/8 106/12 106/17 106/21 147/1
revenues [6] 67/4 69/20 70/5 89/5 171/11 172/21
reverse [1] 150/21
reversible [1] 152/14
review [2] 21/13

77/16
Reynolds' [1] 88/23
rid [2] 81/2 81/5
ride [1] 137/4
rights [12] 139/11 139/11 142/16 143/3 143/18 149/7 158/5 158/5 173/1 174/15 176/15 179/9
rigorous [1] 63/5
rise [1] 9/16
rises [1] 9/12
risk [2] 155/23 157/8
RJ [1] 88/22
RMR [2] 2/1 182/9
Road [1] 1/17
robust [2] 27/24 27/25
roll [1] 20/5
room [1] 125/3
rooms [1] 84/10
ROTHMAN [38] 1/15 2/11 2/15 2/18 2/22 3/10 4/9 5/20 6/4 6/13 7/4 7/12 8/4 11/9 69/8 69/15 109/24 116/12 124/11 124/22 125/9 125/18 127/15 130/21 131/8 152/16 153/21 154/15 157/3 157/16 160/18 162/3 162/17 164/9 173/20 176/19 178/3 180/13
Rothman's [6] 150/17 159/8 162/22 165/3 167/21 180/9
routinely [3] 53/17 62/20 92/2
rule [7] 19/25 77/9 81/9 139/10 139/12 148/14 152/11
ruled [2] 162/6 173/7

rules [2] 27/20 180/22
ruling [4] 10/6 69/24 155/13 161/4

**S**

S-A-F-A [1] 54/21
S-H-R-I-T-E-H [1] 54/15
sadly [1] 72/7
SAFA [24] 1/8 54/21 54/22 54/24 55/1 55/3 55/6 55/9 55/12 55/21 56/3 56/16 57/11 58/23 59/9 59/13 60/3 60/19 62/24 64/18 68/4 70/5 70/15 71/23
safer [6] 92/16 94/10 94/13 104/21 104/22 104/24
safety [8] 11/5 46/20 72/18 73/16 94/15 94/16 103/2 171/22
sake [1] 181/13
sale [11] 48/18 49/19 50/3 50/7 51/12 70/13 91/9 99/20 136/11 145/1 178/18
sales [74] 7/9 9/9 10/24 58/23 59/13 59/14 59/16 60/14 66/15 66/20 67/23 68/14 68/16 68/17 69/10 70/5 70/9 71/23 91/14 91/21 96/7 96/14 97/12 97/22 98/1 101/5 102/21 106/22 106/25 109/1 111/5 112/5 118/22 122/23 123/3 124/17 126/15 128/1 128/6 128/6 129/1 129/21 135/15 135/23 136/4 136/13 137/20

## S

**sales... [27]** 138/3 138/6 138/10 142/23 150/25 151/13 151/15 152/21 153/11 154/22 156/1 163/4 163/5 171/4 171/8 171/9 172/2 172/3 172/3 172/11 172/13 172/15 172/18 172/20 172/21 178/24 178/24

