# Exhibit 1

# Excerpts from Transcript of April 5, 2023 Deposition of Kevin Frija

Kevin Frija
April 05, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORDA
WEST PALM BEACH DIVISION

CASE NO.:  9:22-cv-81576--AMC


VPR BRANDS, LP,

        Plaintiff,

-VS-

SHENZHEN WEIBOLI TECHNOLOGY
CO., LTD., YLSN DISTRIBUTION LLC,
ECTO WORLD, LLC, SAFA GOODS LLC,
D&A DISTRIBUTION LLC, UNISHOW
(U.S.A.), INC., SV3 LLC, and KINGDOM
VAPOR, INC.,

        Defendants.
_____X

                Remote Locations
                April 5, 2023
                9:32 a.m. - 11:51 a.m.


VIDEO TELECONFERENCE

DEPOSITION OF KEVIN FRIJA


        Taken before DOLLY MAY PENICK, Stenographic
Reporter and Notary Public in and for the State of
Florida, pursuant to Notice of Taking Deposition filed in
the above-styled cause.

```
 1    APPEARANCES:

 2                 SRIPLAW, P.A.,
                   BY:  JOEL B. ROTHMAN, ESQUIRE,
 3                      joel.rothman@sriplaw.com, and
                        LAYLA T. NGUYEN, ESQUIRE,
 4                      layla.nguyen@sriplaw.com, and
                        ELI LEKHT, ESQUIRE,
 5                      eli.lekht@sriplaw.com,
                        21301 Powerline Road,
 6                      Suite 100,
                        Boca Raton, Florida  33433,
 7                 appearing remotely on behalf of Plaintiff.

 8                 THOMPSON HINE, LLP,
                   BY:  MICHELLE LI, ESQUIRE,
 9                      michelle.li@thompsonhine.com,
                        1919 M Street, N.W.,
10                      Suite 700,
                        Washington, D.C.,
11                 appearing remotely on behalf of one of the
                   Defendants.
12
                   EPSTEIN DRANGEL, PLP,
13                 BY:  JASON M. DRANGEL, ESQUIRE,
                        jdrangel@ipcounselors.com, and
14                      ASHLY E. SANDEZ, ESQUIRE,
                        asands@ipcounselors.com, and
15                      KERRY BROWNLEE, ESQUIRE,
                        kbrownlee@ipcounselors.com, and
16                      JESSE R. BADER, ESQUIRE,
                        jesse.bader@ipcounselors.com,
17                      60 East 42nd Street,
                        Suite 1250,
18                      New York, New York  10165,
                    appearing remotely on behalf of Defendant
19                  Ecto World LLC.

20


21    ALSO PRESENT:  Joe Smith, remotely,
                     Jon Glauser, remotely.
22


23


24


25
```

Kevin Frija
April 05, 2023

```
 1              INDEX OF PROCEEDINGS

 2   Deposition of KEVIN FRIJA                   Page

 3   Direct Examination by Mr. Drangel             4

 4

 5

 6   Certificate of Oath                          81

 7   Certificate of Reporter                      82

 8   Witness Notification Letter                  83

 9   Errata Sheet                                 84

10

11

12                   DEFENSE EXHIBITS

13   Number              Description            Page

14   No.  1, I.D.         Deposition notice       10
     No.  2, I.D.         Response to request     11
15   No.  3, I.D.         VPR trademark ownership  27
     No.  4, I.D.         Rippo status            33
16   No.  5, I.D.         Assignment 2016         44
     No.  6, I.D.         Assignment              46
17   No.  7, I.D.         Application             49
     No.  8, I.D.         Exclusive marketing     57
18   No.  9, I.D.         Financials              61
     No. 10, I.D.         Report                  69
19   No. 11, I.D.         2018 annual sales       72
     No. 12, I.D.         2019 annual sales       72
20   No. 13, I.D.         2020 annual sales       72
     No. 14, I.D.         2021 annual sales       72
21   No. 15, I.D.         2022 annual sales       72

22   Exhibit No. 2 was not downloaded into Chat.  Exhibits 12,
     13, 14 and 15 were not downloaded into Chat.  The
23   exhibits not downloaded were retained by Jason Drangel,
     Esquire, Epstein Drangel, LLP.

24

25
```

Kevin Frija
April 05, 2023

 1    A    No.

 2    Q    And how long were you with the Smoke 51 entity?

 3    A    2008, 2009 'til 2014.

 4    Q    Okay.  And then in -- what happened in 2014 that

 5    you, I assume --

 6    A    I licensed the industry.  My son was born in

 7    2015.  Then I just took a couple of years away from the

 8    industry.