**sample [2]** 15/9 15/11

**sampled [1]** 57/15

**Sanders [1]** 13/9

**satisfy [2]** 72/10 155/18

**scale [3]** 133/23 133/23 162/20

**scandalous [1]** 145/21

**schedule [1]** 131/13

**scheme [2]** 126/18 142/21

**School [1]** 13/16

**scope [2]** 45/7 123/5

**screen [5]** 47/25 52/11 79/18 107/22 108/14

**se [2]** 174/11 176/21

**seal [5]** 7/14 7/24 9/9 9/15 68/12

**sealed [6]** 7/22 8/14 10/2 10/11 10/25 69/18

**sealing [6]** 9/13 9/24 10/4 69/14 69/21 69/24

**search [14]** 4/23 6/6 6/9 136/10 136/12 139/15 139/17 139/20 139/20 140/8 140/10 140/24 160/19 179/6

**searches [1]** 140/7

**seat [4]** 12/21 54/12 84/23 125/15

**second [11]** 5/15 6/22 32/20 32/23 33/8 35/9 37/16 39/7 130/14 164/23 174/19

**secret [6]** 7/17 8/2 9/17 9/20 67/8 69/19

**section [2]** 17/22 145/20

**security [4]** 12/2 148/13 148/14 148/15

**seek [6]** 24/1 28/10 45/25 46/5 46/5 177/21

**seeking [6]** 148/16 168/3 168/8 168/10 168/11 176/12

**sees [2]** 53/22 141/22

**selection [1]** 24/22

**self [1]** 77/10

**self-authenticating [1]** 77/10

**seller [4]** 107/4 107/9 107/11 112/17

**selling [24]** 9/5 30/15 30/18 39/23 50/16 56/8 60/11 61/5 61/22 62/10 72/15 91/13 92/11 98/3 119/21 123/13 123/16 137/16 144/19 151/2 152/22 156/13 156/15 172/9

**sells, [1]** 114/14

**sells, these [1]** 114/14

**senior [3]** 137/5 137/13 158/5

**sense [10]** 9/7 27/23 83/14 106/9

**searches [1]** 110/1 111/1 111/4 145/8 150/3 150/5

**sensible [1]** 138/21

**sensitive [2]** 11/2 105/12

**September 9 [2]** 23/17 32/1

**September 9th [2]** 25/12 25/17

**serious [2]** 155/23 157/8

**seriously [1]** 94/16

**serve [1]** 17/1

**served [2]** 16/24 180/3

**service [1]** 76/2

**session [2]** 136/21 139/8

**setting [4]** 69/14 132/12 152/9 153/22

**seven [4]** 74/15 90/14 127/1 166/23

**Seventh [1]** 152/9

**Shall [1]** 180/22

**shape [7]** 89/21 90/2 90/5 90/5 133/12 133/18 134/18

**share [3]** 69/22 100/8 101/21

**shared [1]** 47/16

**sharing [1]** 51/17

**SHENZHEN [19]** 1/7 3/6 32/7 32/21 48/8 74/18 74/22 75/2 75/5 75/15 81/1 81/21 87/17 99/4 120/22 120/23 121/9 121/22 122/6