 9    Q    Okay.  You had testified in connection with the

10    preliminary injunction motion filed in this case;

11    correct?

12    A    Yes.

13    Q    Okay.  Have you reviewed the transcript of your

14    testimony during that hearing?

15    A    No.

16    Q    Okay.  Was there anything that you said during

17    that hearing that you believe was inaccurate or you

18    believe that today your testimony is accurate as of that

19    date?

20    A    I -- I don't know if -- I believe everything I

21    said was accurate then.  I don't recall all the testimony

22    then so I couldn't tell in advance -- I couldn't really

23    answer that question, I don't think.

24    Q    Okay.  During that hearing you indicated you got

25    back into the business in 2016.

Kevin Frija
April 05, 2023

1          Do you recall when exactly you got back into the
2    business?
3          A    April, May, something like that.  I don't recall
4    exactly.
5          Q    And what made you get back into the vaping
6    industry?
7          A    I'm a serial entrepreneur.  There was an
8    opportunity there to purchase some of the assets of the
9    company that I left which had failed after I left it.  I
10   took that opportunity, I purchased some of the assets of
11   the company, some brands, some websites, and merged them
12   into VPR Brand which is now publicly traded on the
13   over-the-counter Pink sheet and that -- got into it all
14   over again.
15         Q    Okay.  So you started the VPR Brands sometime in
16   April or May of 2016?
17         A    The year is definitely correct.  The month I
18   don't recall.
19         Q    Okay.  As part of our document request, we had
20   asked for the initial filing documents which were not
21   produced.
22              So I'm going to ask that those initial filing
23   documents be produced.
24         A    What do you mean by filing documents, I'm not
25   clear on that.

Kevin Frija
April 05, 2023

1              And then we subsequently simultaneously started

2         to text message and email our customers to preorder

3         those goods on -- you know, by the 24th.  We moved

4         rather quickly.

5    BY MR. DRANGEL:

6         Q    Yeah.  So if you go to the end of this

7    document, there's a showing of a specimen.

8              Can you tell me what that is?

9         A    Yes, sir.  That is a photo that I took of the

10   electronic -- well, personal vaporizer we call it.  So...

11        Q    Okay.  And this -- this was -- this was branded

12   ELF; correct?

13        A    That's correct.

14        Q    Was this the sample that was sent to you by the

15   factory?

16        A    That is correct.

17        Q    At the time you filed this application, the only

18   product you had available was the sample that was sent to

19   you by the factory?

20        A    There might have been more than one.  I don't

21   recall.

22        Q    But they were samples?

23        A    Well, I mean, yeah.  They were samples, right.

24        Q    So you believe that the November 21st date that

25   you identify is the date you received that product?

Kevin Frija
April 05, 2023

```
 1      A      Yeah.

 2      Q      And the November 24th date is the date that you

 3   began to market that product.

 4      A      That's correct.

 5      Q      Okay.  Do you have any evidence to support the

 6   marketing of that product on November 24th?

 7      A      I mean, text messages originally.  Probably not.

 8          But we -- like I said, we purchased the product,

 9   I think, on or about that date, too.  We have a purchase

10   order from the Chinese factory and our contract gave us

11   the rights, past, present and future for that mark

12   exclusively.

13          So, I guess technically they were using it prior

14   to that and we acquired those rights through that

15   contract.

16          So, I mean, we submitted all those documents, I

17   believe.  I'm not sure if they were submitted to you or,

18   you know, particularly, but we have submitted them over

19   and over again.

20      Q      Okay.  We had asked for the production of

21   documents relating to the marketing, the initial

22   marketing promotion of the product.  And you've indicated

23   that's November 24th, 2017.  So, we haven't received any

24   of those documents so I'm going to put in an additional

25   request for you to search your records and produce
```

Kevin Frija
April 05, 2023

 1    everything that supports that date of use.

 2         A    Yeah.  I mean, so initially, like I said, there

 3    was text messages.  I doubt those will be available.

 4         Q    Who would those text messages have been sent to?

 5         A    Customers, distributors.  That's -- typically,

 6    in this industry people do WhatsApp, you know, messages

 7    and text messages, I consider them the same thing, rather

 8    than an email.

 9              You know, more personal, direct contact.

10         Q    Why don't you take us through the process of how

11    you came to working with this factory who brought you the

12    ELF product and came up with the name.

13              MR. ROTHMAN:  Objection, form.

14              MR. DRANGEL:  I'll rephrase it, then.

15    BY MR. DRANGEL:

16         Q    Why don't you take me through the process of how

17    you started selling the ELF product.

18         A    We received a sample.  We sent pictures to our

19    customers and then we ordered the product.