**shield [1]** 176/13

**shiver [1]** 146/17

**shocked [1]** 126/17

**shop [6]** 55/5 61/1 61/2 76/20 76/20 136/4

**shops [17]** 55/13 55/20 60/24 60/24

**searches [1]** 61/5 61/7 61/7 62/23 62/25 87/22 87/22 90/16 126/1 126/1 126/19 135/20 168/19

**short [3]** 5/9 155/13 172/1

**shorter [1]** 83/21

**shorthand [1]** 18/23

**shown [3]** 44/12 49/13 116/13

**shrift [1]** 155/13

**SHRITEH [16]** 2/13 54/8 54/11 54/14 54/20 56/12 59/5 65/15 66/11 67/22 70/4 73/3 73/4 76/16 83/11 102/12

**Shriteh's [1]** 83/21

**shuffle [1]** 127/12

**SHUFFLEBARGER [10]** 1/20 3/19 139/3 150/14 154/7 157/15 158/2 158/15 172/8 178/21

**sic [1]** 115/5

**side [5]** 4/8 80/5 108/14 151/25 180/12

**sides [2]** 124/8 130/24

**signal [1]** 17/17

**signed [1]** 130/4

**significance [1]** 26/21

**signs [1]** 96/15

**similarity [13]** 134/22 135/4 135/5 135/24 157/25 164/8 165/1 166/7 166/15 166/25 167/25 168/15 168/24

**simple [3]** 24/22 50/5 144/17

**single [6]** 86/6 91/16 111/23 112/3 151/12

**searches [1]** 170/19

**site [1]** 117/14

**situation [6]** 8/8 103/9 111/6 111/25 148/24 149/17

**situations [5]** 46/18 46/19 110/16 111/23 111/23

**Sixth [1]** 162/6

**size [6]** 75/23 89/21 90/2 90/4 90/5 134/16

**sizes [1]** 171/3

**skeptical [1]** 24/24

**skew [3]** 86/23 86/24 87/1

**skews [1]** 86/22

**slew [1]** 22/13

**sliding [1]** 133/23

**slow [2]** 165/12 175/11

**slowly [2]** 12/9 13/3 56/12 89/9

**slug [1]** 146/18

**small [6]** 12/6 48/14 129/5 134/17 142/21 161/8

**smaller [3]** 93/23 106/16 145/12

**smokeless [2]** 20/5 132/20

**smoker [2]** 94/6 95/11

**smokers [1]** 94/10

**smoking [1]** 86/1

**so-called [2]** 18/6 24/18

**software [2]** 29/9 52/14

**sold even [1]** 88/22

**sole [4]** 5/21 46/16 151/20 176/7

**solely [1]** 6/14

**sorts [2]** 77/5 77/16

**sought [6]** 19/18

## S

**sought... [5]** 22/25 39/24 46/20 47/2 174/22

**sounded [1]** 110/17

**sounds [1]** 106/20

**source [5]** 19/2 73/22 78/7 141/19 141/20

**South [2]** 2/2 182/10

**SOUTHERN [3]** 1/2 173/22 177/10

**space [2]** 17/13 126/24

**specific [19]** 7/25 40/7 40/15 40/16 64/8 64/21 67/21 70/16 94/18 105/4 105/14 110/5 110/5 110/9 110/10 110/22 111/1 111/21 114/25

**specificity [1]** 181/2

**specifics [4]** 14/3 17/10 110/19 125/20

**specified [1]** 23/1

**speculation [2]** 49/22 112/11

**speech [1]** 8/8

**spell [3]** 54/13 84/24 125/16

**spent [1]** 99/3

**spin [1]** 156/10

**split [3]** 150/16 173/15 173/18

**spoken [2]** 16/6 16/10

**spot [1]** 107/12

**spring [4]** 57/22 57/23 88/15 173/12

**SRIPLAW [2]** 1/16 3/10

**St [1]** 1/17

**stage [1]** 174/5

**stages [1]** 163/17

**stand [4]** 12/17 42/14 124/24 125/12

**standard [4]** 117/9 131/5 134/24 159/12

**standing [3]** 67/11 84/21 179/18

**standpoint [1]** 138/14

**stands [2]** 10/18 42/16

**staple [1]** 93/7

**starting [2]** 3/8 138/3

**state [13]** 3/8 12/21 51/17 54/13 58/1 58/15 58/21 59/7 84/24 125/16 170/18 176/3 176/5

**stated [6]** 68/11 69/21 106/23 113/10 113/16 170/1

**statement [1]** 111/16

**statements [4]** 5/23 6/6 120/15 148/14

**states [27]** 1/2 1/13 2/2 6/17 18/7 18/12 18/15 28/7 50/3 50/12 51/25 53/1 74/15 86/14 86/16 86/18 86/19 87/2 87/4 87/10 88/19 88/21 124/18 126/3 126/4 161/3 182/10

**stations [1]** 140/3

**statistics [1]** 147/5

**status [1]** 171/6

**statute [3]** 21/8 175/9 176/5

**statutory [1]** 103/17

**stay [8]** 22/25 23/3 23/4 131/4 177/17 177/18

**stayed [1]** 86/2

**steadily [1]** 97/24

**step [7]** 53/19 53/21 77/23 130/18 133/21 133/22 176/25

**stepping [1]** 175/15

**steps [2]** 53/10 53/22

**sticker [1]** 11/22

**stipulate [3]** 5/1 5/21 8/12

**stipulated [1]** 11/23

**stipulation [4]** 5/24 6/20 26/20 32/11

**stipulations [2]** 4/11 4/23

**store [1]** 127/7

**stores [18]** 56/10 56/11 61/6 61/14 87/22 88/23 89/2 90/18 90/20 124/20 126/1 126/11 126/22 127/11 135/20 168/18 168/21 168/22