20         Q    Did you have a preexisting relationship with the

21    manufacturer who sent that to you?

22         A    I believe we did.  Not -- not very long.  But I

23    believe we did.

24              Like I said, I just got back into the industry

25    not too long before that so it would have been a year at

Kevin Brija
April 05, 2023

1   the most or less.

2       Q    Okay.  And do you -- did you come up with the

3   name ELF?

4       A    No.

5       Q    Who came up with the name ELF?

6       A    I guess they did.

7       Q    Okay.  So they -- was the first time you saw the

8   ELF mark in the sample that they sent to you?

9       A    That's correct.

10      Q    Did they send you any email communications or

11  text messages or anything like that to introduce this

12  product to you?

13      A    We have emails going back and forth where I said

14  something like, oh, we love this product with the ELF

15  mark, I'm going to send you a contract, we're going to

16  order it.  And that was all done in that time period.

17      Q    Okay.  Those are communications that we've also

18  asked for so we're going to put in an additional request

19  to have those produced.

20           At the time, then, around -- how quickly did

21  this transaction occur?  Was it over a month period, was

22  it six months?

23      A    I think I just -- I don't know what you mean by

24  transaction.  I think I just answered that earlier.

25           What do you mean by transaction?

Kevin Brija
April 05, 2023

1      Q      From your initial discussion with the factory

2   that supplied you this product.  Did it take a month for

3   you to have a signed agreement with them or six months?

4      A      I think I just told you it was a few days, sir.

5      Q      The whole thing took a few days.

6      A      That's right.  I wrote it myself, I sent it to

7   them and they signed this in a few days.

8      Q      Did you do a trademark search prior to filing

9   this application?

10     A      Yes, sir, I did.

11     Q      So it would have taken place within in a one

12  week period?

13     A      Sure.  Uh-huh.  The -- probably the date I filed

14  it or the day before.

15     Q      Okay.  And do you recall the actual actions you

16  took with regard to searching the ELF trademark in the

17  United States?

18     A      Sure.  I used the simple search and the complex

19  search for full mark and -- you know, so I judge a

20  trademark's strength by how many other ELF marks come up.

21  And at the time there were very few, less than a page.

22  Probably less than ten ELF marks for any class during

23  that time.  So I thought what a great mark this would be.

24          And so we registered it.

25     Q      Why do you think the factory was using the mark

Kevin Brija
April 05, 2023

1    ELF?

2        A    I have no idea.

3        Q    Do you know if they actually sold any products

4    to anyone else?

5        A    We signed an exclusive with them so I would hope

6    not.  I don't believe they have.

7        Q    Well, they sent you a product that actually had

8    the mark ELF on it.

9            Are you sure they did not sell the product to

10   anyone in the United States prior to you, selling the

11   product to you?

12       A    I don't think they did because we asked them.

13   But I don't know for certain.  How would I know that?  I

14   have no idea.

15       Q    So potentially, they could have been selling

16   themselves in the United States.

17       A    No.  I don't think so.  I don't think they did

18   because we signed an exclusive and they told us they

19   didn't.  I wouldn't know for certain.  How would I know

20   for certain?

21       Q    As far as your search for the trademark, did you

22   do the Google search you told us about that you usually

23   do?

24       A    I don't recall.

25       Q    Do you have any record of that?

Kevin Frija
April 05, 2023

1        A    No.

2        Q    But it was your typical practice to do that?

3        A    Typically, yes.

4        Q    At the time that you filed this application you

5    were not aware of any other ELF branded vape products?

6        A    No.

7        Q    But you're not certain you did a Google search

8    to find it?

9        A    I typically do.  I don't recall if I did it 100

10   percent.

11       Q    What do you believe ELF means as applied to the

12   product?

13       A    Absolutely nothing.

14       Q    I'm uploading the Exclusive Manufacturing

15   Agreement which will be DemandVape's Exhibit 8.

16            Can you tell me what this document is?

17       A    It is an Exclusive Manufacturing Agreement for

18   us to purchase the product that we just discussed.  And

19   the brand ELF auto draw mini concealed vaporizer as we

20   called it in the document.

21       Q    And you drafted this agreement?

22       A    Yes.

23       Q    Did you have a lawyer look at it?

24       A    No.

25       Q    Do you know if Shenzhen Clean Vapor Tech, who

Kevin Grija
April 05, 2023

1    was the manufacturer, had a lawyer look at it?

2        A    I do not.

3        Q    Do you know if they made any changes to this

4    agreement?

5        A    They didn't make any changes.  I think we

6    discussed some changes to it.  There was, you know, some

7    discussions over the business aspects, the quantities to

8    get the exclusive and those type of things so...