**strain [1]** 101/17

**strategy [1]** 85/11

**strawberry [2]** 44/22 45/2

**streamline [1]** 76/1

**streamlined [1]** 93/24

**Street [1]** 1/22

**strength [12]** 133/22 133/22 162/18 162/19 162/24 162/24 162/25 163/10 163/16 163/19 163/22 163/22

**STRESSENGER [2]** 1/21 3/19

**stripped [1]** 143/3

**strong [8]** 9/13 11/7 134/20 134/21 142/10

**structures [1]** 121/18

**studies [3]** 28/2 94/24 113/6

**style [2]** 65/5 93/24

**stylized [3]** 135/1 178/12 178/13

**subcategory [1]** 64/10

**subclass [1]** 93/5

**subfactors [1]** 132/10

**subjective [3]** 134/7 134/9 134/10

**submissions [1]** 11/13

**submit [2]** 161/9 173/14

**submitted [7]** 4/5 5/16 5/18 25/16 32/1 136/5 136/21

**subsection [1]** 116/1

**subsequent [2]** 132/8 133/4

**subsidiary [1]** 137/2

**substance [3]** 19/7 28/17 115/19

**substances [4]** 92/17 92/24 135/9 135/9

**substantial [20]** 23/21 24/2 24/3 24/12 24/12 25/1 25/2 25/11 131/6 149/14 151/7 152/15 153/5 157/19 157/22 158/17 159/2 159/7 169/1 174/7

**substantially [2]** 150/25 153/25

**substantive [1]** 131/6

**substitute [2]** 82/21 83/3

**substitutes [1]** 147/14

**subsumed [1]**

**success [16]** 129/11 131/7 132/11 142/12 148/17 148/19 149/13 149/18 153/21 153/23 154/5 157/18 158/3 158/18 159/2 174/8

**successful [2]** 123/11 129/9

**successfully [1]** 41/4

**sudden [1]** 151/17

**suddenly [1]** 22/13

**sufficient [9]** 69/21 70/19 98/6 98/6 99/21 133/1 139/12 170/20 177/22

**suggest [1]** 131/22

**suggested [1]** 131/23

**suggestion [2]** 101/22 180/9

**suggestions [1]** 4/12

**suggestive [6]** 134/5 134/9 134/10 134/14 134/18 134/19 162/20

**suggests [1]** 167/1

**suit [1]** 46/11

**Suite [2]** 1/22 1/24

**suits [1]** 13/1

**sum [3]** 70/17 70/18 106/12

**summarizing [1]** 142/24

**summary [3]** 33/9 68/6 154/3

**summer [3]** 70/24 87/24 99/21

**supplement [1]** 127/15

**supplier [6]** 22/25 23/4 25/19 26/2

**success [16]** 132/11

**S**

supplier... [2]
70/20 76/6
suppliers [3] 24/1
87/17 98/15
supply [7] 71/1
98/6 98/9 99/20
99/20 102/10
155/20
support [1] 149/9
supports [2]
153/3 159/9
Supreme [2]
139/8 161/10
survey [3] 110/5
110/5 163/15
surveys [9] 92/2
109/8 109/8
109/15 109/16
109/25 110/1
110/15 113/5
survival [1] 143/8
sustain [5] 49/23
78/21 81/10
109/22 120/13
sustained [1]
109/12
SV3 [1] 1/9
swear [1] 125/12
switch [1] 102/9
switched [1] 69/8
sword [1] 176/13
sworn [6] 12/18
12/20 54/11 84/21
84/22 125/14
sympathize [1]
139/23
system [39] 25/20
25/22 25/22 25/24
26/3 28/6 28/8
29/16 31/2 31/22
33/5 33/9 35/5
35/12 36/6 36/10
37/17 37/19 37/22
43/12 43/15 58/12
58/14 58/18 59/1
63/22 63/23 63/23
64/2 64/19 65/16
80/13 80/22 93/19
94/3 97/15 100/14
106/6 137/24
systems [7] 24/23