9        Q    Is this a -- where did you get this agreement

10   from?

11       A    Over the years I've had certain agreements that

12   we've used and I probably copied and pasted different

13   things from other means.

14            Where do you lawyers -- do the lawyers get the

15   agreements from?  Basic forms.  I've done some searches

16   and it looks like they all get them from the same place

17   so I don't really know.

18       Q    And it's your understanding that this agreement

19   assigns the right to patent and trademark to you.

20       A    Yeah.

21            Applied to the ELF, yeah.  Uh-huh.

22       Q    Can you -- can you tell me where there's

23   language in here that says -- and again, we're talking

24   about a product that they showed to you that already

25   preexisted and bore the trademark ELF on it -- and you

Kevin Brija
April 05, 2023

```
 1   were not involved with the selection of that trademark;

 2   correct?

 3           MR. ROTHMAN:  Objection, form.

 4           You can answer if you know.

 5           THE WITNESS:  Would you repeat that

 6       question, please?

 7   BY MR. DRANGEL:

 8       Q    I'll just rephrase it to make it easier.

 9           We had a preexisting product that was sent to

10   you that bore the trademark ELF; correct?

11       A    Yes.

12           MR. ROTHMAN:  Objection to form.

13   BY MR. DRANGEL:

14       Q    You were not involved with the selection and

15   placement of that trademark on the product; correct?

16           MR. ROTHMAN:  Objection to form.

17           THE WITNESS:  I was not.

18   BY MR. DRANGEL:

19       Q    Was there a discussion -- strike that.

20           Does this agreement say anywhere that they were

21   assigning the right to that trademark to you?

22           MR. ROTHMAN:  Objection to form.

23           THE WITNESS:  I believe it does.

24   BY MR. DRANGEL:

25       Q    Can you point that out to me?
```

Kevin Frija

April 05, 2023

1    A    Yes.  It says they agree and acknowledge that

2    all images and/or intellectual property, including but

3    not limited to patents, trademarks and copyrights to

4    properties applied for ELF auto draw mini conceal

5    vaporizer at the request of VPR Brands, purchaser, to ELF

6    vaporizer (the products) are exclusive to purchaser and

7    when used upon products means that such products are

8    approved by purchaser and on and on and on.

9    Q    Is there anything there that says -- do you see

10   the word assignment anywhere?

11        MR. ROTHMAN:  Objection, form.

12        Are you asking him to look for a word, Jason?

13   Can we just move on, please?  He's not going to

14   answer the question like that.

15        You can -- you can certainly make whatever

16   argument you want to make.  Okay?  Thanks.

17   BY MR. DRANGEL:

18   Q    What's the date of this agreement?

19   A    It says 30th day of November -- is that the

20   30th?  Yeah.

21        MR. ROTHMAN:  2017.

22   BY MR. DRANGEL:

23   Q    And we discussed earlier that you had

24   assigned -- you had filed an application on November 27th

25   for that trademark; is that correct?

Kevin Brija
April 05, 2023

1    we have purchased and continue to purchase the product.

2    So, you know, we have many orders and invoices and wires.

3    I don't know if they're all in this particular file.

4         Q    Right.

5         A    No.

6         Q    Do you actually know when you received the goods

7    in connection with the first purchase order from November

8    30th, 2017?

9         A    I'm sure that we can figure it out.  I think it

10   was sometime in January.  Might have been December, might

11   have been January.

12             I think we -- our first sales started in January

13   so probably January.

14        Q    I'm going to pull -- you can go to page 15 of

15   this document.

16        A    It's very hard to see.  Can you tell me what the

17   document is?

18             What is the title at the top to make sure we're

19   on the same page?

20        Q    Purchases by Item Detail.

21        A    Yes.  Okay.  Very hard to see.  That's correct.

22        Q    Can you just tell me what this document is and

23   what it shows?

24        A    Yeah.  This would the receiving -- I think, you

25   know, our receiving guy doesn't enter it until it's

Kevin Brija
April 05, 2023

1    Q    Is there a gradual decline over the years?

2    A    I wouldn't say it's gradual.  I think there was

3    a big decline in 2022, specifically.  And we increased

4    sales of the stick battery.  But I wouldn't say the other

5    necessarily declines.

6    Q    What do you attribute the declines in the

7    conceal product to?

8    A    I don't know.  2022, I don't know.  That was a

9    big decline so I'm not sure.

10    Q    Was there a change in the marketplace; was it

11    COVID related?

12    A    That's -- the ELF trademark came out and maybe

13    people just decided they didn't want to fill their own

14    tank and preferred to get it refilled.  I'm not sure.  I

15    really couldn't say.