30/3 31/7 42/17
64/7 86/5 93/21

**T**

table [3] 9/18
12/25 97/8
tank [1] 63/25
tanks [1] 93/22
target [5] 21/14
53/22 92/12 92/14
92/18
tasked [1] 52/5
tax [1] 14/10
Tech [1] 13/15
technical [1]
63/24
Technically [1]
43/20
technologically
[1] 93/24
technology [9]
1/7 3/6 32/7 32/22
48/8 104/15
104/18 104/19
172/19
Teledyne [1]
10/13
temper [1] 153/24
temporal [2]
172/17 172/22
temporarily [1]
7/7
tentatively [1] 6/1
Tenth [2] 173/8
173/18
term [15] 18/18
20/12 38/7 38/13
39/5 39/13 42/6
42/7 42/14 49/5
49/6 49/8 71/19
112/18 162/21
terminology [1]
18/14
terms [11] 5/3
61/22 98/16 98/17
101/13 102/21
121/3 154/12
157/18 159/21
163/4
terribly [1] 43/5
test [4] 103/18
159/1 160/22
160/23

testimony [46]
3/25 7/25 8/13
9/19 34/7 43/18
54/3 60/10 66/19
73/11 83/21 89/17
109/3 109/4
109/18 111/9
113/10 114/13
122/17 122/21
124/12 124/19
126/8 126/12
131/18 132/25
136/7 137/25
140/18 146/22
146/24 147/14
150/6 150/19
151/15 152/19
153/3 154/17
155/15 163/1
163/24 168/17
168/25 170/13
172/13 178/15
text [4] 141/7
141/13 141/25
165/21
thank [60] 3/16
4/10 5/11 6/11
10/21 12/16 41/8
41/9 41/24 53/24
54/1 54/2 54/3
63/10 66/8 70/1
72/23 73/6 76/3
76/14 77/22 78/1
83/5 83/6 83/10
83/11 84/13 85/4
95/4 96/2 104/5
113/12 114/18
116/10 122/10
122/12 123/18
123/20 123/21
125/8 127/13
130/17 130/19
131/10 131/11
131/15 134/10
146/4 150/8
158/24 164/14
170/23 176/23
178/2 178/7 180/5
181/20 181/21
181/25 182/2
thanks [2] 113/14
150/17
THC [2] 92/21

92/23
theme [1] 142/20
thereafter [1]
86/16
thetobaccologblo
g.com [1] 16/1
thickness [1]
133/13
thinking [4] 35/10
51/1 141/7 146/10
Thompson [2]
1/21 3/18
thought [2] 4/25
175/6
thousand [3] 51/6
51/8 90/25
thousands [3]
51/2 126/22
168/22
threaded [2]
117/11 117/12
threat [1] 73/16
threshold [2]
157/21 175/18
throw [2] 64/25
65/5
thrown [1] 135/18
thus [1] 20/10
tied [1] 102/9
til [1] 84/5
time [72] 4/2 4/22
4/25 5/4 9/2 9/4
12/18 13/24 14/18
14/22 23/2 23/5
23/16 27/6 41/17
51/25 51/25 55/16
57/11 57/19 64/25
65/3 65/19 70/10
70/18 70/22 70/24
71/1 72/21 73/6
87/24 88/3 88/10
88/12 88/13 89/7
89/7 91/7 91/7
93/21 94/18 94/24
95/5 97/23 98/5
99/3 101/18
107/11 111/9
111/24 112/1
112/2 112/3 112/4
112/6 112/8
112/10 118/20
124/18 131/12
131/14 133/6