16    Q    At some point you transitioned to do the same

17    thing; correct?

18    A    What's that?

19    Q    At some point you transitioned to sell the same

20    type of product.

21    A    No, no.

22    Q    Is that in the works?

23    A    Yes.

24    Q    When's that supposed to happen?

25    A    Yesterday.  Six months ago.

Kevin Brija
April 05, 2023

1    Q    Okay.

2    A    A year ago.

3    Q    What's that?

4    A    Very slow process, unfortunately.

5    Q    Okay.  Do you actually have a date for when

6    that's supposed to hit the market?

7    A    I don't.  We've licensed that out because there

8    was a very high barrier entry in the marketplace due to

9    the ELF mark product being out there.

10        As a matter of fact, so much so, when we go to

11   our customers they were being told by your clients if

12   they bought from us they wouldn't ship them anymore.  So

13   we have a very high barrier to entry due to ELF mark

14   being in the market.

15        It's been very difficult for us to come out with

16   that same product.

17        Usually, Like I said, it takes me three

18   days, maybe 30 days, as you can see in our historical.

19   This has taken me a year and I still am having

20   difficulty.  So I licensed it out because I couldn't do

21   it which is rare.

22   Q    Did you have plans to come out with that product

23   prior to the ELF mark hitting the marketplace?

24   A    We come out with product as the market demands.

25   Q    Were you developing that product prior to the

Kevin Frija
April 05, 2023

```
 1    ELF mark, to your knowledge, developing?
 2        A    There were a number of products that we sampled
 3    of prefilled vaporizers but we are very low on capital so
 4    our company was, you know, limited to the type of new
 5    products that we could come out with due to capital
 6    restraints.
 7        Q    You mentioned a license agreement.  Could you
 8    tell me about that agreement?
 9        A    Yeah.  It's a licensing agreement to license our
10    ELF brand product.
11        Q    And who is that license with?
12        A    ELF Brand LLC.
13        Q    And who owns ELF Brand LLC?
14        A    There are three people listed on as managers or
15    members of the LLC.  I'm not sure of their exact
16    ownership structure.
17        Q    Do you or anyone associated with VPR Brands own
18    any interest in that entity?
19        A    No.
20        Q    And what -- what are the terms of that
21    agreement?
22        A    It is exclusive to them if they have certain
23    sales or certain royalties paid to us.
24        Q    So it's an exclusive right to use the ELF mark
25    in connection with what products?
```

Kevin Frija
April 05, 2023

```
 1      A     With the trademarks and Class 34 that we have.

 2            All products.

 3      Q     All Class 34 products?

 4      A     Well, they may intend to launch new products

 5  which is why we filed some intent to use marks recently.

 6      Q     You did not retain any rights to sell ELF

 7  branded products?

 8      A     You know, I wrote the contract myself and you

 9  see how that goes.

10            Probably not.  I mean, I think we could if I

11  have to buy it from them.  I don't recall if it allows

12  for some feature of us purchasing from them without them

13  paying royalties that could be in there.  Maybe, maybe

14  not.  I don't recall.

15      Q     Did you cease selling the concealed product and

16  the battery products --

17      A     Oh, no, no, no.

18      Q     So you have the ability to continue to sell

19  those products.

20      A     Yes.

21      Q     And does their exclusive kick in on day one or

22  do they have to meet a minimum?

23      A     They have sometimes six months to meet a

24  minimum, I believe.

25      Q     And was there an advance paid?
```

Kevin Frija
April 05, 2023

1       A     Yes.

2       Q     How much was the advance?

3       A     Five hundred thousand dollars.

4       Q     And what's their first year minimum that they

5   have to hit?

6       A     Five hundred thousand per month to maintain

7   exclusivity.

8       Q     Okay.  Have you ever heard of a company called

9   GD Sigelei?

10      A     Yes.

11      Q     When did you first hear of GD Sigelei?

12      A     I can't say exactly when.  I've heard of that

13  brand of mod vaporizers probably back in 2012 or 2013,

14  maybe '14.  It's an older brand of vaporizers from back

15  in those -- that era.

16      Q     Okay.  And have you -- I mean, strike that.

17            Have you seen them at trade shows?

18      A     I don't recall particularly if I've seen them.

19  I never smoked, owned, bought or sold Sigelei vaporizer.

20  It's a type of vaporizer that's just different.  It

21  really only sells in an exclusive specialty vape shop

22  which, you know, experienced vapors would go to.

23            It's not -- you know, we typically sell to

24  convenience stores, gas stations, smoke shops and bodegas

25  and all types of other outlets and it's really not