137/25 138/1
138/8 138/9 139/7
139/8 164/6 172/5
180/5 180/12
timeframe [2]
14/17 107/10
timeline [1] 62/18
times [6] 16/8
23/8 100/5 101/8
106/18 165/25
timing [1] 159/21
title [3] 54/22
85/9 85/10
TMA [2] 16/15
16/23
tobacco [80]
13/25 14/8 14/10
14/12 16/16 16/24
17/3 18/3 18/4
18/6 18/8 18/9
18/10 18/11 18/19
18/21 18/22 18/23
18/25 19/2 19/10
19/10 19/11 19/13
19/13 19/14 19/23
19/24 20/3 20/5
20/6 20/23 23/1
23/23 23/25 27/9
27/13 27/21 28/1
28/9 28/19 29/1
29/3 29/6 29/12
29/12 30/1 30/3
38/5 38/14 38/16
38/18 38/18 38/21
38/24 39/4 39/16
39/17 40/10 40/12
40/25 41/2 43/16
43/19 43/21 44/5
44/5 44/8 44/23
46/3 50/23 51/1
51/7 51/10 52/25
53/14 94/20 94/22
100/22 103/17
today's [1] 4/4
tolerate [1]
140/22
ton [2] 117/24
152/17
tone [1] 142/24
topic [5] 15/21
16/7 16/20 27/21
127/16
topics [1] 104/12

**T**

**total [15]** 50/21
61/9 70/12 83/18
85/23 96/14 105/1
105/2 105/6
106/11 106/12
106/21 118/22
140/1 140/3
**totals [2]** 96/13
97/18
**touch [1]** 10/3
**Toward [1]** 57/22
**towards [2]** 94/11
175/10
**toxic [2]** 99/12
156/3
**tracks [1]** 39/10
**trademark [43]**
4/23 6/5 6/9 78/4
78/25 113/24
113/25 128/18
132/14 137/3
137/11 137/16
138/13 139/5
139/15 140/7
140/22 140/24
141/22 142/15
143/3 143/6
145/14 145/22
146/2 146/20
148/25 160/10
160/20 161/18
161/19 162/4
162/11 165/8
165/10 165/14
170/2 173/1
174/15 174/22
176/15 179/9
179/10
**trademarks [9]**
78/3 78/6 78/13
78/15 78/23
113/22 129/12
139/1 139/3
**traditional [2]**
65/23 92/16
**trajectory [7]**
60/14 97/21
151/14 151/15
151/16 152/20
154/22
**transaction [1]**

170/15
**transcript [5]**
1/12 7/24 142/3
180/19 181/2
**transcription [1]**
182/6
**transition [3]**
92/15 94/10 95/10
**transitioned [1]**
93/23
**transitioning [1]**
95/8
**trash [1]** 64/25
**travel [2]** 83/25
84/3
**treat [1]** 7/5
**trending [1]**
147/18
**trial [2]** 152/24
162/11
**trip [1]** 86/2
**Troutman [1]**
13/9
**truncated [1]**
167/22
**trust [2]** 72/17
119/24
**TUCKER [2]** 1/23
3/20
**turning [1]** 30/11
**TV [1]** 134/15
**Twenty [1]** 106/1
**Twenty-five [1]**
106/1
**twice [1]** 17/5
**two-year [1]**
123/9
**typical [3]** 43/9
43/9 94/3
**typically [11]** 9/8
10/25 30/4 44/7
47/14 47/18 49/9
53/10 53/21 77/16
181/8

**U**

**U.S [25]** 2/2 10/14
10/19 22/23 39/22
48/22 50/7 50/7
50/12 50/16 51/13
71/20 99/19
121/23 122/24
137/17 139/11

139/11 139/19
139/21 140/9
140/12 157/7
177/14 182/10
**U.S.A [1]** 1/9
**Uh [1]** 78/9
**Uh-huh [1]** 78/9
**Ultacashmere [1]**
173/12
**ultimate [3]** 20/17
151/19 177/4
**ultimately [3]**
23/6 23/12 23/17
**unauthorized [2]**
38/5 45/4
**uncertainty [1]**
174/6
**unclear [2]** 9/16
175/14
**uncommon [1]**
148/25
**undercuts [1]**
162/7
**understanding
[11]** 7/13 33/10
36/5 49/8 62/18
63/21 71/16 81/1
81/3 120/8 128/5
**understating [1]**
152/4
**unequivocally [1]**
88/20
**Unfair [1]** 176/5
**Unfortunately [1]**
82/5
**unique [2]** 157/9
173/6
**UNISHOW [1]** 1/9
**UNITED [25]** 1/2
1/13 2/2 6/17 18/6
18/11 18/15 28/7
50/3 50/12 53/1
53/5 74/15 86/13
86/16 86/18 86/19
87/9 88/19 88/21
124/18 126/3
126/4 161/3
182/10
**University [3]**
13/16 170/18
170/19
**unlawful [17]**
22/18 34/12 34/14

143/23 144/20
144/24 145/4
145/6 146/3
146/11 150/13
158/6 158/12
158/20 170/24
173/2 175/12
**unless [3]** 27/10
140/15 144/6
**unlike [2]** 8/8
78/24
**unlikelihood [1]**
150/15
**unlikely [2]** 92/6
173/19
**Unlimited [1]**
71/14
**unprotectable [1]**
134/6
**unquote [4]** 19/9
24/8 28/9 28/24
**unrelated [1]** 11/3
**unreputable [1]**
98/22
**untrue [1]** 102/4
**upper [2]** 48/13
80/5
**ups [3]** 99/9
162/2 162/5
**upset [1]** 127/8
**URL [1]** 48/24
**us [19]** 5/16 5/20
11/22 30/8 66/23
75/25 77/3 93/25
109/9 111/20
118/22 122/3
139/18 160/25
170/24 173/2
177/17 181/9
181/19
**usage [1]** 65/22
**user [4]** 63/25
64/3 66/5 137/5
**users [3]** 76/2
92/21 164/17
**USPTO [4]** 137/9
137/11 145/18
161/4
**usual [1]** 148/12
**Uwell [15]** 32/7
32/21 33/3 33/4
33/5 35/1 35/16
35/20 35/20 36/6

36/24 37/7 48/8
49/2 115/5
**Uwell's [2]** 33/7
33/16

**V**

**vacuum [1]** 109/1
**vagaries [1]**
175/8
**valid [5]** 139/13
159/14 173/1
174/15 176/15
**validity [3]** 132/25
133/1 159/17
**value [2]** 163/1
169/12
**vape [49]** 60/24
61/1 61/2 61/7
62/25 63/6 76/20
82/18 85/8 85/10
85/10 85/12 85/14
85/17 85/19 85/22
85/25 86/21 87/2
87/6 87/8 87/21
88/10 90/16 97/22
101/5 101/15
101/23 104/15
104/18 104/19
105/1 105/2 107/7
114/5 114/24
115/3 117/23
118/19 122/8
123/13 123/15
126/1 126/19
136/4 137/22
137/24 168/19
168/22
**Vape's [5]** 85/16
89/4 96/22 107/22
135/13
**vaped [1]** 49/7
**vapes [1]** 136/12
**vaping [2]** 79/9
115/19
**vapor [3]** 1/10
16/4 55/5
**vaporize [1]**
135/8
**vaporizer [7]** 19/6
20/10 29/1 29/3
29/4 86/1 117/7
**vaporizers [9]**
20/14 31/2 31/2

**V**

**vaporizers... [6]**
38/10 61/5 92/17
100/14 128/23
132/20
**variance [1]**
43/16
**variant [5]** 43/21
44/5 44/8 44/20
44/21
**variants [4]** 43/19
45/13 82/15 92/25
**variations [1]**
135/12
**varies [1]** 119/2
**variety [7]** 22/5
40/17 46/1 51/3
80/12 106/6 135/8
**vast [2]** 89/6
145/11
**version [6]** 36/7
36/7 107/17 135/1
178/12 178/14
**versions [3]** 36/6
36/9 155/16
**versus [10]** 3/6
10/13 10/18 64/7
65/16 135/18
157/23 171/6
171/10 173/24
**via [2]** 40/4 89/17
**vicinity [1]** 148/24
**victims [1]** 179/3
**video [3]** 11/20
107/16 178/9
**violated [2]** 176/4
176/5
**violation [3]**
40/22 174/12
176/21
**violators [1]**
46/21
**Virginia [2]** 13/15
13/19
**virtue [1]** 37/20
**vis [6]** 21/14
21/14 52/1 52/1
163/5 163/5
**visit [8]** 60/24
61/14 61/17 62/25
90/16 90/20 90/22
91/5

**visited [2]** 35/14
61/19
**Voice [1]** 16/5
**void [9]** 72/12
101/24 103/1
147/1 147/12
147/13 154/18
154/20 155/8
**volume [1]** 60/11
**voluntarily [1]**
69/22
**VPR [24]** 1/4 3/5
3/12 3/12 38/25
39/8 40/21 47/10
57/1 57/5 57/7
60/4 62/7 88/7
89/13 89/20 92/9
114/10 118/4
128/21 132/18
171/19 174/16
176/11
**VPR's [16]** 38/6
38/13 39/7 39/12
62/11 63/15 88/1
91/2 91/8 91/13
91/17 91/22 92/1
100/10 101/22
128/5
**vs [1]** 1/6
**VTA [1]** 104/19
**Vuse [1]** 88/23

**W**

**wall [1]** 151/17
**warning [34]**
17/16 20/14 20/17
20/22 29/21 29/24
30/4 30/5 32/5
32/6 32/21 35/2
37/23 38/2 40/4
43/7 45/17 45/20
45/24 46/3 46/25
47/9 47/11 47/18
47/20 48/9 48/17
49/12 49/20 50/3
50/10 53/18 53/22
140/13
**warrant [2]** 9/24
69/21
**warrants [2]** 9/13
11/7
**Warren [1]** 79/18
**Washington [1]**

1/22
**wasting [1]**
140/15
**web [1]** 49/4
**website [28]** 33/7
33/16 33/21 35/14
35/16 35/20 36/8
36/25 37/7 37/16
47/10 48/18 48/21
50/6 107/15
107/22 107/23
111/15 113/18
114/1 114/24
115/3 115/25
119/1 126/2
147/18 167/21
178/25
**websites [9]** 33/8
50/15 52/23 62/2
91/5 91/10 135/13
135/20 136/11
**weekly [2]** 61/24
62/2
**WEIBOLI [17]** 1/7
3/6 74/18 74/22
75/2 75/5 75/15
81/2 81/21 120/22
120/22 120/23
121/9 121/23
122/3 122/7 161/3
**weigh [2]** 167/5
171/4
**weighed [2]**
93/16 159/5
**weighing [3]**
166/17 166/18
171/17
**weighs [2]** 160/17
171/16
**weight [2]** 162/10
169/23
**welcome [3]** 10/8
127/15 177/22
**well-being [1]**
156/4
**Westlaw [3]**
146/13 148/10
148/10
**whatsoever [4]**
133/25 134/12
163/8 174/15
**whenever [2]**
131/13 175/4

**whereas [1]** 64/2
**wherever [1]** 63/1
**wholesale [6]**
55/20 80/5 128/7
128/9 128/10
136/17
**wide [3]** 24/22
106/5 153/15
**wider [1]** 93/22
**wish [6]** 10/6
10/24 110/2 120/2
120/2 181/6
**wishes [2]** 4/8
131/23
**withdrawn [1]**
149/19
**witnesses [9]** 5/8
7/16 11/14 123/24
124/20 126/20
129/3 155/1 168/3
**world [3]** 1/8 85/8
178/13
**worldwide [2]**
6/18 169/16
**worth [2]** 137/22
151/12
**wrap [3]** 64/4
177/6 178/4
**writings [1]** 15/24

**X**

**Xerox [2]** 133/24
134/2

**Y**

**Y-E-A-R-N [1]**
33/5
**Yearn [3]** 33/5
35/20 36/6
**Yep [1]** 108/15
**YLSN [1]** 1/8
**York [1]** 85/15
**yours [1]** 61/22

**Z**

**zero [2]** 152/13
154/4
**Zoom [8]** 4/6 5/19
5/25 8/9 79/19
89/17 136/21
178/16